**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **SHANE FOWLER and** | ) | |
| **KELVIN TAYLOR,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.:** |
| | ) | **1:21-CV-3303-MLB** |
| **NORFOLK SOUTHERN RAILWAY** | ) | |
| **COMPANY, DIANNE BARNETT,** | ) | |
| **STEPHEN WEATHERMAN, and** | ) | |
| **LEWIS WARE** | ) | |
| | ) | |
| **Defendants.** | ) | |

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

I.     **Introduction**

Plaintiffs Kelvin Taylor and Shane Fowler are currently employed as carmen in the Mechanical Department of Norfolk Southern's former Georgia Division,[1] where they are assigned to Dillard Yard in Savannah, Georgia. Complaint [Doc. 1], ¶¶ 1 and 2. Their Complaint asserts that they are being harassed and disciplined by their immediate supervisor, Senior General Foreman ("SGF") Lewis Ware in retaliation for bad ordering cars and for their "hot-line" complaints to Defendant

---

[1]     Now the Coastal Division.

1

Steve Weatherman in Norfolk Southern's Audit & Compliance Department about Ware.  Complaint [Doc. 1], ¶¶ 9-17.  The Complaint further alleges in paragraph 18 that an event of retaliatory discipline of the two carmen was imposed by Mr. Ware on November 17, 2018, based on their violation of the "Blue Flag Protection" rule on November 14, 2018.[3]  Taylor and Fowler also allege that the investigation of their hotline complaints conducted by Defendant Dianne Barnett, which found that the hotline complaints were without support, and the resulting correspondence from Steve Weatherman dated November 19, 2018, reporting his conclusion that the investigation findings did not show a violation of company policy, were both were contrary to the accurate facts.  Complaint ¶¶ 17 and 22.

As established herein, however, Weatherman's detailed list of the Plaintiffs' hotline allegations (Weatherman, Exhibit A) were thoroughly investigated by Ms. Barnett, which included interviews with 12 carmen and supervisors (including Taylor and Fowler), the results of which were documented in Barnett's 4-page report to Weatherman dated November 6, 2018 (Weatherman, Exhibit B; Barnett, Exhibit J).  As discovered by Ms. Barnett, the contention that Mr. Ware ordered the release of two defective and dangerous railcars is simply false.  (Barnett, p. 4, ¶11.)  As to the Blue Flag violation, the Plaintiffs do not dispute their failure to follow the rule, and after consulting with their union representation each signed a "START" discipline form agreeing to a 30-day deferred suspension as the penalty.  (Barnett, p.

2

9, ¶ 26, Exhibits G and H.)  But in their deposition testimony, Plaintiffs attempt to explain away the Blue Flag violation with clearly implausible arguments, regarding the length of the train and their being victims of a "set-up."  (Barnett, p. 8, ¶ 28; Ware, p. 5, ¶ 14.)

For these and the other reasons presented herein, the retaliation charges brought by Taylor and Fowler are without foundation and due to be dismissed.  The discipline and work instructions issued to these carmen by Mr. Ware were wholly unrelated to any alleged protected activity, and the retaliation claims represent an effort by these employees to use the FRSA as means of avoiding the consequences of a rule violation and covering poor work performance.

## II.   <u>Statement Of Material Facts</u>

1.     At all times relevant to this case, Dianne Barnett has been employed as a division mechanical officer for Norfolk Southern Railway Company.  In 2011, she became the Division Manager Mechanical Operations for the Georgia Division and was in that job in 2018 and 2019.  During that time, Barnett was the direct supervisor for Lewis Ware, the Senior General Foreman ("SGF") for Norfolk Southern's Georgia Division operations in Savannah, Augusta, Brunswick and Jacksonville. (Barnett, p. 1, ¶ 1.)

2.     Norfolk Southern's Mechanical Department is responsible for inspections and repairs of locomotives and all types of railcars which make up the

3

rolling stock of the railroad.  Inspection work is conducted by the carman craft, primarily in the receiving yards, from which arriving trains are broken up for reassembly, and in departure yards where outbound trains are inspected again prior to departure.  Dillard Yard in Savannah is one of Norfolk Southern's smaller facilities, having three receiving tracks, three outbound tracks, and thirty-seven classification tracks.  (Barnett, p. 1, ¶ 2.)

3.     Both the Federal Railroad Administration ("FRA") and the American Association of Railroads ("AAR") mandate inspections of specific railcar components, including the couplings, wheel assemblies, airbrake systems, and what are termed "safety appliances," such as ladders, handholds, crossovers and other devices designed to prevent injury to personnel working on the equipment.  (Barnett, p. 2, ¶ 3.)

4.     When railcar defects are observed during inspections, cars are "Bad Ordered" and a written description is entered on a tag which is then attached to the car.  (Barnett, p. 2, ¶ 4.)

5.     Although some repairs can be performed by carmen out in the yard where inspections take place, most "Bad Ordered" cars must be removed from the train and taken to a designated repair track where a large array of tools and equipment is available for conducting repairs.  (Barnett, p. 2, ¶ 5.)

4

6.     In cases involving a judgment call, such as the extent of wear or other visible conditions affecting coupler cross keys, brake shoes, and other railcar components, supervisors frequently inspect the Bad Ordered equipment to see if they agree with the need to remove the car for repairs, since taking equipment out of service can result in delays in customer service.  (Barnett, p. 2, ¶ 6.)

7.     Before becoming a supervisor in 2016, Lewis Ware worked for many years in the carman classification.  As a carman, he was sufficiently knowledgeable and experienced in the Mechanical Department operations, rules and regulations, such that as a gang leader he conducted training of other carmen in various locations across the Georgia Division.  (Barnett, p. 3, ¶ 7.)

8.     Disputes between supervisors and carmen over the existence or extent of railcar defects are not uncommon and, as with the cars referred to by Taylor and Fowler in their hotline call, supervisors ultimately decide the outcome of such disputes.  (Barnett, p. 3, ¶ 8.)

9.     In 2018 and to the present, Mr. Ware has requested to be notified by the Yardmaster when cars are Bad Ordered, even when he was away from Dillard Yard, since he lives nearby and can come to the yard for a review of reported defects without difficulty.  (Barnett, p. 3, ¶ 9.)

5

10.     Concern with whether Bad Order defects are actually present is part of the supervisor's job, just as is his responsibility for assuring that actual defects are properly repaired and the cars made safe for normal operation.  (Barnett, p. 3, ¶ 10.)

11.     In Barnett's investigation of the hotline complaints filed by Taylor and Fowler, she documented the fact that Lewis Ware's August 16, 2018, decision to override Taylor and Fowler on the defective condition of the coupler cross keys in railcars BKTY152743 and BKTY153453 was fully justified.  After requiring the removal of the Bad Order tags placed on those cars by Taylor and Fowler, the two cars departed the Savannah Yard and subsequently received multiple safety inspections by mechanical personnel at other locations with no cross key issues cited (and no car separations or derailments) and no cross key repairs made to either car. At the time of Barnett's report, there had been six subsequent inspections for BKTY152743, (Barnett, Exhibit A), and four subsequent inspections for BKTY153453, (Barnett, Exhibit B).  Those subsequent inspections establish that the cross keys on those two cars were not defective or in need of replacement.  (Barnett, p. 4, ¶ 11.)

12.     While it is correct that Ware declined Shane Fowler's repeated request to send the carmen an email ordering them to remove the Bad Order tags from the cars, the fact is that Fowler and Taylor could have been disciplined for placing Bad

PD.38046274.1

Order tags on two railcars for nonexistent cross key defects.  Mr. Ware did not initiate any disciplinary action in those circumstances.  (Barnett, p. 4, ¶ 12.)

13.     Contrary to the OSHA complaint allegations of Taylor and Fowler, Mr. Ware has never been disciplined for removing Bad Order tags from equipment. (Barnett, p. 4, ¶ 13.)

14.     Ware has been instructed that when he concludes that it is necessary to remove a Bad Order tag, the removal should be done by a carman or gang leader and not by him.  (Barnett, p. 5, ¶ 14.)

15.     There is no Bad Order limit or "goal" which should not be exceeded. All mechanical department inspection and repair operations have historical experience with Bad Order defects, and those numbers serve to forecast the need for manpower, parts, tools, and repair equipment.  (Barnett, p. 5, ¶ 15.)

16.     There is no thought or practice of simply ceasing to inspect or repair equipment when railcar defects exceed the budgeted expectation numbers, and to suggest otherwise is simply false.  (Barnett, p. 5, ¶ 16.)

17.     The Complaint in this case alleges that Mr. Ware retaliated against Mr. Taylor and Mr. Fowler by falsely charging them with a "Blue Flag" rule violation on November 14, 2018, when the two carmen were observed at Mason Yard working on the coupler slack adjuster of a car in order to release its brakes and thus allow an

7

outbound train to depart.  The requirements of the longstanding Blue Flag safety rule

are attached as Barnett, Exhibit C, and could not be more clear:

> Rule 650:    Employees assigned to inspect, test, repair, or service locomotives or cars must protect themselves against movement of such equipment in compliance with the requirements of blue signal protection.

(Barnett, p. 5, ¶ 17.)

18.    Blue Flagged equipment may not be coupled to or moved, and the blue

signal must not be passed by rolling equipment.  (*See* Barnett, p. 6, ¶ 18, Exhibit C.)

19.    Taylor and Fowler had failed to provide Blue Flag protection on this

occasion and contended that they instead were relying on the "Movement

Protection" procedure in Rule 22, which had been amended effective June 1, 2018

(Barnett, p. 6, ¶ 19, Exhibit D).

20.    Rule 22 applies when carmen are working on cars connected to a

locomotive which has a crew on board the engine.  The rule requires communication

by the carmen with the engineer ("equipment operator") of the locomotive and is

designed to prevent the connected locomotive crew from moving the cars on which

the carmen are working.  In contrast, the Blue Flag rule protects against the entry of

other rolling equipment on tracks with Blue Signals present, and prohibits coupling

to the protected cars.  (*See* Barnett, p. 6, ¶ 20, Exhibit C.)

21.     Blue signal protection is a federal mandate under 49 CFR 218.22, whereas "Movement Protection" is an additional form of safety codified by Norfolk Southern, but it cannot preempt the federal statute.  (Barnett, p. 6, ¶ 21.)

22.     Both of the Rules must be followed, and the May 21, 2018 bulletin (ODB No. 5) announcing the Movement Protection amendment to Rule 22 incorporates Blue Flag protection in the description of its purpose:

> The second purpose for the revisions to Operating Rule 22 "Fouling Equipment" are to codify requirements for Mechanical Department employees when necessary to foul equipment when an equipment operator is present or when using cable pulling systems, all within the confines of perimeter blue signal protection.

(Barnett, p. 6, ¶ 22, Exhibit D (*emphasis supplied*).)

23.     Norfolk Southern training records reflect that before the November 14, 2018, Blue Flag violation, both Fowler and Taylor had been trained in the amended Movement Protection procedure in Rule 22, which included review of ODB No. 5. (Barnett, p. 7, ¶ 23, Exhibits E and F.)

24.     The Blue Flag rule specifically refers to the requirement to provide Blue Flag protection when trains are on a main track:  "On main track, before workmen go on, under, or between rolling equipment, a blue signal must be displayed at each end of the rolling equipment."  (Barnett, p. 7, ¶ 24, Exhibit C, Section 658.)

PD.38046274.1

25.    Except for cars in a repair shop, there is no circumstance where the length or location of a train excuses the requirement that carmen provide Blue Flag protection before working on the cars.  (Barnett, p. 7, ¶ 25.)

26.    In accordance with Norfolk Southern's "START" discipline policy, both Taylor and Fowler were offered and accepted a deferred 30-day suspension for the Blue Flag violation, see signed START-forms attached as Barnett, p. 7, ¶ 26, Exhibits G and H.  The deferred suspensions were accepted by them after consultation with the carmen's union representative who was present to advise Fowler and Taylor, and who also signed the forms.  (*See* Barnett, Exhibits G and H.)

27.    The deferred suspension discipline offered and agreed to by Fowler and Taylor was exactly the same as the discipline issued by Mr. Ware's predecessor to carmen Steven Daniels for his earlier Blue Flag violation in 2017, (*see* Barnett, p. 8, ¶ 27, Exhibit I).  In 2019, Daniels received a 30-day actual suspension for a second Blue Flag violation which occurred in that year.  (Barnett, Exhibit I.)

28.    The November 14, 2018, Blue Flag violation committed by Fowler and Taylor was not the result of any "set-up" by Barnett and Lewis Ware.  Barnett was on vacation that week and had no discussion with Mr. Ware concerning the circumstances of the violation and no input on the proposed penalty, which was handled in her absence by Terry Williams, the Senior General Foreman at Inman Yard in Atlanta.  (Barnett, p. 8, ¶ 28.)

29.     Blue-flag violations are one of the most serious infractions on the railroad because of the potentially catastrophic consequences.  As reported to Barnett, the infraction was observed by Lewis Ware and a fellow supervisor during a saturation safety rules check and could not be ignored.  The fact that Fowler and Taylor had previously filed hotline complaints against Lewis Ware could not excuse the failure to follow the Blue Flag rules, and the deferred 30-day suspension penalty which they accepted was consistent with the same first-time infraction involving other employees.  (Barnett, p. 8, ¶ 29.)

30.     Barnett is familiar with the practice of temporarily stabilizing some defective freight car door mechanisms with wedges to keep them in place.  The temporary wedge repair is a common practice and one which has been observed by FRA inspectors on numerous occasions without comment.  The process is not a violation of any FRA or Norfolk Southern rule.  (Barnett, p. 8, ¶ 30.)

31.     Barnett has received training in Norfolk Southern's policy prohibiting retaliation against employees who engage in protected activity reports, and she has from time to time reminded the supervisors working under her of that anti-retaliation policy.  (Barnett, p. 9, ¶ 31.)

32.     In Barnett's investigation of the Fowler and Taylor hotline complaint, she did not find that there was substantiating evidence to support the allegation that Taylor and Fowler were required to do "more work" on cars that are Bad Ordered.

(Barnett, Exhibit J, p. 3, para. 5B.)  Barnett found that all three shifts working under Ware's supervision participate in repairing railcars whenever the Bad Order count begins to increase, the purpose being to apply additional manpower to expedite the process of returning the cars to service.  (Barnett, p. 9, ¶ 32.)

33.     Savannah carman Eddie Johnson, a working gang leader, reported to Barnett during her investigation that prior to Mr. Ware coming to Savannah, the previous SGF also required second and third shift employees to make repairs whenever the Bad Order count increased.  (Barnett, p. 9, ¶ 33, Exhibit J, p. 3, para. 5B.)

34.     With respect to the alleged retaliation by Ware of requiring Fowler and Taylor to transport water to the locomotives and pick up trash, Barnett found that the employees on every shift at Dillard Yard reported that they participate in transporting water to the locomotive pad, cleaning up trash that has accumulated and whatever additional tasks Mr. Ware assigns to them.  (Barnett, p. 9, ¶ 34, Exhibit J, p. 2, para. 3.)  The fact that other second shift employees (Steve Daniels, Jarrod Blocker and Dustin Wade) also complained that second shift "gets the worst of it," indicated to Barnett that Taylor and Fowler were not singled out for special retaliation treatment.  (Barnett, p. 10, ¶ 34, Exhibit J, p. 2, para. 3.)

35.     Taylor and Fowler alleged in their hotline complaint that they were ordered by Ware to carry the Norfolk Southern shop phone with them while out in

12

the yard on inspection duties in violation of FRA guidelines prohibiting that practice. (Weatherman, Exhibit A.)  As proof of the allegation, Taylor provided Barnett with an audio recording of a conversation among Taylor, Fowler and Ware on the subject, which plainly discloses that Ware's instruction was that the carmen keep the shop telephone in the truck when they traveled to inspect the cars, so it would be present and available to periodically check messages.  At no place in the recording did Mr. Ware direct the employees to keep the telephone on their person while they were working the trains.  There was no violation of an FRA rule.  (Barnett, p. 10, ¶ 35, Exhibit J, p. 2, para. 4.)

36.    Another hotline complaint asserted by Taylor and Fowler involved the September 19, 2018, repair of a Bad Ordered railcar by a transportation department supervisor, which was questioned by Mr. Fowler in radio transmissions with Ware and the Yardmaster.  Mr. Ware stated that he did not actually perform the repairs and only provided tools and verbal instructions to the transportation department supervisor to give him experience about related mechanical operations.  Barnett instructed Mr. Ware that in the future he should have a carman make any such repairs, and as a consequence of his participation in the Blue Flag violation, Ware received a 25% reduction in his 2019 annual incentive award and a warning that any future violation of the Blue Flag rule could result in more severe discipline up to and including dismissal.  (*See* Barnett, p. 13, ¶ 36, Exhibit K.)

13

37.    Lewis Ware started work for Norfolk Southern in Macon, Georgia as a fireman and oiler in 1990 at the age of 18.  He worked for several years as a carman and then as a gang leader traveling to various locations in the Georgia Division to conduct carman training.  (Ware, p. 1, ¶ 1.)

38.    Ware became a Mechanical Supervisor for Norfolk Southern in March of 2016, went to St. Louis, Missouri in February of 2017 as a General Foreman, and was assigned to Dillard Yard in Savannah in November of 2017, as Senior General Foreman.  Ware also has responsibility for Norfolk Southern yards in Augusta, Brunswick and Jacksonville.  (Ware, p. 1, ¶ 2.)

39.    Both Taylor and Fowler were working at Dillard Yard when Ware arrived in 2017.  Ware assigned them to additional repair work when the number of cars "Bad Ordered" for defects needing repair were high, and when the mechanical work was slack, Ware assigned Fowler and Taylor to clean-up, water delivery and other routine chores.  Ware has not assigned Fowler and Taylor to any different work than he has to other carmen employees at Dillard Yard.  (Ware, p. 2, ¶ 3.)

40.    It is part of Ware's job to evaluate Bad Order defects reported by carmen during their inspection of the trains.  He does so when he wants to make sure that the defect is actually present and that taking the car out of service for repairs is necessary.  Carmen with less experience may at times not properly evaluate a defect,

particularly something like the degree of wear on a coupler mechanism cross key which holds the coupler in place.  (Ware, p. 2, ¶ 4.)

41.    Ware has inspected literally thousands of coupler cross keys during his work for Norfolk Southern, and on August 15, 2018, Ware concluded that the cross keys on the two cars which Taylor and Fowler proposed to Bad Order were clearly not in need of replacement.  When Taylor and Fowler strongly disagreed with Ware's conclusion not to send the cars to the repair track, he told them on August 16 that he would take full responsibility for his decision, and there was no need for Ware to put his instructions in an email.  (Ware, p. 2, ¶ 5.)

42.    Railcars (including the cross keys) are inspected each time they enter a yard, and the subsequent inspection records on those two cars which were researched by Dianne Barnett fully supported Ware's judgment that the two cross keys were not defective.  (Ware, p. 3, ¶ 6.)

43.    According to Ware, there is no truth to the allegation that Ware has frequently threatened to "write-up" Fowler and Taylor but he does expect them to follow his instructions, and at times he has to remind them if they are not doing as he requested.  (Ware, p. 3, ¶ 7.)

44.    Carmen under Ware's supervision are not disciplined because they Bad Order railcars but they can be disciplined when they violate the rules.  The Bad Orders written by Shane Fowler and Kelvin Taylor were by no means the highest

number among carmen under Ware's supervision.  Attached as Ware, Exhibit A is a list of Bad Order entries at locations under his supervision for the months of July, August and September of 2018.  The greatest number of Bad Orders by far were entered by carman Charles Hester who had 22 in that 3-month period.  Hester received no discipline in the remainder of 2018, in 2019, or 2020.  The next highest was Kelvin Taylor with seven; Shane Fowler had six, as did two others, Jarrod Blocker and Edward Higginbotham.  Mr. Blocker had no discipline in the remainder of 2018, in 2019, or in 2020, but received a letter of caution for an FRA safety appliance infraction on September 27, 2019.  Mr. Higginbotham received no discipline in the remainder of 2018, in 2019 or in 2020.  (Ware, p. 3, ¶ 8.)

45.    On November 14, 2018, Macon Mechanical Supervisor Phillip Reynolds and Ware were conducting a "saturation rules check" at the Savannah operation.  Mason Yard is a short distance from Dillard Yard and is considered part of the Savannah operation.  (Ware, p. 4, ¶ 10.)

46.    Saturation rules checks are regularly required in order to comply with FRA regulations for the enforcement of safety procedures.  49 CFR 217.9.  A saturation rules check in the mechanical department involves two or more supervisors going to the various work sites to observe carmen in the performance of their jobs and to evaluate whether they are in compliance with the safety requirements and procedures involved with their work.  (Ware, p. 4, ¶ 11.)

PD.38046274.1

47.     DMMO Dianne Barnett had previously scheduled the saturation check for Savannah for the month of November, 2018, and November 14 was selected to perform the safety checks.  On that day Supervisor Reynolds and Ware observed carmen working in both Dillard Yard and at the Mason Yard which serves the Port of Savannah.  (Ware, p. 4, ¶ 12.)

48.     When Reynolds and Ware arrived at Mason Yard, they observed that carmen Fowler and Taylor were working on a freight car in a lengthy train without Blue Flag protection.  Neither of the Plaintiffs denied that there was no Blue Flag compliance when they were confronted, but instead asserted that they were following the recently amended Rule 22 "Movement Protection" procedure by communicating with the locomotive engineer on the engine connected to the train. (Ware, p. 5, ¶ 13.)

49.     The fact that the car on which Taylor and Fowler were working was part of a train which may have been approximately a mile long and extended out on the main track by no means negates the requirements of Rules 650 and 658 to post a Blue Flag signal at the front and rear of the train which they had neglected to do. There is no train that is "too long" for Blue Flag compliance.  (Ware, p. 5, ¶ 14.)

50.     When Rule 22 was amended in June of 2018, Ware had conducted training for all of the carmen under his supervision, during which Ware pointed out that the language of bulletin ODB No. 5 which explains the amendment, specifically

17

states that it covers movement protection "within the confines of perimeter blue signal protection." Ware's training contained no suggestion that Amended Rule 22 was intended to supersede or override Blue Flag Rule 650. (Ware, p. 5, ¶ 15.)

51.    Ware has not permitted any carmen in Savannah or elsewhere in the area of his responsibility to use only movement protection under Rule 22 where Blue Flag protection is required. Both rules must be followed. (Ware, p. 5, ¶ 16.)

52.    Since their Blue Flag violation was a first offense on that rule, Taylor and Fowler were offered the same 30-day deferred suspension normally offered to other first time offenders under Norfolk Southern's "START" discipline policy, in which employees have the option to admit guilt, accept responsibility and agree to appropriate discipline without going through the formal disciplinary investigative hearing provided in the carmen's union collective bargaining agreement which they also have the option to do. (Ware, p. 5, ¶ 17.)

53.    The START discipline offer was discussed with Fowler and Taylor at a conference held on November 17, 2018, attended by Ware and Lewis Smith, the carmen's union representative. Taylor, Fowler and the union representative agreed to the proposed START discipline and signed the form acknowledging that acceptance. (Ware, p. 6, ¶ 18; Barnett, Exhibits G and H.)

54.    Dianne Barnett did not speak with Ware about the November 14, 2018 Blue Flag violation committed by Taylor and Fowler at the time it occurred or when

18

the START discipline was offered and accepted on November 17, 2018.  Barnett was on vacation that week, and for that reason Ware discussed the case with Terry Williams, the Senior General Foreman at Inman Yard in Atlanta, who was the designated contact for such matters in Barnett's absence.  (Ware, p. 6, ¶ 19.)

55.    The allegation that the Blue Flag violation committed by Taylor and Fowler was some kind of "set-up" orchestrated by Ms. Barnett and Ware or that Ware made a statement to that effect is completely false.  (Ware, p. 6, ¶ 20.)

56.    As to Fowler and Taylor's allegation that Ware has approved the release of railcars with defective sliding doors fixed in place with wedges to prevent their movement, Ware has done so depending on the type of mechanical defect with the doors.  The temporary solution with wedges has been observed by FRA inspectors on many occasions without any question or assertion that it is an unsafe procedure. (Ware, p. 6, ¶ 21.)

57.    Ware has been instructed in Norfolk Southern's policy prohibiting acts of retaliation against employees who engage in protected activities.  Except for their admitted Blue Flag violation on November 14, 2018, Ware has not issued any other discipline to Shane Fowler or Kelvin Taylor.  (Ware, p. 7, ¶ 22.)

58.    Steve Weatherman was employed by Norfolk Southern Corporation as Senior Compliance Investigator in the Audit & Compliance Department.  In October of 2018, his duties included receiving and responding to calls on Norfolk Southern's

19

Ethics Hotline number which is used by employees and non-employees for making policy violation and ethics complaints against Norfolk Southern employees, including supervisors. (Weatherman, p. 1, ¶ 1.)

59.    On October 1, 2018, Weatherman answered a hotline call from carman Kelvin Taylor complaining that his immediate supervisor, Lewis Ware was violating FRA regulations by sending unsafe railcars out in trains without repairing defects which had been discovered during carman inspections and by harassing Taylor and carman Shane Fowler when they insisted that repairs be made. On the same day or perhaps the following day, Shane Fowler also called with similar complaints about Mr. Ware. Exhibit A to Weatherman's Declaration is a true and correct copy of his notes of the allegations made by Taylor and Fowler against Lewis Ware in those calls. (Weatherman, p. 1, ¶ 2.)

60.    With approval from upper management in the Mechanical Department, Dianne Barnett was assigned by Weatherman to investigate the allegations of Fowler and Taylor. At the time, Ms. Barnett was the Division Manager Mechanical Operations for the Georgia Division. (Weatherman, p. 2, ¶ 3.)

61.    According to Weatherman, there is nothing at all unusual about assigning department supervisors to such investigations, since they are familiar with Mechanical Department operations, rules and procedures, whereas Audits &

Compliance Department employees do not have such familiarity. (Weatherman, p. 2, ¶ 4.)

62.     Weatherman did not tell Fowler or Taylor that their case would be investigated by someone outside of the Georgia Division Mechanical Department. (Weatherman, p. 2, ¶ 5.)

63.     Exhibit A to the Weatherman Declaration refers to documents and recordings described as supporting the complaints against Ware which were sent to Weatherman by Fowler and Taylor at the time they made the hotline complaints, and he forwarded all of those to Dianne Barnett for use in her investigation. (Weatherman, p. 2, ¶ 6.)

64.     Dianne Barnett conducted a detailed investigation of the allegations made by Fowler and Taylor, which included interviews with 12 carmen and supervisors, the results of which are documented in Barnett's 4-page report to Weatherman dated November 6, 2018, a copy of which, with exhibits, is Weatherman, Exhibit B. (Weatherman, p. 3, ¶ 7.)

65.     Barnett found that Lewis Ware's August 16, 2018, decision to override Taylor and Fowler on the defective condition of the coupler cross keys in railcars BKTY152743 and BKTY153453 was justified by the fact that after the two cars departed the Savannah Yard, they subsequently received multiple additional inspections by mechanical department personnel at other Norfolk Southern locations

with no cross key defects cited and no cross key repairs made to either car. (Weatherman, p. 3, ¶ 8.)

66.     Based on his review of Barnett's entire investigation report of Fowler and Taylor's October 2018 complaints, Weatherman concluded that the findings did not show a violation of Norfolk Southern policy and he communicated that conclusion to Kelvin Taylor in a letter on November 19, 2018, Weatherman, Exhibit C.  (Weatherman, p. 3, ¶ 9.)

67.     The allegation in the OSHA complaint filed by Taylor and Fowler describing Weatherman's November 19, 2018 letter reporting the conclusion of the investigation as somehow suspicious in its timing is completely without foundation. Fowler and Taylor had not complained to the Audit & Compliance Department of the November 14, 2018, Blue Flag violation with which they were charged, and Weatherman had no knowledge of the Blue Flag charges against them at the time of his correspondence to Mr. Taylor.  (Weatherman, p. 3, ¶ 10, Exhibit C.)

68.     Weatherman had no role in the decision to discipline Fowler and Taylor for the November 14, 2018, Blue Flag violation, and did not discuss that charge with Dianne Barnett, Lewis Ware or any other Norfolk Southern supervisor. (Weatherman, p. 4, ¶ 11.)

22

III.   **Plaintiffs' Deposition Allegations.**

Deposition allegations of Shane Fowler.

1.     Lewis Ware allegedly engaged in the unsafe practice of wedging or plugging doors on Bad Ordered freight cars and sending them on in trains rather than to the repair track.  (Fowler Tr. 31:12-25, 32:1-25, 33:1-25, 34:1-25, 35:1-25, 36:1-10.)

2.     Fowler and Taylor should not have been cited for a Blue Flag violation at Mason Yard on November 14, 2018, because the train on which they were working was a mile long, portions of which were on the main track where Blue Flag protection allegedly could not be achieved.  (Fowler Tr. 142:19-25, 143:1-8.)

3.     Shortly after the START discipline was accepted on November 17, 2018, Shane Fowler allegedly overheard Lewis Ware say that "they tried to get me and we got them.  And we went out there and they didn't--they used the movement protection but we got them on the Blue Flag protection, it is basically it, and Dianne was behind all of it."  (Fowler Tr. 159:4-19, 160:5-10.)

4.     Shane Fowler has suffered no monetary loss of any kind as a result of the allegations in this FRSA case.  (Fowler Tr. 123:25, 124:1-6.)

Deposition allegations of Kelvin Taylor.

1.     It was not possible for Taylor and Fowler to establish Blue Flag protection on the train they were working on November 14, 2018, at Mason Yard. (Taylor Tr. 54:6-23.)

2.     Kelvin Taylor claims that he lost one hour and fifteen minutes of pay when he was sent home before the end of the shift on November 14, 2018, because of the Blue Flag violation.  (Taylor Tr. 69:5-25.)

## IV.   **Proceedings Before OSHA and Federal Railroad Administration**

Taylor and Fowler filed their separate FRSA complaints with OSHA on March 11, 2019.[2]  After an investigation, on April 21, 2020, the Secretary issued findings in support of the following conclusion:

> Although Plaintiffs did engage in protected activities, the evidence demonstrates that Defendant acted reasonably when it concluded that Plaintiffs had violated the requirements of Blue Flag protection. Moreover, the offered START and deferred punishment also appears to negate a finding of a retaliatory intent.  Consequently, this complaint is dismissed.

(Complaint [Doc. 1], ¶ 30.)

On May 5, 2020, Plaintiffs appealed the Secretary's dismissal.   (Complaint, ¶ 31.)

---

[2]     Although filed in separate names, the charge letters were otherwise identical.

In June of 2019, Plaintiffs' counsel, William Tucker, submitted verbal and written complaints to the Federal Railroad Administration requesting an investigation as to the validity of the complaints against Lewis Ware.  (Summary Judgment Supporting Exhibit A.)  In correspondence addressed to Bill Tucker from Regional FRA Administrator Carmen Patriaca dated September 4, 2019, she advised Mr. Tucker of two conclusions regarding his complaint:

> During the FRA investigation, it was determined that the cars in question, BKTY152743 and BKTY153453 did not have defects meeting FRA minimum standards. . . .  The investigation could not substantiate harassment or intimidation of car inspectors when they bad order railroad cars.

(Summary Judgment Supporting Exhibit A.)

The referenced September 4, 2019, correspondence to Mr. Tucker from the FRA is described in part in paragraph 23 of the Complaint which makes no reference to the quoted portions set forth above.  The correspondence was produced by Mr. Tucker to Defendants' counsel.

## V.   Case Analysis and Argument

### A.   Taylor And Fowler Must Satisfy The Requirement To Prove Intentional Retaliation Prompted By Protected Activity.

In order to establish a claim under the whistleblower protections of the 2007 amendments to the Federal Rail Safety Act ("FRSA"), 49 U.S.C. § 20109, Fowler and Taylor must establish by a preponderance of the evidence that:  (1) they engaged

in protected activity; (2) the employer knew that they engaged in the protected activity; (3) they suffered an adverse personnel action; and (4) the protected activity was a contributing factor in the adverse action. *See e.g.*, 29 C.F.R. § 1982.104(e)(3); *Gutierrez v. Norfolk Southern Railway Co.*, 2014 WL 551684 at *4 (N.D. Ill. Feb. 12, 2014). If the Plaintiffs show that they engaged in protected activity, they must also establish that the protected activity was a "contributing factor" to the Blue Flag discipline about which they complain. *See* 49 U.S.C. § 42121(b)(2)(B)(iv); 29 C.F.R. § 1982.109(a). Defendants concede that the Plaintiffs' hot line complaint to Steve Weatherman containing allegations of two unsafe railcars and asserting retaliation by Mr. Ware was protected activity under the FRSA.

There is a circuit split regarding whether discriminatory animus is required to establish the "contributing factor" element in a FRSA retaliation case. As described in *Grantham v. CSX Transportation, Inc.*, No. CV 329-065, 2022 WL 677575 at 4 (S.D. Ga. March 7, 2022), the split is between the Second, Fourth, Fifth, Sixth, Seventh, and Eighth Circuits, which find that there <u>is</u> such a requirement, and the Third and Ninth[3] which state that an employee need <u>not</u> demonstrate retaliatory motive.[4] The Third Circuit case, *Araujo v. New Jersey Transit Rail Operations, Inc.*,

---

[3]   *Frost v. BNSF Ry. Co.*, 914 F.3d 1189, 1196 (9th Cir. 2019).

[4]   Although the Eleventh Circuit has not directly addressed the requirements for a claim under the FRSA, in *Grantham* the Southern District of Georgia recently concluded that FRSA plaintiffs – like retaliation plaintiffs under Title VII and other anti-retaliation statutes – must demonstrate intent to retaliate in order to state a claim, holding that the "[t]he intentional retaliation standard is the correct standard to apply in this [FRSA] case." Also, the Second Circuit very recently addressed the intentional standard in a case brought under the Sarbanes-Oxley

708 F.3d 152, 158 (3d Cir. 2013), includes a brief, conclusory analysis of the issue, relying heavily on a case that was applying a different statutory scheme with materially different language.  *See Armstrong v. BNSF Ry. Co.*, 880 F.3d 377, 382 & n.1 (7th Cir. 2018) (pointing out *Araujo*'s flawed reasoning); *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 791 & n.4 (8th Cir. 2014) (same).  When approached with the same legal issue a second time, the Eighth Circuit again found that discriminatory animus was required, and declined to take the issue *en banc*; the United States Supreme Court denied certiorari.  *See Blackorby v. BNSF Ry. Co.*, 849 F.3d 716 (8th Cir.), rehearing and rehearing en banc denied, cert. denied, 138 S. Ct. 264, (2017).[5]

From the foregoing analysis, under the FRSA's standard for causation, "a prima facie case does not require that the employee conclusively demonstrate the employer's retaliatory motive. . . .  But the contributing factor that an employee must prove is **intentional retaliation** prompted by the employee engaging in protected

---

Act, which has an anti-retaliation provision nearly identical to the FRSA anti-retaliation provision, and held that "the antiretaliation claim requires a showing that the employer took the adverse employment action against the whistleblower-employee with retaliatory intent."  *Murray v. USB Securities, LLC*, Docket Nos. 20-4202 and 21-56 (2nd Cir. August 5, 2022) *quoting Tompkins v. Metro-N. Commuter R.R. Co.*, 983 F.3d 74, 82 (2nd Cir. 2020 ("some evidence of retaliatory intent is a necessary component of an FRSA claim.") and *Armstrong v. BNSF Ry. Co*, 880 F.3d 377, 382 (7th Cir. 2018) ("The [FRSA] prohibits intentional discrimination in response to an employee's performance of a protected activity.  That is to say, an employer violated the statute only if the adverse employment action is, at some level, *motivated* by discriminatory animus." (citation omitted) (emphasis in original)).

[5]  On July 31 2020, the 8th Circuit again addressed the issue in *Neylon v. BNSF Railway Company*, 968 F.3d 724 (8th Cir. 2020).  After extensive analysis of the circuit court decisions that have addressed the issue, the 8th Circuit concluded:  "regardless of other circuits' decisions, this Court requires Neylon to show intentional retaliation."  *Id.* at p. 4.

PD.38046274.1

activity." *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 791 (8th Cir. 2014) (*emphasis added*).

Even were it correct, that Norfolk Southern may have committed error in making its decision, which is not at all true here with the Blue Flag violation, that is not alone sufficient: "The question is not whether an employer made an erroneous decision; it is ***whether the decision was made with discriminatory motive.***" *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995) (*emphasis added*). **"In the absence of evidence connecting his protected activity to the discharge, [a plaintiff] is not entitled to FRSA anti-retaliation relief even if [the employer] inaccurately concluded that he" violated a company rule.** *Kuduk*, 768 F.3d at 792 (*emphasis supplied*). **As long as the "employer takes an adverse action based on a good faith belief that an employee engaged in misconduct, then the employer has acted because of perceived misconduct, not because of protected status or activity."** *Richey v. City of Indep.*, 540 F.3d 779, 784 (8th Cir. 2008) (emphases supplied).

In short, to show that protected activity was a contributing factor in the disciplinary action taken against them for the Blue Flag violation, Taylor and Fowler must point to something more than the fact that they were disciplined for the Blue Flag incident. *See Gibbs v. Norfolk S. Ry. Co.*, No. 3:14-CV-587-DJH-DW, 2018 WL 1542141, at *8 (W.D. Ky. Mar. 29, 2018) (summary judgment for defendant

because plaintiff failed to prove that safety complaints were a contributing factor in decision to dismiss him from employment).

**B.**      **Dianne Barnett Correctly Concluded That There Was No Basis For The Allegation That Lewis Ware Had Violated FRA Or Norfolk Southern Policy Based On His Decision That The Railcar Cross Keys Bad Ordered By Taylor And Fowler Were Not Defective.**

Only short work is required to dispose the Plaintiffs' allegation that Dianne Barnett and Stephen Weatherman reached an erroneous conclusion in the investigation of Plaintiffs' hotline allegations. As evident in Weatherman's October memo listing their assertions and Barnett's November 6, 2018, investigation report and its exhibits, the detail and objectivity with which these Defendants handled the investigation of Fowler and Taylor's complaints against Lewis Ware was anything but shallow or perfunctory. Barnett interviewed 12 carmen and supervisors, including both telephone and in-person interviews with Fowler and Taylor. (Barnett, Exhibit J.)

At the threshold, a review of Barnett's report reveals the extent to which Fowler and Taylor included out-right fabrications in their presentation to Steve Weatherman. Contrary to their allegations, Lewis Ware has never been disciplined for removing Bad Order tags; all carmen, not just Taylor and Fowler, are required to perform increased work when Bad Order numbers increase and with necessary transporting of water and clean-up; Ware did <u>not</u> order Taylor and Fowler to violate

the FRA telephone rules.  Barnett, Exhibit J, para. 2, 3, 4, and 5B.  Obviously the "white wash" allegation is nothing but the product of the complainant's unhappiness with Barnett's well documented report.

There can be no question that Barnett was correct in finding that Lewis Ware's August 16, 2018 decision to override Taylor and Fowler on the defective condition of the coupler cross keys in railcars BKTY152743 and BKTY153453 was fully justified.  After removal of the Bad Ordered tags, the cars left Savannah Yard and were subsequently inspected on multiple occasions with no indication of any problems with the cross keys.  (Barnett, ¶ 22 and Exhibit J, ¶ 5A.)

In addition, and as determined by the FRA following the investigation requested by Mr. Tucker, Taylor and Fowler provided no substantiating evidence to support the Plaintiffs' allegation that Ware retaliates against employees who Bad Order railcars  (*See* FRA correspondence of September 4, 2019, to Mr. Tucker, Summary Judgment Supporting Exhibit A.)  The only specific incident provided to Dianne Barnett by Fowler and Taylor regarding this allegation was the tape-recording of Ware's August 16, 2018 statement advising Mr. Fowler "that the cars would be leaving the shop and instructing him not to [Bad Order] tag them or he would handle him for failure to follow instructions."  And that "if the car was taken apart and found to have no defects, it would constitute falsifying a Bad Order." (Barnett, Exhibit J, ¶ 5(c).)  But given the context, Ware's effort to bring an end to

30

Fowler and Taylor's obstinate refusal to follow his instructions by giving those warnings was more than justified.  Plaintiffs were insisting that they were correct about the cross key defects, Weatherman, Exhibit A, but they were not, as borne out by the subsequent inspection history.  (Barnett, Exhibit J, ¶ 5A.)  Moreover, as the supervisor in charge, and one who had himself assessed a very large number of cross keys, Ware, ¶ 5, Lewis Ware had expressly advised Fowler and Taylor that he was accepting full responsibility for the decision to release the cars.  At the end of the day, Fowler and Taylor were not charged with anything arising from the August 15/16 disagreement, which is an indication of the restraint exercised by Mr. Ware in dealing with the two recalcitrant carmen.

All the foregoing supports Dianne Barnett's and the FRA's conclusions that employees under Ware's supervision were not being punished or retaliated against for Bad Ordering cars, the most striking confirmation of which is the fact that in the 3-month period surrounding the August 15/16, 2018 confrontation between Ware and the Plaintiffs, carmen C.C. Hester Bad Ordered 22 railcars and received no discipline for the next two years.  (Ware, p. 3, ¶ 8.)  There is simply no substance to the allegation that Dianne Barnett's investigation and Steve Weatherman's acceptance of her conclusions had it wrong.  It is just the opposite.

31

**C.**  **The Admission Of The November 14, 2018, Blue Flag Violation And Acceptance Of Proportional Discipline By Taylor And Fowler Are Undisputed And Unconnected To Their Protected Activity By Any Credible Evidence.**

Plaintiffs' attempt to explain away their admitted Blue Flag violation with reliance on the amended Rule 22 Movement Protection procedures is simply unavailing. First and foremost, the Blue Flag regulation is clear and unequivocal:

> Rule 650:  Employees assigned to inspect, test, repair, or service locomotives or cars must protect themselves against movement of such equipment in compliance with the requirements of blue signal protection.

(Barnett, p. 5, ¶ 17.)

When Rule 22 was amended in June of 2018, its purpose was described in Bulletin ODB No. 5 as covering movement protection "within the confines of perimeter blue signal protection." (Ware, p. 5, ¶ 15.) Moreover, Plaintiffs' efforts to justify the lack of Blue Flag protection based on Rule 22 was abandoned by both Fowler and Taylor in the November 17, 2018, START conference attended by their union representative, Lewis Smith. In that meeting, both Taylor and Fowler agreed to the proposed START discipline and signed the form acknowledging that acceptance and their responsibility for their actions. Barnett, Exhibits G and H.

In the face of these undisputed facts, Plaintiffs have rolled out two new assertions, neither of which were included in the March 11, 2019, OSHA charge letters. The first is that the train on which they were working without Blue Flag

protection at the Mason Yard on November 14, 2018, was so long that a portion extended out onto the main track where there was no convenient switch which could be closed to prevent the entry of other equipment.  Fowler Tr., pp. 142-143; Taylor Tr., p. 54  Second, Shane Fowler testified that he overheard Lewis Ware commenting to a trainmaster that "they [meaning Fowler and Taylor] tried to get me and we got them.  They used movement protection but we got them on Blue Flag protection, and Dianne was behind all of it."  Fowler Tr., p. 159.

The extent to which the first assertion is completely bogus is revealed by merely reading Section 658 of the Blue Flag rule:

> On main track, before workmen go on, under or between rolling equipment, a Blue Signal must be displayed at each end of the rolling equipment.

(Barnett, Exhibit C, Section 658.)  Both Barnett and Ware, two railroad officers with years of experience, have testified that there is no exception for Blue Flag protection based on the length or location of any train.  (Barnett, p. 7, ¶ 25; Ware, p. 5, ¶ 14.) For experienced carmen as Taylor and Fowler hold themselves out to be, such an argument is an patently incredible, and they will be unable to cite any rule or decision supporting that contention.

The "set-up" argument, which appears nowhere in Plaintiffs' original complaint before OSHA, has all the indicia of being concocted to add an otherwise absent element of intentional retaliation by Ware and Barnett to this case.  The notion

that Dianne Barnett and Lewis Ware would arrange a brake failure on one car in a mile long train at Mason Yard in order to test Taylor and Fowler's compliance with the Blue Flag rule is nothing short of preposterous.  But Plaintiffs' have another problem, which is that they are unable to dispute the fact that Dianne Barnett was on vacation during the week of the infraction, she had no discussion with Lewis Ware about the incident or the penalty, and that Ware's conversation on the subject was limited to his communication with Georgia Division Senior General Foreman Terry Williams.  (Barnett, p. 8, ¶¶ 28 and 29; Ware p. 6, ¶¶ 19 and 20.)  For these reasons, Plaintiffs' efforts to fabricate intentional retaliation simply do not fit the picture.  *See Martin v. Allie Property and Casualty Insurance Company*, 794 Fed. Appx. 883, 886 (11th Cir. 2019) (When ruling on a summary judgment motion, "facts need not be viewed in the light most favorable to the nonmoving party where a dispute over those facts is not 'genuine.'") (citation omitted).  *See also Hunter v. Leeds, City of*, 941 F.3d 1265, 1281 (11th Cir. 2019) (Although a court is to resolve all reasonable inferences of the facts in the non-movant's favor, "we draw those inferences only 'to the extent supportable by the record.'"  (quoting *Pensley v. Eslinger*, 605 F.3d 843, 853 (11th Cir. 2010)).

In both *Martin* and *Hunter*, *supra*, the 11th Circuit cited affirmatively the Supreme Court's opinion in *Scott v. Harris*, 550 U.S. 372 (2007).  In *Harris*, writing for the Court, Justice Scalia addressed the fact, also present here, that the

34

Defendant's version of events was so utterly discredited by the record that no reasonable jury could have believed him and thus his version of events should not be adopted on summary judgment:

> When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version for purposes of ruling on a motion for summary judgment.

550 U.S. at 380.

The "set up" allegation fails for want of any credible support.

### D.    **Defendants' Have Proved Their Affirmative Defense.**

Even if Mr. Taylor and Mr. Fowler were deemed to have made a *prima facie* case, which is demonstrably lacking here, Defendants can avoid liability if they "demonstrate" by clear and convincing evidence, that the same unfavorable personnel action would have been taken in the absence of protected activity. *See Echols v. Grand Truck Western Railway Co.*, ARB 16-022 (October 5, 2017) (Comparators for purposes of proving affirmative defense need not have engaged in identical rule violations to be similarly situated to complainant, but must only "have enough in common to allow for a meaningful comparison." In *Echols* the ARB affirmed the ALJ's finding that the carrier could rely on evidence that it had disciplined employees for violating different subsections of the same rule that complainant violated.)

35

Norfolk Southern and Lewis Ware have enforced the Blue Flag rule in similar cases, "clear and convincing" examples of which are included in Exhibit I to Ms. Barnett's Declaration. In February of 2019, Dillard Yard carman Steven Daniels was observed by Lewis Ware in a Blue Flag violation for which he was cited for discipline. Since Ware's predecessor SGF had assessed Daniels with a 30-day deferred suspension for a previous Blue Flag violation in 2017 (the same first offense penalty offered to Taylor and Fowler), Daniels was given a 30-day actual suspension without pay for his 2019 second infraction. Both violations are reflected in Daniels' career service record, Barnett, Exhibit I. Since discipline for such violations has been consistently applied in similar cases, it cannot be seriously disputed that the same course of disciplinary action with Taylor and Fowler would have been taken by Norfolk Southern and Ware regardless of Plaintiffs' protected activity.

In addition, Defendants have offered undisputed evidence that one of Lewis Ware's employees has a record of Bad Orders which substantially exceeds those of Fowler and Taylor, and two other employees have a record of Bad Orders of one less than Taylor, with seven, and the same number as Fowler, with six. (Ware, p. 3, ¶ 8 and Exhibit A.) None of these three comparators received discipline having any remote temporal proximity to their Bad Order reports. While a history of compliance with the FRSA with some employees does not preclude the possibility of discriminatory conduct with others, it clearly implies that Taylor and Fowler's Blue

36

Flag violation sets their case apart.  It is undisputed that three months elapsed between the Bad Order confrontation between Fowler, Taylor and Lewis Ware in August of 2018 and the Blue Flag incident on November 14 of that year.  The evidence firmly shows that Norfolk Southern believed Fowler and Taylor committed a serious safety offense, and it was that conduct, not protected activity, that led to the disciplinary measures taken against them.  The Defendants therefore qualify for the affirmative defense provided in § 42121(b)(2)(B)(iv).

### E.    Summary Judgment For Defendants Is Also Due On Taylor And Fowler's Claim For Punitive Damages.

Finally, since there is no evidence of "reckless or callous disregard for the Plaintiffs' rights, [or] intentional violations of federal law," summary judgment should be entered on the claim for punitive damages.  *See e.g.*, *Murphy v. Norfolk S. Ry. Co.*, 2015 WL 914922 at *6 (S.D. Ohio March 3, 2015); *Fields v. Southeastern Pa. Transp. Auth.*, 2015 WL 4610876 at *7 (July 31, 2015); 49 U.S.C. § 20109(e)(3).

## VI.   Conclusion

While it may be conceded that a hotline complaint of alleged retaliation for Bad-Ordering railcars is a protected activity under the FRSA, connecting that activity to Mr. Ware's work-related instructions to his employees and his handling of the Taylor/Fowler Blue Flag violation simply fails for want of proof. Unquestionably, Ware had a good faith basis for charging Taylor and Fowler with a

violation of a critical safety rule, a rule specifically designed to prevent employees – like Taylor and Fowler – from being killed or maimed while working on or between cars that get moved because another train crew does not know they are there, which is evident from their acceptance of the deferred suspensions after consultation with their carmen's union representative.  The facts concerning Ware's work instructions to other employees as well as Taylor and Fowler are undisputed, and have everything to do with the supervisor's interest in having his employees perform necessary work, even if unwelcomed by Taylor, Fowler and the other second shift employees, and nothing whatever to do with the FRSA.  There must be some showing of <u>intentional</u> animosity or retaliatory intent, for which there is no credible evidence here.  *See*, *Kuduk v. BNSF Railway Co.*, 768 F.3d 786 (8th Cir. 2014) ("but the contributing factor is that an employee must prove his intentional retaliation prompted by the employee engaging in protected activity").

The FRSA federal case decisions are clear that "'federal courts do not sit as a super-personnel department that re-examines' an employer's disciplinary decisions. In the absence of evidence connecting his protected activity to the discharge, [an employee] is not entitled to FRSA anti-retaliation relief <u>even if [the carrier] inaccurately concluded that he committed [serious rule violations]</u>." *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 792 (8th Cir. 2014) (emphasis supplied) (quoting *Kipp v. Mo. Highway & Transp. Comm'n*, 280 F.3d 893, 898 (8th Cir. 2002)).

38

Taylor and Fowler cannot avoid their burden of proof under the FRSA and fabricate a nexus between Mr. Ware's entirely appropriate decisions concerning the two Bad Orders, his carmen work assignments and the Blue Flag discipline, when it is abundantly clear that no such nexus exists.

For all of the foregoing reasons, the Plaintiffs' claims should not survive the Defendants' motion for summary judgment.

Submitted this 11th day of October, 2022.

/s/ Sydney F. Frazier, Jr.
Sydney F. Frazier, Jr.
(Admitted *Pro Hac Vice*)

/s/ Crawford S. McGivaren, Jr.
Crawford S. McGivaren, Jr.
(Admitted *Pro Hac Vice*)

/s/ Desharne Carroll
Desharné Carroll (Georgia Bar No. 913658)
PHELPS DUNBAR LLP
2001 Park Place North, Suite 700
Birmingham, Alabama  35203
E-Mail:   Sydney.Frazier@phelps.com
          Crawford.McGivaren@phelps.com
          Desharne.Carroll@phelps.com

*Counsel for Defendants*
Norfolk Southern Railway Company,
Lewis Ware, Dianne Barnett, and
Stephen Weatherman

PD.38046274.1

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 11th day of October, 2022, I filed the foregoing with the Clerk of Court using the CM/ECF System which will send electronic notification of such filing to the following attorneys for Plaintiff:

D. James Jordan, Esq.
Hannah E. Heltzel, Esq.
ADAMS, JORDAN, & HERRINGTON
577 Mulberry Street, Suite 1250
Macon, GA 31202
jjordan@adamsjordan.com
hheltzel@adamsjordan.com

William C. Tucker, Jr., Esq.
J. Tom Walker, Esq.
MAPLES, TUCKER & JACOBS LLC
2001 Park Place North
Suite 1325
Birmingham, AL  35203
bill@mtandj.com
tom@mtandj.com

*/s/ Desharne Carroll*
OF COUNSEL

40

PD.38046274.1