Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SHANE FOWLER and
KELVIN TAYLOR,

         Plaintiffs,        CIVIL ACTION FILE

      vs.                 NO. 1:21-cv-3303-MLB

NORFOLK SOUTHERN RAILWAY
COMPANY, et al.,

         Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~


VIDEOCONFERENCE DEPOSITION OF

SHIRLEY DIANNE BARNETT


August 9, 2022

9:01 a.m.



900 Circle 75 Parkway

Suite 500

Atlanta, Georgia



Joel P. Moyer, CCR 2745

Shirley Barnett                                                8/9/2022

Page 2

1                    APPEARANCES OF COUNSEL

2    On behalf of the Plaintiffs:

3         WILLIAM C. TUCKER JR., ESQUIRE
          J. THOMAS WALKER, Esquire (via Zoom)
4         Maples, Tucker & Jacobs, LLC
          2001 Park Place North
5         Suite 1325
          Birmingham, Alabama 35203
6         (205) 322-2333
          bill@mtandj.com
7         tom@mtandj.com

8    On behalf of the Defendant:

9         SYDNEY F. FRAZIER JR., Esquire
          Phelps Dunbar, LLP
10        2001 Park Place
          Suite 700
11        Birmingham, Alabama 35203
          (205) 716-5200
12        sydney.frazier@phelps.com

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX TO EXAMINATIONS

2    WITNESS:  SHIRLEY DIANNE BARNETT

3    EXAMINATION                                      PAGE

4    By Mr. Tucker                                       4

5                         - - -

6                    INDEX TO EXHIBITS

7    PLAINTIFF'S EXHIBITS                             PAGE

8    Exhibit 1    Notice of Deposition of Dianne        4
                  Barnett
9
     Exhibit 2    Declaration of Dianne Barnett        11
10
     Exhibit 3    Allegations                          27
11
     Exhibit 4    Email from Dianne Barnett to Steve   30
12                Weatherman, 11-6-2018

13   Exhibit 5    Annual Review 2018, L.M. Ware Jr.    31
                  (NSRC_0021 - 23)
14
     Exhibit 6    DMMO Scorecards 2nd Qtr 2017         35
15
     Exhibit 7    Letter from Dianne Barnett to        81
16                Lewis Ware, 9-25-2019

17   Exhibit 8    Color overhead view of Mason Yard    90

18   Exhibit 9    Color aerial view with handwriting   92
                  by Mr. Fowler
19
     Exhibit 10   General Blue Signal Requirements,   107
20                NS Operating Rules, 1-1-2015

21   Exhibit 11   Norfolk Southern Corporation        108
                  Operations Division ODB No. 5
22                5-21-2018

23

     (Original Exhibits 1 through 11 have been attached
24
     to the original transcript.)
25

Shirley Barnett                                        8/9/2022

                                                        Page 4
    1           Deposition of SHIRLEY DIANNE BARNETT
    2                    August 9, 2022
    3           (Plaintiff's Exhibit 1 was marked for
    4           identification.)
    5                    SHIRLEY DIANNE BARNETT,
    6    having been first duly sworn, was examined and
    7    testified as follows:
    8                         EXAMINATION
    9    BY MR. TUCKER:
   10           Q       Tell us your full name, please, ma'am.
   11           A       Shirley Dianne Barnett.
   12           Q       And you're -- you're employed by NS?
   13           A       Yes.
   14           Q       In what capacity?
   15           A       I am the director of mechanical
   16    operations.
   17           Q       Is that a new name for what used to be
   18    the DMMO?
   19           A       Yes.
   20           Q       And I know I've deposed you twice, so
   21    I'm going to assume you know the rules.  The main
   22    one is, if you answer it, I'm going to assume you
   23    understood it.  So when I ask a stupid question,
   24    make me do it again.  Okay?
   25           A       Okay.

Shirley Barnett                                          8/9/2022

Page 5

```
 1         Q        What did you do -- well, before I do
 2    that, you are here in Atlanta?
 3         A        I am.
 4         Q        What is your territory now?
 5         A        I currently cover the states of
 6    Georgia, Florida, North and South Carolina.
 7         Q        Okay.  What is that -- is that a new
 8    division?
 9         A        It is the coastal division.
10         Q        Okay.  All right.  Is your only point
11    in Florida Jacksonville?
12         A        That's correct.
13         Q        And you've got several places, I know,
14    in Georgia.  North and South Carolina, there's
15    several.
16         A        Yes.
17         Q        Okay.  And are you in charge of cars
18    and locomotives?
19         A        Yes.
20         Q        Okay.  And you know Lewis Ware?
21         A        Yes.
22         Q        Who is Lewis Ware, and what is your
23    professional relationship to him?
24         A        Lewis Ware is the senior general
25    foreman at Savannah, and he reports directly to the
```

Shirley Barnett                                    8/9/2022

Page 6

1    assistant director, Rex Powers.

2         Q     Okay.  So he's not a -- he's not a

3    direct report to you right now?

4         A     Not at this time.

5         Q     Okay.  Is his another one of all these

6    changes that have been going on the last couple of

7    years?

8         A     This is an organizational change, yes.

9         Q     Okay.  How many carmen does he have

10   working there right now?  Four?

11        A     That sounds about right.  Between four

12   and six.

13        Q     How long have you been -- let's put it

14   this way.

15              Would you give me a thumbnail sketch of

16   your railroad career?

17        A     I began my career in August of 1998 as

18   a steno clerk in Birmingham.

19        Q     As a signal --

20        A     It was a stenographer clerk.

21        Q     Oh, stenographer clerk.  Okay.

22        A     I was promoted to locomotive mechanical

23   supervisor February of 1999 in Birmingham.

24        Q     Okay.

25        A     I was moved to Knoxville -- it should

Shirley Barnett                                          8/9/2022

1    have been probably around 2000 -- as a locomotive

2    supervisor and subsequently went to Portsmouth,

3    Ohio, as a senior general foreman in 2002.

4         Q     Was that in cars or locomotives?

5         A     That was both car and locomotive.

6         Q     Okay.  Was that in '02?

7         A     Yes, it was in 2002.

8         Q     Okay.  Then what?

9         A     I went to Kansas City as the senior

10   general foreman car and locomotive in 2005.  I

11   believe it was 2008; I came to Atlanta as the

12   senior general foreman of -- it would have been car

13   and locomotive.  That job was subsequently upgraded

14   to a mechanical superintendent position I believe

15   around 2009.

16        Q     And that would have been at Inman Yard?

17        A     That was at Inman Yard.

18        Q     Okay.

19        A     I then went to Harrisburg,

20   Pennsylvania, in 2012 as the DMMO, the division

21   manager of mechanical operations.  That was

22   primarily car involved.  And I've been in Atlanta

23   since 2016.  That position was division manager of

24   mechanical operations, and the title was changed to

25   director of mechanical operations.

Shirley Barnett                                          8/9/2022

Page 8

1        Q       Essentially though, it's pretty much

2    the same thing, just different areas, different

3    reporting chains, that sort of thing?

4        A       Correct.

5        Q       What's the pay band now?

6        A       The pay band is a B6.

7        Q       B6.  Okay.  And Mr. Ware, is he a Pay

8    Band 4?

9        A       That's correct.

10       Q       Okay.  You have been on the ground and

11   are familiar with mechanical operations in

12   Savannah; correct?

13       A       Yes.

14       Q       All right.  How often do you get there?

15       A       Not very often anymore.  I -- it has

16   been a while since I've been in Savannah.

17       Q       Okay.  And you told me Mr. Powers was

18   your deputy.  Does he get to Savannah more often

19   than you do?

20       A       He does not at this time.

21       Q       Okay.  Why is that?

22       A       At this point, we are focused on

23   primarily locomotive issues.  We have capable

24   people in place around the division.

25       Q       Okay.  Excuse me.

Shirley Barnett                                    8/9/2022

Page 9

1            MR. FRAZIER:  Did I understand, Dianne

2    and Bill, that Mr. Powers is primarily focused on

3    locomotives?  Is that what you said?

4            THE WITNESS:  His primary focus is

5    locomotives.  He also focuses -- I mean, he also is

6    responsible for cars, but his primary focus is

7    locomotives.

8    BY MR. TUCKER:

9        Q    I'm sort of taking from this that right

10   now there are more issues in locomotives that

11   demand management attention than there are cars.

12   So it's not a change of duty; it's a change of

13   emphasis?

14       A    That will be -- that would be safe to

15   say.

16       Q    Close enough?  Okay.

17            MR. TUCKER:  By the way, Syd, we have

18   the usual stabilizations?

19            MR. FRAZIER:  That will be fine.

20            MR. TUCKER:  Sure.

21   BY MR. TUCKER:

22       Q    Ms. Barnett, tell me what you've done

23   to prepare for this deposition.

24            MR. FRAZIER:  Object to the form of the

25   question because some of the things she's done to

Shirley Barnett                                    8/9/2022

```
                                             Page 10
 1   prepare for it are covered by attorney-client

 2   privilege.

 3              MR. TUCKER:  That's okay.  Make your

 4   objections or tell her don't answer.

 5   BY MR. TUCKER:

 6        Q     What have you done to prepare for this

 7   deposition?

 8              MR. FRAZIER:  Same objection.  Go

 9   ahead.

10   BY MR. TUCKER:

11        Q     Let me address his objection.

12              I want to know everything you've looked

13   at and read, to start with.

14              MR. FRAZIER:  You can answer that one.

15        A     I have looked at the notification that

16   I received from Stephen Weatherman with regard to

17   the Complaint as well as my notes that I -- the

18   conclusion that I came to that was sent to Stephen

19   Weatherman.

20   BY MR. TUCKER:

21        Q     Okay.  What else?

22        A     I have reviewed the blue flag rules.

23        Q     Okay.  What else?

24        A     And I have spoken to my attorney, of

25   course.
```

Shirley Barnett                                           8/9/2022

                                                          Page 11

1        Q      Okay.  Did you read Lewis Ware's

2   declaration that he submitted in this case?

3        A      I have not read a declaration.  I've

4   read some portions of a -- of a declaration that

5   Lewis submitted.

6        Q      Okay.  Was there anything in there in

7   which you disagreed?

8        A      Like I said, I did not -- I did not

9   read the entire statement.

10       Q      Did you read your declaration?

11       A      I did.

12       Q      Okay.  Did you look at any pictures,

13  any -- did you see our Google Earth overheads?

14       A      I did not.

15       (Plaintiff's Exhibit 2 was marked for

16       identification.)

17  BY MR. TUCKER:

18       Q      Okay.  Number 2 is going to be --

19  Number 2 is your declaration?

20       A      Yes.  That's what it says.

21       Q      Okay.  It had some exhibits with it;

22  correct?

23       A      Yes.

24       Q      All right.  Okay.  Do you know Shane

25  Fowler?  Shane Fowler and Kelvin Taylor?

Shirley Barnett                                          8/9/2022

Page 12

1        A       I have met them before.

2        Q       Okay.  Did you only meet them because

3    of this -- these matters that we're here for you to

4    testify about?

5        A       No.

6        Q       Had you met them before that just in

7    routine matters around Savannah?

8        A       Yes.

9        Q       Okay.  Had you ever been involved in

10   any discipline issues with Fowler or Taylor prior

11   to the matters we're going to talk about occurring

12   in 2018?

13       A       None that I can recall.

14       Q       Okay.  Were you at one time Lewis

15   Ware's direct supervisor?

16       A       Yes.

17       Q       Are supervisors -- and when I say

18   "supervisor," we're talking about company officers;

19   correct?

20       A       Yes.

21       Q       Excepted positions, that is, not

22   agreement positions?

23       A       Yes, supervisory positions.

24       Q       Okay.  Are you still a member of a

25   labor union?

Shirley Barnett                                    8/9/2022

Page 13

1          A      I am not.

2          Q      Were you a member -- what were you a

3    member of?  The clerk union?

4          A      Yes.

5          Q      Okay.  Could you go back to that if you

6    wanted to?

7          A      No.

8          Q      Okay.  Why?  Are there no jobs left?

9          A      I don't know.  I have not paid union

10   dues.

11         Q      Okay.  Was Mr. Ware out of the craft?

12   He was out of carmen craft, was he not?

13         A      He was formerly a carman, yes.

14         Q      Okay.  Have you reviewed his career

15   service record?

16         A      I have not recently.

17         Q      But you have in the past?

18         A      I'm sure at some point in the past I

19   have.

20         Q      Does his career -- let me ask you this.

21   Does his career service record have any discipline

22   on it?

23         A      I do not know.

24         Q      Okay.  All right.  You attached a

25   copy of Steven Daniels' career service record to

Shirley Barnett                                          8/9/2022

Page 14

1   your declaration; correct, as an exhibit?  That's
2   it.
3              Do you know Steven Daniels?
4       A     I have met Steven Daniels in the past.
5       Q     Okay.  What was the purpose of
6   attaching his career service record to your
7   declaration, which is Exhibit 2 here?
8       A     I don't recall at this point.
9       Q     Do you contend -- well, Steven Daniels
10  is a carman in Savannah; correct?
11      A     That is correct.
12      Q     All right.  And you interviewed him
13  during your -- as a part of the process in
14  compiling the report you rendered to
15  Mr. Weatherman; correct?  Along with others, but he
16  was one of them; right?
17      A     That's correct.
18      Q     Okay.  Do you not -- there must have
19  been a purpose of attaching Mr. Daniels' --
20             MR. FRAZIER:  It's paragraph 27 of her
21  declaration, Bill.
22             MR. TUCKER:  It's 27?
23             MR. FRAZIER:  Yes.
24             MR. TUCKER:  Okay.  Thank you.
25             MR. FRAZIER:  Turn to 27 of the

Shirley Barnett                                          8/9/2022

Page 15

1    declaration, Dianne.

2         A    Yes.

3    BY MR. TUCKER:

4         Q    Okay.  All right.  In your declaration,

5    you said the deferred suspension discipline offered

6    and agreed to by Fowler and Taylor was the same

7    by -- that was given to Steven Daniels; correct?

8         A    That's correct.

9         Q    All right.  What were the circumstances

10   of Mr. Daniels' deferred suspension incident?

11        A    The circumstances of Mr. Daniels' --

12             MR. FRAZIER:  He's asking about the

13   2017?

14             MR. TUCKER:  Yes.

15             MR. FRAZIER:  Yeah.  That's the

16   previous exhibit, I believe, Dianne.

17             THE WITNESS:  Okay.

18             MR. FRAZIER:  Previous exhibit.  Maybe

19   the one after.  There you go.  I think you had it.

20             THE WITNESS:  Here?

21             MR. FRAZIER:  Right.

22        A    So the --

23             MR. TUCKER:  Where is it?

24             MR. FRAZIER:  Yeah, it's exhibit -- is

25   it I?

Shirley Barnett                                    8/9/2022

1            MR. TUCKER:  Oh, I.

2            MR. FRAZIER:  I said the previous

3    exhibit.  There are two pages of Exhibit I.  One of

4    them --

5            MR. TUCKER:  No, no.  I got it.

6            MR. FRAZIER:  -- is deferred, and the

7    other one is the record of -- the CSR record of the

8    third document.

9            MR. TUCKER:  Okay.  All right.

10       A      So as I stated in the declaration, this

11   was -- Steven Daniels is an employee at Savannah

12   who was found to have violated the blue flag law as

13   well, and he was offered 30 days deferred.

14   BY MR. TUCKER:

15       Q      Well, he was also charged with working

16   with a cell phone within four feet of the track;

17   correct?

18       A      He was.

19       Q      All right.  And Mr. Fowler and

20   Mr. Taylor were not found to be working with a

21   cell phone within four feet of the track, were

22   they?

23       A      They were not.

24       Q      Okay.  So do you know what Mr. Daniels

25   was doing that constituted a violation of the blue

Shirley Barnett                                          8/9/2022

1    flag law?

2          A      I don't specifically remember at this

3    time, but he was working in the yard.  He was doing

4    car inspections is my recollection without having

5    blue signal protection.

6          Q      All right.  Now, you said in here that

7    he -- he committed a second violation in 2019.  Do

8    you have anything about that in here?

9          A      That is in Mr. Daniels' CSR.

10         Q      Okay.  But where is -- where is the

11   START form for that?

12         A      The START form was not attached for

13   that.

14         Q      Okay.  That was after all of this --

15   these incidents arose; correct?

16         A      That is correct.

17         Q      Okay.  Now, you've met with

18   Mr. Frazier, I assume?

19         A      I have.

20         Q      When?  I don't want to know what was

21   said.  I just want to know when.

22         A      I met with Mr. Frazier yesterday.

23         Q      Okay.  And then again this morning?

24         A      I did speak to him this morning.

25         Q      Okay.  Well, that's nice.  There's a

Shirley Barnett                                    8/9/2022

Page 18

1   lot of people that won't talk to him, but that --

2              MR. FRAZIER:  Object to the form of the

3   comment.

4              MR. TUCKER:  No.

5              MR. FRAZIER:  Bill, just to be clear on

6   the record, the question that you asked her about

7   meeting with me was a follow-on to your question

8   about her preparation for the deposition.  She has

9   met with me before, before this deposition, on

10   different occasions.  I just want to make sure that

11   the question was clear.

12              MR. TUCKER:  Okay.

13   BY MR. TUCKER:

14        Q     You have met with him on other times --

15              MR. FRAZIER:  About this case.

16   BY MR. TUCKER:

17        Q     -- either virtually or in person about

18   this case as -- in general?  I mean, that's how you

19   came up with the declaration; right?

20        A     That's correct.

21        Q     Okay.  All right.

22              MR. FRAZIER:  I didn't think you were

23   trying to exclude that from your position.

24              MR. TUCKER:  No, no.

25              MR. FRAZIER:  But I just want to make

Shirley Barnett                                    8/9/2022

Page 19

1   sure it's clear on the record.

2              MR. TUCKER:  Thank you.

3              MR. FRAZIER:  Sure.

4   BY MR. TUCKER:

5       Q      All right.  Were you aware that Kelvin

6   Taylor had been out of work, furloughed for some

7   period of time, between 2018 and September, I

8   think, of last year?

9       A      I was aware that Mr. Taylor had been

10  furloughed.

11      Q      Okay.  There were fairly -- there were

12  furloughs around the system, and that included

13  Savannah; correct?

14      A      That is correct.

15      Q      All right.  And were you aware that

16  Mr. -- during the course of events that Mr. Taylor

17  was recalled to service off of furlough?

18      A      I do recall that he and some other

19  employees were recalled.

20      Q      Okay.  Ms. Barnett, were you aware that

21  he had had a physical issue for which he had to

22  have some surgical procedure which delayed him

23  actually being able to come back to work?

24      A      I was not.

25      Q      Okay.  Did you have anything to do with

Shirley Barnett                                          8/9/2022

                                                        Page 20

 1    releasing him to return to work once his doctors
 2    had cleared him?
 3         A     I did not.
 4         Q     You didn't have -- you didn't have any
 5    input into the medical department decision to clear
 6    him?
 7         A     I do not work for the medical
 8    department.
 9         Q     I understand that.  That's not what I
10    asked you.  Did you have any part or input into
11    the medical department approving him to return to
12    work?
13         A     No.
14         Q     Okay.  Have you read Mr. Fowler's or
15    Mr. Taylor's depositions given in this case?
16         A     I have not.
17         Q     Do you know anything that they -- have
18    you discussed the content with anyone?
19               MR. FRAZIER:  Object to the form of the
20    question.  Invades attorney-client privilege.
21    Anyone outside your lawyer, Ms. Barnett, you may
22    answer.
23         A     I have not.
24    BY MR. TUCKER:
25         Q     Okay.  Have you discussed that content

Shirley Barnett                                          8/9/2022

Page 21

1   with Mr. Frazier or any other lawyer?

2            MR. FRAZIER:  Objection to that

3   question.  Instruct the witness not to answer.

4   Invades attorney-client privilege.

5            MR. TUCKER:  Okay.

6   BY MR. TUCKER:

7       Q    Would it be correct that everything you

8   know about what Mr. Taylor and Mr. Fowler said in

9   their deposition comes from one of your lawyers?

10           MR. FRAZIER:  Object to the form of the

11   question.  Answer it if you can.

12      A    Can you repeat the question?

13   BY MR. TUCKER:

14      Q    Yes, ma'am.

15           MR. TUCKER:  And you've got your

16   objection on form.

17   BY MR. TUCKER:

18      Q    Am I correct that everything you know

19   about what Mr. Fowler and Mr. Taylor said in their

20   deposition comes from one of your lawyers?

21           MR. FRAZIER:  Objection to the question

22   on the grounds it invades attorney-client privilege

23   and to the form of the question.

24           MR. TUCKER:  Are you directing her not

25   to answer?  I'm not asking -- I just want to know

Shirley Barnett                                    8/9/2022

Page 22

1    if that's her source.

2              MR. FRAZIER:  Let's see if I can ask

3    you to ask her -- ask the question you had before

4    which was has she talked to anybody else about it

5    other than her lawyers, Bill.  You're not trying to

6    get her lawyer --

7              MR. TUCKER:  I just want to know if

8    that's the only source, and I'm not saying that's a

9    waiver of the privilege, if that's your problem.

10             MR. FRAZIER:  That's my objection.  I

11   think her answering the question is -- invades the

12   privilege because you're asking her about -- about

13   communications with her lawyer.  I object to it on

14   that ground and instruct her not to answer.

15             MR. TUCKER:  Let me ask it this way.

16             MR. FRAZIER:  I'm going instruct her

17   not to answer the question.  Go ahead.

18   BY MR. TUCKER:

19        Q    Am I correct that you know nothing

20   about -- no one other than your lawyer has talked

21   to you about anything that's in Fowler or Taylor's

22   deposition?

23             MR. FRAZIER:  Same objection.  Same

24   instruction.

25             MR. TUCKER:  Okay.

Shirley Barnett                                    8/9/2022

Page 23

1    BY MR. TUCKER:

2         Q    Tell me what you know about Mr. Fowler

3    and Mr. Taylor's depositions, what they said?

4         A    I know nothing about what they said in

5    their deposition.

6         Q    You haven't read any summary of it?

7    Nothing?

8         A    I have not read their depositions.

9         Q    I didn't ask you that.  I said, did you

10   read a summary of it?

11        A    I did not read a summary of it.

12        Q    Okay.  Tell me how you came to be

13   involved in Mr. Fowler and Mr. Taylor's dispute

14   with Lewis Ware and Norfolk Southern.

15        A    To my recollection, I received

16   notification from Stephen Weatherman where he had

17   taken an anonymous complaint, and I was asked to

18   investigate.

19        Q    An anonymous complaint?

20        A    It was anonymous in terms of the

21   investigation, so the -- yeah.

22        Q    Are you saying that Mr. Weatherman did

23   not know the names of who made the complaints about

24   Lewis Ware?

25        A    Mr. Weatherman was aware of who made

Shirley Barnett                                         8/9/2022

1    the complaints.  In terms of the investigation, the

2    investigation did not specify during the course of

3    my investigation who made the complaint in dealing

4    with the employees that were interviewed.

5         Q     Okay.  Let me see if -- where is that

6    in --

7              MR. FRAZIER:  What's the question,

8    Bill?

9    BY MR. TUCKER:

10        Q     Where is the -- wasn't his list,

11   Weatherman's compilation of their complaints, in

12   her --

13             MR. FRAZIER:  If you're looking at the

14   Weatherman memo --

15             MR. TUCKER:  Yeah, what's that I'm

16   looking for.

17             MR. FRAZIER:  To her?

18             MR. TUCKER:  Yeah.

19             MR. FRAZIER:  Well, I don't remember,

20   but it may reflect that.  Let's look and see.

21             Bill, your declaration -- your exhibit

22   which has her declaration -- oh, okay.  It's

23   exhibit -- let's see.  It's Exhibit J is her

24   report, but I don't see the Steve Weatherman --

25             MR. TUCKER:  I don't either.

Shirley Barnett                                          8/9/2022

```
 1              MR. FRAZIER:  -- email to her as part
 2    of her declaration, but hang on.
 3              Actually, what her report does, it
 4    repeats the Weatherman declaration.
 5              MR. TUCKER:  It does.  I remember that.
 6              MR. FRAZIER:  Yeah.  And then she
 7    follows it with her investigation after each one of
 8    the bullet point allegations.  But it doesn't
 9    recite that they were the ones who made the hotline
10    complaint, which is what she just testified to.
11              MR. TUCKER:  And I've got it somewhere,
12    and I can't find it.  Go off for a moment.
13         (Whereupon off-the-record discussions
14         ensued.)
15    BY MR. TUCKER:
16         Q    So do I hear you telling me that when
17    you got this -- well, I apologize.  You didn't say
18    that.  You didn't get this blind from
19    Mr. Weatherman, did you, the allegations?
20         A    When you say "blind", do you --
21         Q    Blind.  He just didn't email to you out
22    of the blue.  I'm assuming he called you and said,
23    I need you to help me out?
24         A    I don't recall.
25         Q    Okay.  You don't know --
```

Shirley Barnett                                    8/9/2022

Page 26

 1            MR. FRAZIER:  It's only been four and a
 2    half years ago.
 3    BY MR. TUCKER:
 4        Q     Well, is your memory bad about all the
 5    events of four years ago?
 6        A     No.
 7        Q     Okay.  Your lawyer just accused you of
 8    that.
 9            MR. FRAZIER:  I didn't accuse you of
10    anything, but let's --
11            MR. TUCKER:  I'm going to make that
12    Number 3.
13            MR. FRAZIER:  I'll withdraw the
14    comment.
15            MR. TUCKER:  Yeah.
16            MR. FRAZIER:  It doesn't matter.
17            MR. TUCKER:  I know.
18            MR. FRAZIER:  She's answered the
19    question.
20            MR. TUCKER:  I know.
21            MR. FRAZIER:  She doesn't remember
22    whether he called her.
23            MR. TUCKER:  When we take a break,
24    let's maybe get them to copy it for us.
25                         - - -

Shirley Barnett                                          8/9/2022

Page 27

1          (Plaintiff's Exhibit 3 was marked for

2          identification.)

3     BY MR. TUCKER:

4          Q     All right.  And is it your -- do I

5     understand your testimony that when you went to

6     Savannah and conducted all your interviews that

7     we're going to talk about and wrote your report,

8     you were not aware that Mr. Fowler and Mr. Taylor

9     were the ones who had made the complaint?

10         A     My recollection is that I was aware of

11    who made the complaint, but I did not share that

12    information during my investigation.

13         Q     Did Mr. Fowler and/or Mr. Taylor tell

14    you that they were upset or worried that they had

15    been told by Mr. Weatherman that it would be

16    someone independent of their chain of command who

17    was investigating their complaints and they didn't

18    think that you were independent?

19         A     I do not recall them stating that.

20         Q     Okay.  You're not saying they didn't.

21    You just don't remember whether they did or not?

22              MR. FRAZIER:  Object to the form.  Go

23    ahead and answer.

24         A     I have no information to say that they

25    made that statement.  Otherwise, I would have

Shirley Barnett                                              8/9/2022

Page 28

1    shared that with Stephen Weatherman.

2    BY MR. TUCKER:

3        Q       So you are saying they didn't say it?

4        A       I'm saying that I have no information

5    that they ever stated that.  They never stated that

6    to me.

7        Q       That's different from you don't

8    remember.  So you said they did not say -- make any

9    complaint about you being the investigator?

10       A       Did they make a complaint to me?

11       Q       Yes.

12       A       No.

13       Q       Did they make a complaint to

14   Weatherman?

15       A       I do not know if they made a complaint

16   to Weatherman.

17       Q       And at the time you did this, quote,

18   "investigation," close quote, you were Mr. Ware's

19   direct supervisor; correct?

20       A       At that time -- at that time, Mr. Ware

21   was reporting to the mechanical superintendent,

22   which was Cortez Mason out of Macon.

23       Q       Who reported to you?

24       A       Correct.  That is my recollection.  It

25   would have been the mechanical superintendent,

Shirley Barnett                                          8/9/2022

Page 29

1   whoever that was.

2        Q     Okay.  Am I correct that the

3   performance of the mechanical department in

4   Savannah, Georgia, you were responsible for that

5   performance of the chain of command?

6              MR. FRAZIER:  Object to the form of the

7   question.  Go ahead and answer it if you can.

8   BY MR. TUCKER:

9        Q     It was a little convoluted, but I think

10  you got it.

11       A     I'm responsible for the performance of

12  all locations.

13       Q     And Savannah was one of them?

14       A     That's correct.

15       Q     Okay.  When did you get the allegations

16  contained in the document in Exhibit 3?

17       A     And that is the email you're referring

18  to?

19       Q     Yes, ma'am, that Weatherman gave to

20  you.

21             MR. TUCKER:  And, Syd, it's two pages.

22       A     I'm not showing what date.  It would

23  have been sometime around November of 2018 or

24  October of 2018.

25                        - - -

Shirley Barnett                                        8/9/2022

Page 30

```
 1          (Plaintiff's Exhibit 4 was marked for
 2          identification.)
 3   BY MR. TUCKER:
 4          Q      All right.  Let's make Number 4 your
 5   report.  Is that a good way to call it?  A report?
 6          A      Yes.
 7          Q      Okay.  And this is a --
 8                 MR. TUCKER:  There you go.  I do have
 9   this one, Syd.
10                 MR. FRAZIER:  Exhibit 4?
11                 MR. TUCKER:  Exhibit 4.
12   BY MR. TUCKER:
13          Q      Were you able to determine when it was?
14   I looked and saw there were interviews on October
15   the 3rd, so --
16          A      Yes.  I cannot recall, and it doesn't
17   show the email.  This email was just dated from
18   when I sent the report of my findings.
19          Q      And it was sent November the 6th of
20   2018.  Am I correct about that?
21          A      That's correct.
22          Q      And at the time, did NS company
23   officials get annual evaluations?
24          A      Yes.
25          Q      Do they still get annual evaluations?
```

Shirley Barnett                                    8/9/2022

Page 31

1          A      Yes.

2          Q      And do you remember if you were his

3     evaluator, Mr. Ware's, that is?

4          A      I believe I would have been his

5     evaluator.

6          Q      So you were his direct supervisor?

7          A      I would have completed his evaluation.

8          MR. TUCKER:  I'll make this Number 5.

9     There you go, Syd.

10         MR. FRAZIER:  Thanks.

11         (Plaintiff's Exhibit 5 was marked for

12         identification.)

13    BY MR. TUCKER:

14         Q      What is Number 5?

15         A      This is -- shows to be the annual 2018

16    review for Lewis Ware.

17         Q      And that was by you?

18         A      Yes.

19         Q      At the time -- in 2018 at the time of

20    this investigation, what was the bad order count

21    for Savannah?

22         MR. FRAZIER:  Object to the form of the

23    question.  Go ahead.

24         A      I do not recall.

25    BY MR. TUCKER:

Shirley Barnett                                    8/9/2022

Page 32

1        Q        There was one, though; correct?

2        A        There were bad orders in Savannah.

3        Q        I understand that.  Bad -- tell us what

4    a bad order is.

5        A        It's a defective railcar.

6        Q        All right.  And if it's tagged by a car

7    inspector, then it's -- a bad order tag's put on it

8    and it either has to be repaired where it is or

9    moved to another track for repair or sent to a

10   shop, and the repair has to be completed before the

11   car can be released back into service?

12       A        If the bad order is confirmed to be

13   valid, then it is required that it be repaired and

14   the train moved to another track or sent to another

15   location for repairs.

16       Q        Like a car shop?

17       A        Correct.

18       Q        Okay.  Well, I think that's what I just

19   said, but you added "if found to be valid."  Are

20   all bad orders found by carmen under your

21   jurisdiction at the time of these incidents in

22   2018 -- did a supervisor have to go and check the

23   bad order?

24                MR. FRAZIER:  Object to the form.  You

25   may answer.

Shirley Barnett                                           8/9/2022

Page 33

1        A       If a supervisor is -- was available and

2   present, yes.

3   BY MR. TUCKER:

4        Q       Okay.  Why?

5        A       This is to confirm that the defect is

6   actually valid, to gather materials or any other

7   information that would be pertinent should the car

8   need to be repaired.

9        Q       Okay.  Was bad order count a part of

10  the evaluation of you and other mechanical

11  department officials?

12       A       Can you repeat the question?

13       Q       Was the bad order count a criteria for

14  evaluation of Norfolk Southern mechanical officials

15  at the time in 2018 when this was occurring?

16              MR. FRAZIER:  Object to the form of the

17  question.

18       A       The bad order count would have been

19  discussed or reviewed at some point.  If not on

20  the -- on the evaluation, it would have been a

21  topic of discussion.

22  BY MR. TUCKER:

23       Q       Well, a topic of discussion.  I want to

24  know if it was part of the evaluation.

25       A       Was it part of the evaluation?

Shirley Barnett                                          8/9/2022

Page 34

1        Q        Of you, of Ware, of anybody.

2        A        So I would have definitely given

3   comments about his ability to process bad orders.

4        Q        Okay.  But were you graded on bad order

5   counts?

6        A        When you --

7        Q        Graded, evaluated.

8                 MR. FRAZIER:  When?

9   BY MR. TUCKER:

10       Q        Were you?

11       A        Would I have been graded or evaluated

12  on bad orders?

13       Q        Yes.

14       A        My supervisor would have discussed with

15  me at some point how well the division was

16  processing bad orders.

17       Q        Okay.  So that -- you were graded or

18  evaluated on it; correct?

19                MR. FRAZIER:  Object to the form.  You

20  can answer.

21       A        All employees, all supervisors would

22  have been evaluated on their ability to process bad

23  orders.

24  BY MR. TUCKER:

25       Q        Okay.  And they kept score on that,

Shirley Barnett                                          8/9/2022

Page 35

1    didn't they, people above you?

2         A      There was a scorecard.  I don't recall

3    whether it was in place at that time, but there was

4    a scorecard that showed you how well you were

5    processing bad orders.

6         (Plaintiff's Exhibit 6 was marked for

7         identification.)

8    BY MR. TUCKER:

9         Q      Okay.  In fact, the one for the year

10   2017 is this one, is it not?  Because I think you

11   discussed this with me before in deposition.

12                Thid will be Number 6.  There you go.

12                This will be Number 6.  There you go.

13                Isn't that you right there?

14        A      I don't see where it shows Georgia

15   division, but it's --

16        Q      I'll make this clean copy -- I just

17   wanted to have that marked for you, and I meant to

18   copy -- but you see the page I'm talking about.

19                Yes, ma'am.  I understand that.  But

20   didn't you tell me in a deposition on another case

21   about a year ago or nine months -- so many months

22   ago that this was in fact your scorecard?

23        A      I would have to see the deposition.

24        Q      Okay.  Well, take a look for me,

25   please, and give me, if you would -- tell me all

Shirley Barnett                                          8/9/2022

Page 36

1   the divisions whose scorecards are in there.  And
2   you tell me if the only one that isn't marked is
3   the -- has to be the Georgia division because
4   it's -- the rest of them all are labeled.
5              MR. FRAZIER:  Object to the form of the
6   question.
7        A     The one that is not labeled would
8   likely be the Georgia division.
9   BY MR. TUCKER:
10       Q     Okay.  Because everybody -- well, all
11  right.
12             And am I correct that bad order
13  count -- wait a minute.  Hold on.  Wrong division.
14             Harrisburg had 170, was their count.
15  Yours is a hundred for base 2016, and the target
16  for 2017 was 120.  You would not have gotten this
17  scorecard yet for 2018 at the time of the -- your
18  investigation, would you?
19             MR. FRAZIER:  Object to the form.
20       A     I would not.
21  BY MR. TUCKER:
22       Q     All right.  And on this, the Georgia
23  division scorecard, which would you -- that was
24  what it was called at the time?  Am I correct?
25  Georgia division?

Shirley Barnett                                          8/9/2022

Page 37

1          A      That is correct.

2          Q      Okay.  Bad order count, bad order dwell

3     accumulated - all, bad order dwell accumulated -

4     loads, bad order intermodal - load, bad order

5     intermodal - empty.  Did that count for 15 percent

6     of your scorecard?

7          A      That is what it shows.

8          Q      All right.  Do you disagree that that

9     was what it was?

10         A      I do not.

11         Q      And you were the senior most Georgia

12    division mechanical department officer at NS;

13    right?

14         A      Yes.

15         Q      All right.  Tell me what effects bad

16    order tags -- and when I say "bad order," I use it

17    as a noun and a verb.  But tell me what effect it

18    has on on-time performance of trains if a carman

19    finds a bad order car and tags it in an outbound

20    train that's already had the brake test done.

21                Excuse me.  Let me re-ask that.

22                Same question but not the bad -- but is

23    in an outbound track ready to have the brake test

24    run.

25                MR. FRAZIER:  Object to the form of the

Shirley Barnett                                          8/9/2022

Page 38

1    question.

2         A       It could have an effect or no effect

3    depending on what the defect is.

4    BY MR. TUCKER:

5         Q       Okay.  If it's a defect, it could be

6    repaired in place.  You've already got the blue

7    flags up.  You can -- a minor thing, you can fix it

8    right there; correct?  I mean, you hope you can.

9         A       Correct.

10        Q       Okay.  But if it's not minor and has to

11   be taken out to go to either an expedite track or

12   into the repair rip track, then it's going -- could

13   cause a train delay depending on how long it takes

14   to switch it out and the stated departure time for

15   the train?

16            MR. FRAZIER:  Object to the form of the

17   question.

18        A       Again, it could have an effect or not.

19   BY MR. TUCKER:

20        Q       Okay.  And you were graded on train

21   reliability also, were you not?

22        A       Yes.

23        Q       And that's on-time performance and

24   delays accounted for 10 percent of your score?

25        A       Can you repeat the question?

Shirley Barnett                                          8/9/2022

Page 39

 1        Q       Yeah.  On-time performance and delays
 2   accounted for 10 percent of your score?
 3        A       That's correct.
 4        Q       All right.  Is it permissible for a
 5   supervisor to remove a bad order tag from a car?
 6        A       We discourage supervisors from removing
 7   bad order tags from cars.
 8        Q       Okay.  Why?
 9        A       It could complicate the situation.  We
10   do encourage that they have an agreement employee
11   to go and confirm certain defects after the
12   supervisor has gone out and received the report as
13   well to remove any bad order tags that need to be
14   removed.
15        Q       Have you ever heard the expression "if
16   it rolled in, it can roll out"?
17        A       I have not.
18        Q       Never heard that?
19        A       No.
20        Q       Never said that?
21        A       (Shakes head negatively.)
22        Q       Well, if you haven't heard it, you
23   haven't said it.  Okay.
24                What led you to write in Exhibit 5,
25   your evaluation or appraisal on Lewis Ware, that

Shirley Barnett                                      8/9/2022

Page 40

1    "Lewis needs to be mindful to maintain a clear

2    separation between his personal and professional

3    connections while on the job"?

4         A     That was due to Lewis's tenure at

5    Norfolk Southern.  At this time, he had only been a

6    supervisor for a short period of time for -- in

7    terms of years, so he had a lot of existing

8    relationships with employees from the time that he

9    was a carman as well as a train and gang leader.

10              So this was more of a coaching reminder

11   for Lewis that, although he has established many

12   relationships with employees over the years, just

13   to make sure that he's mindful and keeping that

14   separate.

15        Q     Why does that have to be separate?

16              MR. FRAZIER:  Object to the form of the

17   question.

18        A     Why does it have to be separate?

19   BY MR. TUCKER:

20        Q     Yeah.

21        A     Professional and personal connections?

22        Q     Yes, ma'am.

23        A     Because, as a supervisor, he needs to

24   be able to take care of the duties that he's been

25   hired to execute.

Shirley Barnett                                      8/9/2022

```
 1      Q      And you think personal relationships
 2   with employees could get in the way with that?
 3      A      Personal relationships with employees
 4   in general could cause issues for a supervisor.
 5      Q      How?
 6      A      Making sure that they're able to remain
 7   neutral and unbiased in their decision making.
 8      Q      Okay.  You're talking about the
 9   supervisors?
10      A      Supervisors.
11      Q      All right.  All right.  Ms. Barnett, in
12   your declaration on one of the paragraphs -- and I
13   apologize, I don't remember which one -- you said
14   that Mr. Ware had no history of discipline for
15   removing bad order tags?
16             There it is.  It's number 13, page 4.
17             MR. FRAZIER:  Is that a question?
18             MR. TUCKER:  Yeah.
19   BY MR. TUCKER:
20      Q      I said, is that what you said, that he
21   had no -- he had never -- I said he had no
22   discipline history for removing bad orders.  What
23   you said was he's never been disciplined for
24   removing bad order tags.  Same thing.  I'm --
25      A      That is what was in my declaration.
```

Shirley Barnett                                    8/9/2022

Page 42

1        Q      Okay.  How did you find that out?

2        A      At the time I reviewed Mr. Ware's CSR,

3    I conferred with HR and also spoke to one of his

4    more recent supervisors.

5        Q      Okay.  If he had been disciplined for

6    having a -- for removing a bad order tag, would

7    that appear on his CSR?

8        A      Yes.

9        Q      Okay.  All right.  This is what I get

10   for reviewing the stuff last night.  I did not put

11   it back in the order Carl put it.  That's awful.

12              Does Mr. Ware's violation of the blue

13   flag law that you disciplined him for in 2019

14   appear on his CSR?

15       A      I don't recall.

16       Q      Okay.  All right.  Now, I want to go

17   back to your declaration.  You said he had no

18   history of removing bad order tags; right?

19              MR. FRAZIER:  Object to form.  That's

20   not what she said.

21   BY MR. TUCKER:

22       Q      Oh, I'm sorry.  You said he had never

23   been disciplined; correct?

24       A      That is what I stated.

25       Q      However, you are aware he had a history

Shirley Barnett                                      8/9/2022

Page 43

1    of removing bad order tags; correct?

2          A      Mr. Ware on one occasion reported to

3    his supervisor at the time that he had removed a

4    bad order tag.

5          Q      And that was when he was a mechanical

6    supervisor in Macon?

7                 MR. FRAZIER:  Akin?

8                 MR. TUCKER:  Macon.

9          A      That is correct.

10   BY MR. TUCKER:

11         Q      Now, you suspect that that's occurred

12   more frequently than reported in the complaint made

13   to Mr. Weatherman, did you not?

14         A      Can you repeat the question?

15         Q      You suspected that he had removed tags

16   more frequently than reported in the complaints to

17   Weatherman; correct?  You're reading it on the

18   first page of your report?

19         A      Yes, I am.

20         Q      Okay.

21         A      And that's what I stated.

22         Q      Okay.  What history was that to which

23   you referred?  How did you -- what was the basis of

24   your statement to Weatherman about why you thought

25   that he had done it more often than reported in

Shirley Barnett                                    8/9/2022

Page 44

1    this complaint?

2         A     That was based on the conversation that

3    I had with the mechanical superintendent Mason

4    where he told me about the rumor he had heard which

5    was unsubstantiated -- he could not provide any

6    specific details -- as well as the one occasion

7    when he stated that Mr. Ware told him that when he

8    became a -- when he was a new supervisor.

9         Q     Am I correct that Mason told him don't

10   remove bad order tags at the time that originally

11   happened?

12        A     That's what Mr. Mason reported, that he

13   told him not to make another repair or remove

14   another bad order tag.

15        Q     Okay.  All right.  Did you find that he

16   had removed bad order tags in Savannah as a result

17   of your investigation?

18        A     That is correct.

19        Q     All right.  Did you discipline him for

20   it?

21        A     I did not.

22        Q     Why?

23        A     Because his reason for removing the bad

24   order tags was that the cars were not defective.

25        Q     Okay.  Well, one of those cars that he

Shirley Barnett                                          8/9/2022

Page 45

1    removed the tag on, it was defective; correct?  At

2    least one.  Let's put it that way.

3              MR. FRAZIER:  Object to the form of the

4    question.

5         A      The allegation was that Mr. Ware had

6    pulled the bad order tags off of two railcars.

7    Those two railcars -- neither of the two railcars

8    was defective.

9    BY MR. TUCKER:

10        Q      Who told you that, that they were not

11   defective?

12        A      Mr. Ware told me that they were not

13   defective.  I also had a -- information from a

14   carman who was working at the time that broke down

15   the car who stated that it was not defective.  And

16   the FRA got -- received a complaint or a request to

17   investigate.

18              They did inspect both of these railcars

19   shortly after they were released from Savannah, and

20   they found that they were not defective.

21        Q      All right.  Did they find that the car

22   was not defective or that the cross key was not

23   defective?

24        A      They found that the -- to my knowledge,

25   they found that the cars were not defective.  There

Shirley Barnett                                    8/9/2022

Page 46

1    were no issues with the cross keys on the car, and

2    no other additional information was cited.

3         Q       Okay.  All right.  What is a cross key?

4         A       A cross key is a component that holds

5    the coupler in place within the draft end sill of

6    the car.

7         Q       And if it's defective under certain

8    circumstances, the coupler could pull out; correct,

9    and -- of the car?

10        A       If the cross key is defective?

11        Q       Yes.  I said under certain

12   circumstances.  It's a dangerous thing if a coupler

13   comes out of a car while it's moving?

14               MR. FRAZIER:  Object to the form of the

15   question.

16        A       I would not say it's dangerous.  It's

17   undesirable.

18   BY MR. TUCKER:

19        Q       It's not dangerous if a coupler pulls

20   out of a car while the train is moving?

21        A       It is not dangerous.  We do have

22   coupler pullouts that occur, and typically that

23   allows the brakes to set up on -- on the train, and

24   the train will stop.

25        Q       It's not dangerous for a coupler to

Shirley Barnett                                              8/9/2022

                                                            Page 47

1    pull out of a car while the train is moving?

2    That's astonishing.  That's a personal comment.

3               MR. FRAZIER:  Object -- object to your

4    comment about it.

5               MR. TUCKER:  And --

6               MR. FRAZIER:  She's answered your

7    question.

8               MR. TUCKER:  And your objection is well

9    taken.  I understand that.

10   BY MR. TUCKER:

11        Q     When the train goes in emergency, that

12   can cause derailments, can't it?

13        A     Very rarely and none that I'm aware of

14   at this point.

15        Q     Never heard of one.  Okay.

16              Are you familiar with the 23 G -- never

17   mind.  Don't worry about that.

18              Am I correct that you never looked at

19   BKTY 152743 or 153453, the two cars about which the

20   dispute arose?

21        A     That is correct.

22        Q     Okay.  Are you familiar with a swing

23   gate?

24        A     That holds the cross key and all that

25   in place?  Yes.

Shirley Barnett                                          8/9/2022

Page 48

1       Q       Yeah.  Is that also called a key

2   retainer?

3       A       Yes.

4       Q       Okay.  Am I correct that if the key

5   retainer is defective or not operable that there's

6   no way to write that up in the computer?  It has to

7   be listed -- coded as a cross key problem?

8       A       Can you repeat the question?

9       Q       Yes, ma'am.  Am I correct that a

10  problem with the swing gate or the key retainer

11  cannot be written up as such?  It has to be coded

12  in the system as a cross key defect?

13      A       In terms of the employee bad ordering

14  the car or in terms of a bill?

15      Q       Both.

16      A       An employee can list whatever defect

17  they find.

18      Q       Okay.  But the bill is where I'm coming

19  from.  You answered it better than I asked.  The

20  billing is a different issue though, and that's

21  where there's not a code for the retainer.  It's --

22  the code has to be for the cross key?

23              MR. FRAZIER:  Object to the form of the

24  question.  You can answer.

25      A       I would have to look at the double yard

Shirley Barnett                                        8/9/2022

Page 49

1   billing manual, but there is a -- they can make

2   comments about what specifically was done.  There

3   was an area that a biller can add comments for to

4   specify what was done.

5   BY MR. FRAZIER:

6       Q     Okay.  Did you listen to a recorded

7   conversation between Mr. Ware and Fowler and/or

8   Taylor about these two cars?

9       A     I did.

10      Q     And in that conversation -- well, let

11  me ask you this.  When did you listen to it?

12      A     It would have been at some point in

13  2018 when I received them.

14      Q     During this investigation?

15      A     That's my recollection.

16      Q     Did you get that recording from Fowler

17  and/or Taylor, or did you get it from Weatherman?

18      A     I would have gotten the recordings from

19  either Fowler or Taylor.

20      Q     Okay.  In that conversation, did

21  Mr. Fowler or Taylor -- let me -- do you remember

22  who the recording was?

23            MR. FRAZIER:  Who the recording was?

24  BY MR. FRAZIER:

25      Q     Who the recording was?  Who was

Shirley Barnett                                          8/9/2022

Page 50

1   recorded?  Fowler or Taylor?

2        A      I don't recall.

3        Q      Okay.  But one of the two of them had a

4   conversation with Ware that was recorded about the

5   two BKTY cars?

6        A      Correct.

7        Q      Okay.  In that recording, do you

8   remember -- did you hear Fowler or Taylor say that

9   the -- that that coupler could come out of that car

10  the way it was when they bad ordered it?

11       A      I recall a conversation back and forth

12  about whether the car -- whether the coupler could

13  come out of the car.

14       Q      All right.  And do you -- did you form

15  the opinion then and is it still your opinion today

16  that when Mr. Fowler and Taylor reported those two

17  cars that they had a good-faith belief that those

18  couplers were dangerous and could pull out of those

19  cars?

20              MR. FRAZIER:  Object to the form of the

21  question.

22  BY MR. TUCKER:

23       Q      I'm not asking you whether you agree

24  with them.  Do you think they had that good-faith

25  belief?

Shirley Barnett                                          8/9/2022

Page 51

1            MR. FRAZIER:  Object to form.

2    BY MR. TUCKER:

3        Q     That they believed that?

4            MR. FRAZIER:  Object to the form of the

5    question.  You can answer.

6        A     I do not know what they had.  I don't

7    know whether they believed it or not.

8    BY MR. TUCKER:

9        Q     You think they were lying?

10       A     I don't know if they believed it or

11   not.

12       Q     Okay.  Did you hear Mr. Taylor --

13   excuse me.  Did you hear Mr. Ware respond by saying

14   that he knew it could pull -- the couplers could

15   pull out but it hadn't yet?

16       A     I do not recall Mr. Ware stating that.

17       Q     Okay.  Would it be permissible for a

18   supervisor to let a car go from the yard if he

19   thought that the coupler could pull out of the car?

20           MR. FRAZIER:  Object to the form.  You

21   can answer.

22       A     Can you repeat the question?

23   BY MR. TUCKER:

24       Q     Would it be permissible for a

25   supervisor to let a car go out of the yard on a

Shirley Barnett                                      8/9/2022

Page 52

1    train if the supervisor thought that the coupler

2    could pull out of the car?

3         A     No.

4         Q     It would not be permissible?

5         A     No, it would not.

6         Q     Okay.  So you're agreeing with me, it

7    would not be permissible?

8               MR. FRAZIER:  Objection.  Asked and

9    answered.

10   BY MR. TUCKER:

11        Q     But she say no, and I think the answer

12   should be yes, but I think we're agreeing with each

13   other.

14              You agree with me, he should not let it

15   go if he thought the coupler could pull out of the

16   car?

17        A     A supervisor would not allow -- should

18   not and would not allow a car to continue if they

19   felt that a coupler could pull out.

20        Q     Okay.  And you don't remember as you

21   sit here whether or not the recording contained

22   Mr. Ware saying he knew it could pull out but it

23   hadn't yet?

24        A     My recollection is that Mr. Ware, after

25   going back and forth with -- I believe it may have

Shirley Barnett                                      8/9/2022

Page 53

1    been Mr. -- Mr. Fowler --

2         Q     I think it was Fowler.

3               MR. FRAZIER:  Let her -- let her answer

4    the question.

5    BY MR. TUCKER:

6         Q     Go ahead.

7         A     I believe that, as they went back and

8    forth, Mr. Ware stated -- continued to state that

9    it was not defective and that's why it was going to

10   continue and that the coupler -- the coupler had

11   not pulled out of the car.

12        Q     All right.  Is there a job procedure, a

13   car department instruction, on how to repair a

14   swing gate or key retainer and cross key such as

15   were installed on BKTY -- these two BKTY cars?

16        A     It's possible, but I can't say for

17   sure.

18        Q     Not asking you to remember them all,

19   but do you try to have a department -- car

20   department instruction for the usual list of

21   repairs that may have to be made on a car?

22        A     There are numerous instructions with

23   regard to repairs.

24        Q     What is a swing gate?

25        A     A swing gate is a mechanism that holds

Shirley Barnett                                          8/9/2022

Page 54

1    the cross key in place.  It holds the cross key in

2    place, in position.

3         Q      Okay.  Not every car has one?

4         A      That's correct.

5         Q      I mean, there are different ways, more

6    today than ever, I guess, but there are a lot of

7    ways they're put together; correct?

8         A      Yes.

9         Q      While I'm talking about that, about

10   cars, let me ask you:  Were you aware of

11   allegations made about doors being wedged for

12   movement, boxcar doors being wedged for movement?

13        A      I don't recall where it came up, but,

14   yes, I do remember looking into doors being wedged.

15        Q      Okay.

16        A      Yeah, wedged for movement.

17        Q      All right.  And I think they were

18   talking about plug doors; correct?

19        A      This would have been -- I don't recall

20   what it was referring to, but I remember looking

21   into doors being wedged.

22        Q      Okay.  If a plug door is loose or off

23   the track, that's dangerous, is it not?

24        A      It has the potential to allow the door

25   to move further out of position.

Shirley Barnett                                          8/9/2022

Page 55

```
 1       Q      Yeah.  Or fall off the car?
 2       A      That is a possibility.
 3       Q      And those things are heavy, are they
 4  not?
 5       A      Define "heavy."
 6       Q      800 pounds?
 7       A      They are big doors.
 8       Q      Yeah.  You ever seen a man hit by one?
 9       A      I have not.
10       Q      Okay.
11       A      Or a woman.
12       Q      I agree.  Or a school bus; right?
13       A      Correct.
14       Q      Okay.  Should a car be run out of the
15  yard with a plug door wedged to keep it on the car?
16       A      Plug doors are wedged.  It occurs
17  sometimes where plug doors are wedged for a variety
18  of reasons.
19       Q      Okay.  But you didn't answer the
20  question.  Is it proper to run the car out of a
21  yard with a plug door wedged?
22       A      It is not improper.
23       Q      Why is it proper?  Shouldn't it be
24  fixed at -- let's take Savannah, and let's just say
25  a hypothetical that a door's found loose or off the
```

Shirley Barnett                                      8/9/2022

Page 56

1    track on a plug-door car.  You've got to repair it;

2    correct?  You should repair it?

3         A       If we are not capable of repairing it,

4    then it has to be secured against undesired

5    movement, and it would be moved to another

6    location.

7         Q       Okay.  And you could repair -- you

8    could re-track a plug-door car in Savannah,

9    couldn't you?

10        A       Currently, we would likely secure it

11   and move it to another shop.

12        Q       But at the time of this incident, you

13   could have repaired it in Savannah, couldn't you?

14        A       More than likely, it would have been

15   moved to Macon for repairs depending on the

16   severity of the defect.

17        Q       The plugs can be used to take it from

18   the -- excuse me.

19               The wedge could be used on the plug

20   door to get it out of the yard, into a repair

21   facility where it can be repaired?

22        A       That's correct.

23        Q       Okay.  And it should be repaired at the

24   first available place where such repair could be

25   made?

Shirley Barnett                                    8/9/2022

Page 57

1            MR. FRAZIER:  Object to the form of the

2     question.

3         A     It would be routed to a location that

4     is capable of making repairs.

5     BY MR. TUCKER:

6         Q     Shouldn't it be the closest available?

7         A     That would be the closest available.

8     It would be routed to the closest shop available to

9     make repairs.

10        Q     All right.  And if you did that, would

11    you have to notify the train crew of the condition,

12    and would the train speed have to be restricted?

13        A     The crew would have a consist list

14    including any defective cars or special handling

15    cars that are within the consist, and the train

16    speed would not be restricted.

17        Q     Okay.  But it would be noted on the

18    consist list that the engineer and the conductor

19    got just so they'd know it, be aware of it?

20        A     It would be listed as a bad order.

21            MR. TUCKER:  Okay.  All right.

22            Syd, we've been going -- you want to

23    take a break?

24            MR. FRAZIER:  If you wish, we wish.

25            MR. TUCKER:  Yeah, I do.

Shirley Barnett                                        8/9/2022

Page 58

 1              MR. FRAZIER:  All right.

 2          (Proceedings in recess, 10:25 a.m. to

 3          10:33 a.m.)

 4    BY MR. TUCKER:

 5          Q      Ms. Barnett, would it be improper to

 6    tell or even hint -- excuse me.  Would it be

 7    improper for a supervisor to tell or even hint to a

 8    carman not to tag bad orders because of bad order

 9    counts?

10          A      Yes.

11          Q      What does it mean to manage a bad order

12    account?

13          A      That means to confirm defects, make

14    sure we have the resources -- the material,

15    people -- to efficiently get the cars into and out

16    of the shop repaired, and handle any exceptions to

17    the process.

18          Q      When you wrote your report -- look on

19    page 2.  I think it's -- you've got it separate if

20    you want.

21              MR. FRAZIER:  It's Exhibit 4.  It's

22    right here.

23    BY MR. TUCKER:

24          Q      There you go.  That's separate.

25          A      Thank you.

Shirley Barnett                                          8/9/2022

Page 59

1        Q       That's probably easier to get through.

2   See up at the top, Allegation 1, "Ware removing --

3   improperly removing bad order tags"?

4        A       Yes.

5        Q       Okay.  Now, in this part of your

6   report, you were told by Cortez Mason that Ware

7   denied removing tags improperly?  See that?

8        A       Correct.

9        Q       All right.  What would be -- how would

10  it be improper?

11       A       It would be improper to remove a tag on

12  a car that is still defective.

13       Q       Okay.  All right.  If a carman has a

14  good-faith belief that a car is defective, should

15  he tag it?  Or he or she.  When I say "he," I mean

16  carman.  Should the car be tagged?

17       A       If the car cannot be repaired in the

18  train.

19       Q       I understand.  But it should be tagged

20  in either the -- whatever is proper, however to fix

21  it, you've got to do it?

22       A       Correct.

23       Q       All right.  If the carman thinks that

24  the defect is a legitimate -- excuse me.  If the

25  carman thinks that the condition for which he has

Shirley Barnett                                    8/9/2022

Page 60

1    tagged a car is legitimate and he is ordered by his

2    supervisor to remove the tag, should he remove it

3    or leave it on?

4         A      The employee would need to comply with

5    the instructions of the supervisor unless the

6    supervisor is instructing them to do something that

7    is illegal, against the rules, or immoral.

8         Q      Okay.  But if he had -- if the carman

9    has a good-faith belief that what they are seeing

10   is a defect and the supervisor says run it, take

11   the tag off, should the carman comply, or should he

12   leave it on?

13        A      The supervisor would discuss the reason

14   why the tag should be removed.

15        Q      Okay.  I didn't put that -- and I

16   appreciate that, but if the supervisor persists and

17   the employee thinks the supervisor is wrong, should

18   he leave the car on -- I mean, excuse me, leave the

19   tag on, or should he pull it?

20        A      The employee would need to leave the

21   tag on, follow the instruction of the supervisor,

22   unless the supervisor is instructing them to do

23   something that is illegal, against the rules,

24   immoral.

25        Q      Okay.

Shirley Barnett                                    8/9/2022

Page 61

1        A       They have a method to address their

2    grievance afterwards.

3        Q       How?

4        A       They can notify another supervisor.

5    They can call the ethics and compliance hotline.

6        Q       That's Mr. Weatherman that we've been

7    talking about all day?

8        A       Mr. Weatherman did work in the ethics

9    and compliance group.

10       Q       That's what this hotline was that

11   Fowler and Taylor called, wasn't it, the ethics and

12   compliance hotline?

13       A       I'm assuming so.

14       Q       Okay.  Good.  I interrupted.  I'm

15   sorry.  What were the other options?

16       A       They could talk to another supervisor.

17   They could talk to their local chairman or their

18   general chairman.

19       Q       Whoever.  But there are no -- none of

20   those there in Savannah.  Ware is the only

21   supervisor; right?

22       A       He is the only supervisor.  There are

23   phones available in Savannah.

24       Q       I understand.

25       A       And computers.

Shirley Barnett                                          8/9/2022

Page 62

1        Q       I understand.  But I don't think we've

2   ever gotten to the question.  If the supervisor

3   says pull the tag and the carman thinks that it is

4   a legitimate defect, should he pull the tag or

5   leave it on?

6        A       The employee will need to comply with

7   the instructions of a supervisor unless the

8   supervisor is giving them instructions to do

9   something that is illegal, against the rules, or

10  immoral.

11       Q       All right.  What if the carman thinks

12  it's illegal?

13       A       At that point, they will need to appeal

14  to another supervisor, the ethics and compliance

15  hotline, their local chairman.

16       Q       What's the train going to do in the

17  meantime?

18       A       I don't understand the question.

19       Q       What are they going to be doing with

20  the train in the meantime while they're escalating

21  this up a chain?

22       A       Are you giving me a hypothetical

23  situation?

24       Q       Yes, ma'am.

25       A       The train would be doing what the train

Shirley Barnett                                          8/9/2022

Page 63

1    would normally do.

2        Q       Would it leave, or would it have to sit

3    there till this is resolved?

4        A       The supervisors that we have in place

5    are responsible for being knowledgeable with the

6    applicable instructions, rules, code of federal

7    regulations.  So they would need to comply with the

8    supervisor's instructions.

9        Q       Okay.  Now, if the car is run -- if the

10   tag is pulled, the car gets run, and that condition

11   later causes a wreck, a derailment, breaks down on

12   the line of road, whatever, could the carman be

13   disciplined for running it?

14               MR. FRAZIER:  Object to the form of the

15   question.

16       A       If the -- if the supervisor instructs

17   the employee to remove the tag.  Is that what

18   you're asking?

19   BY MR. TUCKER:

20       Q       No.  I mean if he said remove the tag,

21   carman removes the tag, further down the road it

22   causes a wreck, it comes apart, it causes a delay,

23   something not good happens, can the carman be

24   charged for running the car with the condition that

25   caused the problem later?

Shirley Barnett                                      8/9/2022

Page 64

1              MR. FRAZIER:  Object to the form of the

2      question.

3         A     No.

4     BY MR. TUCKER:

5         Q     Okay.  In this incident with the BKTY

6     cars, you were aware, were you not, that Mr. Fowler

7     or Taylor asked Ware to put it in writing that he

8     was directing them to move -- remove the tag?

9         A     I do recall that in the recordings that

10    I listened to.

11        Q     Okay.  Why wouldn't -- and Ware didn't

12    do it, did he?

13        A     He did not.

14        Q     Why?

15        A     He's not required to.

16        Q     Why didn't he do it?  What would be

17    wrong with it?

18        A     Mr. Ware has a whole list of duties

19    that he's responsible for, and he cannot stop to

20    put everything in writing that an employee asks him

21    to.

22        Q     Well, how long would it take to say,

23    Mr. Fowler, I ordered you to remove the tag on

24    September whatever, 2018, Lewis Ware?

25              MR. FRAZIER:  Object to the form of the

1    question.

2    BY MR. TUCKER:

3        Q       How long did that take me?

4                MR. FRAZIER:  Object to the form of the

5    question.

6        A       I don't know how long it would have

7    taken.  Mr. Ware is the sole supervisor there.  I

8    do not recall at this time what else he had going

9    on, but Mr. Ware's not required to put all of his

10   instructions in writing.

11   BY MR. TUCKER:

12       Q       You think it might help employee

13   relations if he would?

14               MR. FRAZIER:  Object to the form of

15   that question.

16       A       I do not.

17   BY MR. TUCKER:

18       Q       Okay.  If a carman believes that a

19   condition is a defect and should be tagged and

20   the -- and will not follow the supervisor's

21   directive to remove the tag and it is later

22   determined that the car was not defective, can

23   the -- can the carman be charged with falsifying a

24   bad order report?

25       A       Can you repeat the question?

Shirley Barnett                                              8/9/2022

Page 66

```
 1        Q      If a carman believes in good faith that

 2    a condition is a -- a car condition is a defect and

 3    he tags it and he is ordered by his supervisor to

 4    pull the tag but does not and the car is then taken

 5    out of the train and inspected and it turns out

 6    that it was not a defect, can the carman be charged

 7    with falsifying a bad order report?

 8              MR. FRAZIER:  Object to the form of the

 9    question.  You may answer.

10        A      If the carman tags a car that is later

11    determined to not be defective, after receiving

12    instructions and clarification of why the car is

13    not defective, the employee could be disciplined

14    for falsifying the repair -- or falsifying the

15    record as well as insubordination.

16    BY MR. TUCKER:

17        Q      Okay.  And either or both of those

18    charges can be punishable by up to termination;

19    correct?

20              MR. FRAZIER:  Object to the form.

21        A      The employee would be afforded an

22    opportunity to have a formal hearing.

23    BY MR. TUCKER:

24        Q      A kangaroo court?

25              MR. FRAZIER:  Object to the form of the
```

Shirley Barnett                                          8/9/2022

Page 67

1   comment.

2            MR. TUCKER:  It's not a comment.  It's

3   a question.

4            MR. FRAZIER:  Bill.  Bill, everybody

5   knows your views about the collective bargaining

6   agreement process.  Please don't interject those

7   personal views into these questions.  Thank you.

8            MR. TUCKER:  Please don't interject

9   your personal views into this conversation either.

10  Thank you.

11  BY MR. TUCKER:

12       Q     I call it a kangaroo court.  Do you

13  disagree?

14       A     I do disagree.

15       Q     Okay.  I figured you would.  Have

16  you --

17            MR. FRAZIER:  Well, why --

18  BY MR. TUCKER:

19       Q     Have you ever been a hearing officer?

20            MR. FRAZIER:  -- did you ask her that

21  question then?

22  BY MR. TUCKER:

23       Q     Have you ever --

24            MR. TUCKER:  Because it's got to be in

25  the record.

Shirley Barnett                                    8/9/2022

Page 68

1    BY MR. TUCKER:

2          Q      Have you ever been a hearing officer?

3          A      I have.

4          Q      How many times?

5          A      I don't know an exact number.

6          Q      20?  30?  40?

7          A      Somewhere below 50.

8          Q      Below 50.  Have you ever found an

9    employee not guilty of a charge?

10         A      I have.

11         Q      Who?

12         A      I do not remember the employee's name.

13   But, yes, I have found one employee that I can

14   recall off the top of my head that was not -- the

15   evidence did not support the charge.

16         Q      Okay.  1 out of somewhere under 50?

17         A      Correct.

18         Q      Okay.  Do you remember where the

19   employee was from?

20         A      The employee may have been from

21   Harrisburg.

22         Q      Okay.  Was it in Harrisburg?

23         A      Conway.  Harrisburg.  I don't recall

24   really recall.

25         Q      Okay.  That's all right.  Do you

Shirley Barnett                                    8/9/2022

Page 69

1    remember when it was, Ms. Barnett?

2         A      I do not.  It's been a long time.

3         Q      Was it while you were at Harrisburg?

4         A      No.  This would have been -- so since I

5    was in Harrisburg, this would have been like on the

6    Pittsburgh.  So it would have been somewhere

7    adjacent to me.  It would not have been in my

8    division.

9         Q      Right.  I understand.

10        A      Yeah.

11        Q      But so you think it was while you were

12   in Harrisburg?

13        A      I really don't recall.

14        Q      That's okay.  All right.  Before all of

15   this blew up?

16        A      Correct.

17        Q      Okay.  All right.  Do you ever remember

18   Mr. Fowler contacting you about a boom issue he

19   had?

20              MR. FRAZIER:  A what issue?  I'm sorry.

21              MR. TUCKER:  Boom, B-O-O-M.

22              MR. FRAZIER:  Mr. Fowler?

23              MR. TUCKER:  Yes.

24              MR. FRAZIER:  You understand the

25   question?

Shirley Barnett                                    8/9/2022

Page 70

1                    THE WITNESS:  I do.

2          A       And I don't recall.  If you have any

3    more details you can share?

4    BY MR. TUCKER:

5          Q       No, I --

6                    MR. FRAZIER:  You've answered.

7    BY MR. TUCKER:

8          Q       You do --

9                    MR. FRAZIER:  You've answered.

10   BY MR. TUCKER:

11         Q       You do recollect it?

12         A       I do not.

13         Q       Oh, you do not.  Okay.

14                  I can't find my copy of Fowler's

15   deposition, and I swore I brought it with me.  The

16   last thing you touch; right?

17                  I want to go back.  Ms. Barnett, I'm

18   going to -- this is an answer that Mr. Fowler gave

19   in his deposition at page 59 about -- when he was

20   answering Mr. Frazier's questions about the cross

21   key issue on the BKTY car.

22                  And he said, "If the swing gate does

23   not cover the cross key to prevent it from ejecting

24   from the coupler, it's a bad order because of safe

25   that key can wiggle out.  That is what my

Shirley Barnett                                    8/9/2022

Page 71

1    inspection is based on when I look at it.

2                    "I don't know.  I did not pull the

3    cross key out.  I do not know if it was worn.  But

4    if that swing gate -- it is put there as a safety

5    precaution -- is not covering that cross key, that

6    cross key can slide out.  I am obligated to bad

7    order that car."

8                    Do you agree or disagree with -- if you

9    want to read it, you can read it.  It's right there

10   in yellow.

11                   I finally found it.  It's the last

12   thing I touched.

13        A     I do not agree.

14        Q     Why?

15        A     There are a number of things that play

16   into whether the swing gate is secure.  It's either

17   secure or it's not secure.  In this case, it's not

18   defective.  The swing gate was performing as

19   intended.

20        Q     How do you know that?

21                   MR. FRAZIER:  Objection.  Asked and

22   answered.  Answer it again.

23        A     That is based on Mr. Ware's breakdown

24   of the car with another carman.  It is also based

25   on the FRA inspector's investigation which

Shirley Barnett                                    8/9/2022

Page 72

1    concluded that it was not defective.

2    BY MR. TUCKER:

3         Q      What you told us earlier?

4         A      Correct.

5         Q      All right.  Do you remember that

6    carman's name?

7         A      I do not remember the carman's name.

8         Q      If the swing gate or the retainer is

9    not covering the cross key, could the cross key

10   come out of the coupler?

11        A      I cannot say definitively without

12   looking at a picture.

13        Q      Okay.  All right.  All right.  I want

14   to swap -- swap.  I want to shift gears to

15   September the 19th, 2018, when Taylor and Fowler

16   bad ordered two cars in Track R3 scheduled to go

17   out on Train 377.  Okay?

18               And that's on -- I'm reading from your

19   report on page 3.  You got it?

20        A      Okay.

21        Q      All right.  What -- do you know what

22   Track R3 is?

23        A      It's one of the tracks in Savannah

24   Yard.

25        Q      Was it your understanding that these

Shirley Barnett                                    8/9/2022

                                                    Page 73

1      two cars that Taylor and Fowler bad ordered were in

2      Train 377 ready to go out?  This was -- that this

3      was not an inbound inspection?  This was an

4      outbound inspection is what I'm getting at.

5           A      That is correct.

6           Q      Okay.  And one of them was GATX 32106

7      bad order for a mangled cut lever?

8           A      That is what I was told.  It was a

9      defective cut lever.

10          Q      Cut levers often get damaged when

11     couplers mismatch; right?

12          A      That is one way, yes.

13          Q      All right.  And was it your

14     understanding when you did this report that Fowler

15     and Taylor had bad ordered those cars and had

16     called them into the yardmaster?

17          A      That is correct.

18          Q      All right.  And if the process operated

19     as designed, would the yardmaster then tell the

20     transportation we got two bad orders, we got to get

21     out, and here they are, and then the transportation

22     department would have to switch the cars out?

23          A      In this case, being that it was a cut

24     lever, it could have been repaired in the train or

25     set out.

Shirley Barnett                                      8/9/2022

Page 74

1        Q      But the other one was going to have to
2    be pulled out; correct?
3        A      I do not recall what the other car was
4    bad ordered for.
5        Q      Okay.  Did Ware pull the tags on both
6    of those cars?
7        A      I do not know who pulled the tag from
8    the cars.
9        Q      Somebody did, didn't they?
10       A      I would assume someone did remove the
11   tags.
12       Q      Tell me what your investigation found
13   about what happened to those two cars on September
14   19, 2018.  By the way, are we talking about second
15   shift or third shift?
16       A      I don't recall what shift they were
17   working at the time.
18       Q      Tell me what your investigation
19   revealed.
20       A      As I wrote on my conclusion here is
21   that I will -- I can read verbatim.  "Mr. Ware
22   recalled the situation, reported he was performing
23   mechanical education session with Senior Terminal
24   Supervisor Waylon Kimble where Mr. Kimble
25   volunteered to make the repair on the car to

Shirley Barnett                                    8/9/2022

Page 75

1    protect train performance.

2              "Mr. Ware stated he did not foul the

3    track and only provided tools and verbal

4    instructions on how to remove and replace the cut

5    lever.  Mr. Kimble confirmed that he made the

6    repair because he wanted to learn more about

7    car-related operations.

8              "I discussed with Mr. Ware the fact

9    that there was no repair billed in the system for

10   the repair on the car and reported that he forgot

11   to have someone prepare the bill for it.

12   Mr. Fowler reported that he never got around to

13   entering the bad ordered car into the computer so

14   it was not necessary to release the car from bad

15   order status.

16             "Mr. Ware has been instructed to have a

17   carman make repairs whenever found to eliminate any

18   time claims for violating the Collective Bargaining

19   Agreement Rule 37."

20        Q    All right.  Did your investigation also

21   reveal that Mr. Ware -- well, that Mr. Ware said --

22   excuse me.

23             Somebody told you that it was done to

24   protect train performance; correct?  Who told you

25   that?

Shirley Barnett                                       8/9/2022

Page 76

1        A       I don't recall whether anyone told me

2    that or not.  I don't --

3        Q       "Where Mr. Kimble volunteered to make

4    the repair on the car to protect train

5    performance"?

6        A       Oh, sorry.

7        Q       Yeah.

8        A       Yes.  Yeah, so that would have been

9    Mr. Ware.  I apologize.  Mr. Ware stated Mr. Kimble

10   volunteered to make the repair to protect train

11   performance.

12       Q       Okay.

13       A       Mr. Kimble stated that he wanted to

14   learn more about car-related operations.

15       Q       And so they made the repair on these

16   cars.  Did they make them on both or just one?

17       A       I don't recall what happened with the

18   second car.

19       Q       We do know one, though.  They did a

20   repair on the cut lever; right?

21       A       That's correct.

22       Q       All right.  And they did it without the

23   blue flags up, didn't they?

24       A       I later did learn that, yes.

25       Q       Did you ask them whether the blue flag

Shirley Barnett                                          8/9/2022

Page 77

1    was up on this date?

2           A       I did not ask them.

3           Q       When did you learn that the blue flags

4    were not up?

5           A       There was a subsequent conversation.  I

6    don't recall at this point who notified me, whether

7    it was someone in the FRA or someone within NS,

8    that there was an allegation that a repair had been

9    completed outside of the mechanical department

10   where the blue flag protection had not been

11   applied.

12          Q       That I told them that?

13          A       I'm sorry?

14          Q       I told them that.

15          A       Okay.

16          Q       And what difference would it make if

17   the blue flag were up -- let me ask it this way.

18                  If the blue flag is not up, is it

19   improper for anyone to work on, under, or around a

20   freight car?  In the mechanical department now.

21   I'm not talking about the train crew.

22          A       Can you repeat the question?

23          Q       Yes, ma'am.  If a blue flag is not up,

24   like on the night of this incident in September, is

25   it illegal, a statutory violation of the federal

Shirley Barnett                                      8/9/2022

Page 78

1    blue flag law, to work on, under, between, around?

2    What are all the circumstances of that car?

3         A     It would be improper for a mechanical

4    department employee to do so.

5         Q     Okay.  All of those things; correct?

6         A     That's correct.

7         Q     If the blue flag is up, a mechanical

8    department person -- that's the purpose.  That's so

9    they can go under, around, like we just discussed;

10   correct?

11        A     That's correct.

12        Q     All right.  And you were very specific

13   with us that Mr. Ware said he did not go in between

14   the cars or foul the cars; correct?  He didn't get

15   in the foul?

16        A     That is correct.

17        Q     Okay.  And tell us what "in the foul"

18   means.

19        A     He was not on, under, breaking the

20   plane of the car's equipment.

21        Q     Right.  The foul is the outside limits

22   of the car which -- usually the grab irons; right?

23   That's the widest part of cars and engines?

24        A     The -- yes, whatever's the widest

25   portion that would allow you to break the plane.

Shirley Barnett                                    8/9/2022

Page 79

```
1        Q       It's like the footprint of the car.
2   All right.
3                Of what -- would you agree with me that
4   it wouldn't matter what Mr. Ware did, if breaking
5   the plane, fouling that car, if the blue flag was
6   up?
7        A       Can you repeat the question?
8        Q       Yes, ma'am.  Do you agree with me that
9   if the blue flag was up, it wouldn't matter if
10  Mr. Fowler had broken the plane, gone in between,
11  or got inside the foul of the car?
12       A       Mr. Fowler would not matter --
13       Q       I'm sorry.  Mr. Ware.
14       A       It would not matter.
15       Q       Right.  And it would only matter if he
16  didn't break the plane and didn't perform the
17  repair if it was not blue flagged?
18       A       Can you repeat the question?
19       Q       Yes, ma'am.  The fact -- read what
20  Mr. Ware said that he didn't do.
21       A       From what I just said?
22       Q       Yes.
23       A       "Mr. Ware stated that he did not foul
24  the track and only provided tools and verbal
25  instructions on how to remove and replace the cut
```

Shirley Barnett                                    8/9/2022

Page 80

1    lever."

2         Q      Okay.  So that would only matter if the

3    car -- that would only matter, those circumstances,

4    if the track weren't blue flagged; right?

5              MR. FRAZIER:  Object to the form of the

6    question.

7         A      Can you clarify your statement or the

8    question with regard to it mattering or not

9    mattering?

10   BY MR. TUCKER:

11        Q      Yes, ma'am.  Whether he fouled the

12   track or performed the repair would only be

13   significant if the track were not blue flagged;

14   correct?

15             MR. FRAZIER:  Object to the form of the

16   question.

17   BY MR. TUCKER:

18        Q      He doesn't like the question.  That's

19   why he's doing that.

20             MR. FRAZIER:  I think it's an improper

21   question in form.

22             MR. TUCKER:  She's a party.  Is she a

23   party?

24             MR. FRAZIER:  She is a party,

25   Mr. Tucker.

Shirley Barnett                                        8/9/2022

Page 81

1          MR. TUCKER:  Okay.  So I can lead

2     cross-examine.

3          MR. FRAZIER:  I'm not arguing with you

4     about that.  It's the form of the question.

5          A     That is correct.

6     BY MR. TUCKER:

7          Q     Okay.  And am I correct that you only

8     disciplined Mr. Ware for violating the blue flag

9     law after the federal government notified you that

10    they had determined where -- or excuse me, they had

11    determined that the repairs were made without the

12    blue flag?

13         A     Mr. Ware was disciplined after I was

14    notified of the violation.

15         MR. TUCKER:  Okay.  What was Number 6?

16         MR. FRAZIER:  The scorecard.

17         MR. TUCKER:  Scorecard.

18    (Plaintiff's Exhibit 7 was marked for

19    identification.)

20    BY MR. TUCKER:

21         Q     Number 7, what is that?

22         A     That is a letter addressed to Mr. Ware

23    regarding a reduction of his 2019 annual incentive

24    award.

25         Q     And was this letter about his violation

Shirley Barnett                                    8/9/2022

Page 82

1   of the blue flag law?

2        A      That's correct.

3        Q      And that incident for which he was

4   disciplined with this pay bonus loss, that

5   violation to which you refer, was the September 19,

6   2018, incident; correct?

7        A      That is correct.

8        Q      Okay.  Now, if Mr. Ware did not foul

9   the track and only provided tools and instructions,

10  how did he violate the blue flag law?

11       A      Mr. Ware was overseeing this training

12  session with the transportation officer and should

13  have made sure that the blue flag protection was

14  applied to the track.

15       Q      In fact, the train -- do you really

16  believe this transportation department supervisor

17  did that to learn about how to repair a cut lever,

18  or did he in fact do it to get the train out

19  without any further delay?

20       A      I believe the trainmaster involved was

21  doing it to learn more about operations as at the

22  time we were doing a lot of cross training between

23  departments.

24       Q      So you violate -- how did you train him

25  well when you broke the blue flag law?  That's not

Shirley Barnett                                      8/9/2022

Page 83

1    good training, is it?

2              MR. FRAZIER:  Object to the form of the

3    question.

4         A     Mr. Ware received a reduction in his

5    bonus --

6    BY MR. TUCKER:

7         Q     I understand that.

8         A     -- as a result of that.

9         Q     I'm sorry.  I thought you were through.

10             I understand that, Ms. Barnett.  But if

11   you were trying to teach another supervisor about

12   car repair, is it a good teaching session when you

13   break the law to do it?

14        A     It is not good to break -- to violate

15   rules.

16        Q     Okay.  But you don't think that getting

17   that train out without further delay had anything

18   to do with that trainmaster repairing that car --

19             MR. FRAZIER:  Object to the --

20   BY MR. TUCKER:

21        Q     -- in violation of the blue flag law?

22             MR. FRAZIER:  Object to the form of the

23   question.  Object as asked and answered.

24   BY MR. TUCKER:

25        Q     I don't think you've answered that.

Shirley Barnett                                                    8/9/2022

Page 84

1             MR. FRAZIER:  Answer it again.

2        A      I stated in my conclusion report that

3    Mr. Kimble volunteered to make the repair on the

4    car to protect train performance and also, when I

5    spoke to him, he confirmed that he wanted to learn

6    more about car-related operations.

7    BY MR. TUCKER:

8        Q      Okay.  Did Mr. Ware at the time of this

9    letter or later receive any increase in pay which

10   would make up for the incentive bonus he lost?

11       A      No.

12       Q      Did you believe that Mr. Fowler and

13   Mr. Taylor honestly feared retaliation by Ware for

14   their coming forward with their concerns about him

15   bad ordering cars -- excuse me, about bad ordered

16   cars being sent out without being properly

17   repaired?

18       A      Can you repeat the question?

19       Q      Yes, ma'am.  And I apologize.  I said

20   it wrong.

21             Do you think that Mr. Fowler and

22   Mr. Taylor really feared retaliation by Ware for

23   coming forward for their concerns about bad order

24   cars being sent out without proper repairs?

25       A      I do not.

Shirley Barnett                                      8/9/2022

Page 85

1        Q       You think they did not genuinely feel
2    that?
3        A       I do not feel that they feared
4    retaliation.
5        Q       Okay.  So they were lying when they
6    told you that?
7                MR. FRAZIER:  Object to the form of the
8    question.  Go ahead.
9        A       I don't feel that they feared
10   retaliation.
11   BY MR. TUCKER:
12       Q       Okay.  But they told you they did,
13   didn't they?
14       A       They stated they feared retaliation.
15       Q       Okay.  Did you find that morale in the
16   mechanical department employees in Savannah was
17   low?
18       A       I did not find that the morale of the
19   employees there was low.  There were employees who
20   were happier than others.
21       Q       Did you write that you, Dianne Barnett,
22   felt that both employees are sincere in their
23   concerns about being disciplined for bad ordering
24   cars?
25       A       I did write that.

Shirley Barnett                                              8/9/2022

Page 86

1       Q       Okay.  And is that still your opinion?

2       A       I feel that at the time both employees

3  stated that they were concerned that if they bad

4  ordered cars, they would be disciplined.

5       Q       Did you feel they were sincere in their

6  concern?

7       A       At the onset of my investigation, I

8  felt that they were.

9       Q       Did you later determine that they were

10  not sincere?

11       A       I later determined that -- after

12  discussing this entire situation with both

13  employees that they understood what measures they

14  would need to take if they felt that they were

15  being treated improperly and unfairly.

16       Q       That's not what I asked you.  I said,

17  "Did you later determine they were not sincere?"

18       A       I felt that both employees were sincere

19  about their concerns when they reported them.

20       Q       Okay.  But that indicates that there

21  are other times when they were not sincere.  Is

22  that what you're trying to tell us?

23       A       I investigated this incident that was

24  brought to me by Mr. Weatherman.

25       Q       Do you feel today as you sit here that

Shirley Barnett                                              8/9/2022

Page 87

1    those employees were not sincere about their

2    reports and their concerns?

3         A       I feel that the employees at the time

4    were sincere with regard to their concerns with

5    regard to discipline -- I mean with regard to bad

6    ordering cars.

7         Q       Okay.  All right.  All right.  You did

8    talk to Kimble; correct?

9         A       I did.

10        Q       Okay.  Did you report the blue flag

11   violation by Mr. Ware to the federal government?

12        A       I did not.

13        Q       Why?

14        A       I am not required to report the blue

15   flag violation to the federal government.  As I

16   recalled -- yeah, I don't recall who -- who

17   notified me, whether it was the FRA, the federal

18   government, or someone within NS that had

19   communicated with the federal government.

20        Q       Okay.  But I thought by your testimony

21   that you were saying that you did not know until

22   almost a year later where it broke the blue flag

23   law.

24        A       It has been several years.  I don't

25   recall like what the sequence of events was.  When

Shirley Barnett                                    8/9/2022

Page 88

1    I was made aware that he broke the blue flag law,

2    that is when it was handled.

3         Q      Okay.  But then did you report that a

4    senior general foreman of Norfolk Southern had

5    broke the blue flag law?  Did you report that to

6    the federal government?

7              MR. FRAZIER:  Object to the form of the

8    question.

9         A      I did not.

10   BY MR. TUCKER:

11        Q      Okay.  Why?

12        A      I am not required to report it to the

13   federal government.

14        Q      Okay.  All right.  Now, your report was

15   done on November the 6th; correct --

16        A      That's --

17        Q      -- 2018?

18        A      That is when it was emailed to Stephen

19   Weatherman.

20        Q      Okay.  On November the 14th, Mr. Fowler

21   and Mr. Taylor were working at Mason -- and that's

22   different from Macon.  It's Mason -- Mason Yard on

23   an intermodal train when they -- and they were

24   accused of violating the blue flag law; correct?

25        A      Based on the information that I have

Shirley Barnett                                          8/9/2022

Page 89

1    read, that is correct.

2         Q     Okay.  Did you approve the START on

3    that?

4         A     I did not.

5         Q     Did you even know about it?

6         A     I did not.

7         Q     Okay.  What is START?

8         A     START is System, Teamwork and --

9         Q     It's an acronym; right?

10        A     It is an acronym.

11        Q     Okay.

12        A     And essentially, it is a way --

13   alternative handling report.  So this is a way for

14   supervisors, employees to more collaboratively and

15   constructively address deficiencies with regard to

16   rule violations.

17        Q     It's a part of the discipline system?

18        A     It is a way of improving performance as

19   far as adherence to the rules.

20        Q     Okay.  All right.  What is Mason Yard?

21        A     What is Mason Yard?

22        Q     Yes, ma'am.

23        A     It's a rail yard within Norfolk

24   Southern's system.

25        Q     It's an intermodal yard where container

Shirley Barnett                                          8/9/2022

Page 90

1    stack trains are put together and depart.

2         A    I don't know what the mix of freight

3    they have coming through, but it is one of the

4    yards.  They have a variety of car types that would

5    go through.

6              MR. TUCKER:  Okay.  I'll make this

7    Number 8.

8         (Plaintiff's Exhibit 8 was marked for

9         identification.)

10   BY MR. TUCKER:

11        Q    Have you seen this overhead view of

12   Mason Yard?

13        A    I have not.

14        Q    Okay.  You've been there before,

15   though; correct?

16        A    I have been there.

17        Q    All right.  Tell me what you know of

18   about what was -- what Mr. Fowler and Taylor did

19   that evening that constituted a violation of the

20   blue flag law.

21        A    The information that I received was

22   that the employees were working on a slack adjuster

23   without blue flag protection.

24        Q    Okay.  And slack adjuster is a part of

25   the draft system of the car that's under -- it's

Shirley Barnett                                              8/9/2022

Page 91

1    underneath the car.  So to work on it, you would

2    have to be up under the car?

3         A      That's correct.

4         Q      Okay.  Do you know what -- whether or

5    not Mason Yard is equipped with blue flags on the

6    tracks themselves?

7         A      I -- I am not aware at this point.  I

8    would have to --

9         Q      Okay.

10        A      I'm not aware.

11        Q      It's my understanding that Mason Yard

12   has its own blue flags on each track.  All right?

13   Let's assume that for purposes of these questions.

14   Okay?

15        A      Okay.

16        Q      It's my understanding that at Mason

17   Yard carmen, Norfolk Southern carmen, do not do the

18   outbound inspections or brake tests, that they're

19   done by personnel from somebody other than

20   themselves.  Do you know who that might be?

21        A      I do not.

22        Q      I also understand that if there is a

23   repair that needs to be made that that is done by

24   your people, Norfolk Southern carmen.  Does that

25   make sense?

Shirley Barnett                                            8/9/2022

Page 92

1        A       Yes.

2        Q       Okay.  Otherwise, Fowler and Taylor

3    wouldn't have been over there; right?

4        A       I was told that they were there.  So,

5    yeah, I have to go by what I've been told.

6        Q       Okay.  All right.  Was it your -- was

7    it your understanding that when Fowler and Taylor

8    got to Mason Yard that the slack adjuster that was

9    bad was on the very last car of the train?

10       A       That is my understanding.

11       Q       All right.  And, Ms. Barnett, it's my

12   understanding that the very last car was on the

13   this end of the yard -- all right?  -- and that the

14   train extended out of the road.  Is that your

15   understanding also?

16       A       I was never told where the train was.

17              MR. TUCKER:  Okay.  I'm going to make

18   this Number 9.

19          (Plaintiff's Exhibit 9 was marked for

20          identification.)

21   BY MR. TUCKER:

22       Q       This is an exhibit in the deposition of

23   Mr. Fowler, and he drove -- he drew on there the

24   location of blue flags.  BF, blue flags.  All

25   right?

Shirley Barnett                                        8/9/2022

                                                       Page 93

1          A       Okay.

2          Q       All right.  It's my understanding that

3     the last car was a multiunit container well car.

4     Are you familiar with what I'm trying to describe

5     there?

6          A       Yes.

7          Q       Usually, what are they?  Threes or

8     fives?  And they look like three or five cars, but

9     it's actually only one car.

10         A       Yes.

11         Q       And that it was the last car and that

12    it was on -- let me mark it on there -- that it was

13    on this end of the train where I wrote "last

14    car" --

15         A       Okay.

16         Q       All right.

17                 -- and that the train had been doubled

18    or tripled over.

19                 Tell me what that tells you as a

20    mechanical company officer?

21         A       That the train had been doubled or

22    tripled over?

23         Q       Yes, ma'am.

24         A       That would say that the train had

25    been -- the cars for the train had been staged in

Shirley Barnett                                    8/9/2022

Page 94

1   multiple tracks that had to be coupled together.

2       Q     Okay.  And that would be done by a

3   switch engine going in and getting one track of

4   car -- the cars, pull it out, come out, then back

5   into another track, get those cars, come out, pull

6   it all the way out, and then couple up to the last

7   piece, which in this case would be the one with

8   the -- with the slack adjuster problem, and then

9   couple together.

10                And so three tracks would make -- cars

11  would become one train.

12      A     Okay.

13      Q     Does that make sense?

14      A     Yes.

15      Q     Okay.  All right.  So that, according

16  to the information we've got in the deposition

17  testimony, that the train extended from what I call

18  the bottom end of the yard where it's got the last

19  car out of the yard and up the line of road over a

20  mile.  All right?

21      A     Okay.

22      Q     Okay.  Now --

23            MR. FRAZIER:  You're not asking her to

24  agree with that.  You're telling her that's your

25  understanding?

Shirley Barnett                                          8/9/2022

Page 95

1    BY MR. TUCKER:

2         Q      That's my understanding.  And was that

3    your understanding, that the front end of the train

4    was out of the yard, up the road?

5               MR. FRAZIER:  Objection.  She's already

6    answered.  She said she did not know where the

7    location was.  She just told you that two minutes

8    ago.

9    BY MR. TUCKER:

10        Q      I didn't hear that.  You didn't --

11        A      I have -- was never told where the

12   train was.

13        Q      Okay.  I'm sorry.  Maybe I

14   misunderstood what you said.

15              All right.  But can we assume that

16   though for this purposes of these questions I'm

17   going to ask you?

18        A      Sure.

19        Q      Okay.  That would not be an unusual

20   situation if you double or triple it over to form a

21   train out of all those tracks; right?

22        A      Correct.

23        Q      All right.  So when Mr. Fowler and

24   Mr. Taylor get there and they find the last car has

25   the problem, what should they have done?

Shirley Barnett                                        8/9/2022

                                                       Page 96

    1        A      They should have placed blue flags on

    2   each end of the train.

    3        Q      How?

    4        A      Walking the required distance behind

    5   the last car as well as going to the head end and

    6   erecting a blue flag there as well.

    7        Q      All right.  The back end -- the bottom

    8   end, I'm going to call it -- where the bad -- bad

    9   order was, that's not a problem.  It's already got

   10   a blue flag.  I mean, it's there.

   11             MR. FRAZIER:  Are you testifying to

   12   that?

   13   BY MR. TUCKER:

   14        Q      I'm telling her to assume that.  That's

   15   what Fowler testified, I think.

   16             MR. FRAZIER:  I understand that, but

   17   that's not what you're testifying to.  Okay.

   18   You're representing that for purposes of this

   19   question as a hypothetical.

   20             MR. TUCKER:  Well, I'm sure if I had it

   21   wrong, you'd probably tell me.

   22             MR. FRAZIER:  I'm not obligated to tell

   23   you anything --

   24             MR. TUCKER:  Well, I understand that.

   25             MR. FRAZIER:  -- what you got wrong,

Shirley Barnett                                         8/9/2022

Page 97

1    Bill.  You've got a lot of things wrong, but let's
2    keep going.
3              MR. TUCKER:  I'm sure I have.
4              MR. FRAZIER:  She answered the question
5    about what they should have done.  What's the next
6    question?
7    BY MR. TUCKER:
8         Q     My next question is:  The bottom blue
9    flag takes care of itself if the track's got a blue
10   flag on it.  Correct?  It's there.  You don't have
11   to do anything special.  You can use it.
12        A     Can you repeat the question?
13        Q     Yes, ma'am.  If you assume that the
14   last car on the train had a slack adjuster that had
15   to be fixed before the train could leave, there was
16   a blue flag on that end which was already on the
17   track which could be used; correct?
18             MR. FRAZIER:  You're saying if there
19   was?
20             MR. TUCKER:  If.  I said if there was.
21             MR. FRAZIER:  Okay.
22   BY MR. TUCKER:
23        Q     Correct?
24        A     Based on your description,
25   hypothetically, yes.

Shirley Barnett                                      8/9/2022

Page 98

1      Q      Okay.  All right.  But you don't --
2  even though you're in charge of this area, you
3  don't know that?  You don't know whether it had
4  them on there or not, do you?
5      A      You're asking me whether they had blue
6  flag protection erected?
7      Q      No.  I asked you if there are blue
8  flags already on the tracks that can be used?
9      A      I do not know.
10     Q      Okay.  All right.  So how would they
11 establish blue flag protection on the other end of
12 the train, on the head end of the train?
13     A      They would need to go to the head end
14 of the train and place a blue flag on the track.
15     Q      How?  Where?
16     A      They would need to walk ahead of the
17 locomotive, or locomotives, and place a blue flag
18 on the track.
19     Q      Where?  Where?  How far in front of the
20 locomotives?
21     A      They would need to have it 150 feet
22 away from the lead unit in the consist.
23     Q      Okay.  What else would they have to do?
24     A      They would need to talk to the crew and
25 place their blue flag on the controlling

Shirley Barnett                                           8/9/2022

Page 99

1    locomotive.

2         Q     Okay.  And is that a rule that the

3    train crews are knowledgeable about also?

4         A     As far as blue flag protection?

5         Q     Under these circumstances.

6         A     Can you clarify your question?

7         Q     Yes, ma'am.  If the blue flag that you

8    placed on the locomotive is placed on the -- is it

9    placed on the throttle?

10        A     It is placed in the cab where it's

11   visible to the crew.

12        Q     Yeah.  All.  Right and the crew knows

13   that by their training, and they know what that

14   thing mean -- that flag means on their locomotive;

15   correct?

16              MR. FRAZIER:  Object to the form of the

17   question.  Go ahead.

18   BY MR. TUCKER:

19        Q     Well, let me ask it better.  Should

20   they know what it means?

21        A     Yes.

22        Q     Okay.  All right.  And the blue flag

23   that would have to be put up in front of the train,

24   does it have to be placed at a switch, or can it

25   just be placed on the track?

Shirley Barnett                                           8/9/2022

                                                         Page 100

1        A       It can do -- it's supposed to be placed

2    on the track.

3        Q       Okay.  And that would have to be a

4    portable blue flag; correct?

5        A       Correct.

6        Q       And it would have to be -- how big is

7    that?

8        A       It's -- when you -- you want

9    dimensions?  I don't know the exact dimensions.

10       Q       That's okay.  How much does it weigh?

11       A       Less than ten pounds.

12       Q       Okay.  Would they also have to place a

13   portable derail there?

14       A       In the hypothetical situation you

15   described, the head end was on the main line.

16       Q       That's my -- is that a main line coming

17   out of Mason Yard that way?

18       A       Yes.  Is that the situation you're

19   asking me about?

20       Q       That's what I'm -- if that's a main

21   line, yes.

22       A       Okay.  So we would not place a derail

23   on the main line.

24       Q       Okay.  All right.  And so they get

25   there.  They see that.  Do you have any idea how

Shirley Barnett                                          8/9/2022

                                                        Page 101

1    long it would take to walk from Mason Yard a mile

2    up along that train?

3          A      It would -- I don't know how long it

4    would take at Mason Yard, but our employees as well

5    as myself, that's one of the things that we do.

6          Q      I understand that.  I just want to know

7    how long it would take.

8          A      I can't say.  I don't have the

9    dimensions of how many cars or how long this train

10   was.

11         Q      Are there walkways up that track?

12         A      There are walking areas next to the

13   tracks.

14         Q      Where?

15         A      There are walking areas next to all the

16   tracks.

17         Q      It's not slope and ballast, main lane

18   ballast?

19         A      Employees walk on main line ballasts to

20   get to other parts of the tracks.

21         Q      I understand that, but I want to know

22   if it was main line ballast.  And I think you've

23   answered yes.  You essentially said yes.

24         A      I do not know what was there.

25         Q      Okay.  Do you know how many bridges

Shirley Barnett                                    8/9/2022

Page 102

1    there were between them?

2         A    I do not.

3         Q    If there was a bridge that had no

4    walkway, how would they get across a creek or a

5    river or a gully or anything?

6              MR. FRAZIER:  Object to the form of the

7    question.  You can answer.

8         A    Employees are required to place blue

9    flag protection on both ends of the tracks.

10   BY MR. TUCKER:

11        Q    That's not what I asked you.  I want to

12   know, if there's a bridge there that doesn't have a

13   walkway, how do they get to the other side?

14        A    I do not know if there was a bridge

15   there for them -- whether they can get to the other

16   side easily or whether they would have to drive

17   around and then walk further.

18        Q    Okay.  And walk in from the other end?

19        A    Correct.

20        Q    Okay.  And then assume you did that.

21   Say you drove up there, walked in, put your blue

22   flag on the engine, put your blue flag on the

23   track, came back around.  You fixed the car,

24   however long that takes.

25              And then you've got to do the whole

Shirley Barnett                                    8/9/2022

```
                                              Page 103
 1    thing over again; correct?  You've got to go pick

 2    it up?

 3         A       That is the requirement.

 4         Q       Okay.  All right.  Would it be easier

 5    just to have the train uncouple from the last car,

 6    pull out of the yard, blue flag the other end of --

 7    the north end of the yard, make your repair, pull

 8    your blue flags, and couple back up?

 9              MR. FRAZIER:  Object to the form of the

10    question.

11         A       I do not know what would have been

12    easier.  I was not privy to the circumstances.

13    BY MR. TUCKER:

14         Q       Okay.  All right.  So what did -- tell

15    me what Fowler and Taylor did that caused them to

16    be charged with a blue flag violation.

17              MR. FRAZIER:  Objection.  Asked and

18    answered.  But answer it again.

19         A       They did not erect blue flag protection

20    prior to making the repair to the car.

21    BY MR. TUCKER:

22         Q       Okay.  I understand that.  I want to

23    know what they did.  You said what they did not.  I

24    want to know what they did.

25         A       I was on vacation.  I do not know what
```

Shirley Barnett                                              8/9/2022

Page 104

1    they did.

2        Q       Okay.  You were not aware that they

3    used the ODB five-movement protection rule?

4        A       I am aware that they stated that that's

5    what they based their protection on, but that does

6    not apply, as they were aware that did not apply to

7    the circumstances here.

8        Q       How do you know they weren't aware?

9    Excuse me.  How do you know they were aware it

10   didn't apply?

11       A       It had been discussed for numerous

12   weeks.

13       Q       That's not what I asked you.  How do

14   you know that they didn't?

15       A       It had been discussed with all

16   employees.

17       Q       How do you know that?

18       A       Because Senior General Foreman Ware

19   stated that he had -- that he had discussed it with

20   all of his employees and there is documented

21   training that has been applied to their training

22   records.

23       Q       Do you know how that training was

24   conducted other than what Ware told you?

25       A       Can you be more specific?

Shirley Barnett                                    8/9/2022

Page 105

```
 1        Q      Yeah.  I want to know how you know that
 2   training was actually conducted other than Ware
 3   telling you.
 4        A      Because Senior General Foreman Ware
 5   told me, and I've seen him actually perform
 6   training at Savannah before in the past.
 7        Q      That's fine.  But Ware told you.
 8   That's the only reason you know that; right?
 9        A      I had a discussion with Ware.  I had
10   subsequent discussion with their local chairman,
11   Lewis Smith.
12        Q      Who -- now, what did Lewis Smith tell
13   you?
14        A      Lewis Smith asked me is there any way
15   to circumvent the movement protection rule and
16   apply it in lieu of blue flag protection.
17        Q      When?
18        A      I don't -- I don't specifically
19   remember when.
20        Q      After this?
21        A      Yes, it would have been after that.
22        Q      Okay.  Well, Lewis Smith is not --
23   what's he got to do with their training before this
24   incident?
25               MR. FRAZIER:  Object to the form of the
```

Shirley Barnett                                    8/9/2022

Page 106

1    question.

2         A       I don't know what he has to do with

3    their training before that.

4    BY MR. TUCKER:

5         Q       Okay.  Were you aware -- are you aware

6    now that Mr. Fowler and Mr. Taylor have testified

7    that they were in fact told by Lewis Ware that

8    that -- that new rule replaced the blue flag and

9    that they could use it for circumstances like this?

10        A       Can you repeat the question?

11        Q       Yes, ma'am.  Are you aware that

12   Mr. Fowler and Mr. Taylor have testified that they

13   believed at the time of this incident at Mason Yard

14   that they had been instructed by Lewis Ware that

15   the movement protection rules that we've been

16   talking about was in the -- was to take the place

17   of the blue flag law -- rule under these

18   circumstances as presented that night in Mason

19   Yard?

20        A       I am not aware of that.

21        Q       You didn't -- nobody ever told you

22   that's what they said they were taught?

23        A       I'm not aware of that.

24        Q       Okay.  If they had been taught that,

25   would that training have been improper?

Shirley Barnett                                          8/9/2022

Page 107

1      A      Had they been taught that, it would be
2   improper.
3      Q      Okay.  Are you aware of anyone else in
4   Savannah who says that they were told that that was
5   movement -- the protection was to take the place of
6   the blue flag rules under the circumstances at
7   Mason Yard that night?
8      A      I am not.
9      (Plaintiff's Exhibit 10 was marked for
10      identification.)
11  BY MR. TUCKER:
12     Q      Okay.  What were the -- maybe it would
13  be better to get this out.
14             There's Number 10, Ms. Barnett.
15             MR. TUCKER:  I understand we're going
16  to be back upstairs tomorrow?
17             MR. FRAZIER:  That's right.
18  BY MR. TUCKER:
19     Q      All right.  The blue flag -- Number 10,
20  Blue Signal Protection -- blue signal, blue flag,
21  we're all talking about the same thing, are we not?
22     A      Correct.
23     Q      All right.  Now, these are the NS
24  Operating Rules.  These operating rules reflect the
25  federal blue flag law which is one of the cardinal

Shirley Barnett                                          8/9/2022

Page 108

1   federal railroad safety laws.  Would that be a good

2   way to describe it?

3        A     Yes.

4        (Plaintiff's Exhibit 11 was marked for

5        identification.)

6   BY MR. TUCKER:

7        Q     Okay.  Now, I'll make this Number 11.

8              All right.  What is Number 11?

9        A     Number 11 is an operations division

10  bulletin, Number 5.

11       Q     All right.  Does it apply to the

12  mechanical department?

13       A     It does.

14       Q     How?

15       A     It clarifies instructions with regard

16  to employees performing -- performing work on

17  equipment within the confines of blue signal

18  protected areas.

19       Q     Well, I'm reading 22(f), which I think

20  became effective June 1, 2018, that says

21  "Mechanical Department Movement Protection -

22  Locomotives within Perimeter Blue Signal Protection

23  or operated by LSE outside Blue Signal Protection."

24       A     Okay.

25       Q     So this is inside and outside blue

Shirley Barnett                                    8/9/2022

                                                   Page 109

1   signal protection; right?

2        A      Yes.

3        Q      Okay.  And certainly on the night of --

4   what's the date?  -- November the 14th of 2018, the

5   locomotive in large -- most of the train that was

6   involved was outside blue signal protection, was it

7   not?

8        A      It was, but this subpart (f) pertains

9   to locomotive service employees, which would not be

10  like a train -- T&E crew member.

11       Q      Okay.  I understand that.  But it does

12  apply outside; right, outside the blue signal

13  protection?

14       A      When you have a locomotive service

15  employee at the head end of the --

16       Q      That's like a hostler?

17       A      A hostler.

18       Q      All right.  What does that movement

19  protection -- how does it work when a locomotive

20  are outside the blue signal protection being

21  operated by a locomotive service employee?

22              MR. FRAZIER:  Object to the form of the

23  question.  You can answer.

24       A      Can you repeat the question?

25  BY MR. TUCKER:

Shirley Barnett                                    8/9/2022

Page 110

1        Q      Yeah.  What does the rule require?

2    What is it intended to do, and what does it

3    require?

4              MR. FRAZIER:  Bill, can you get

5    specific as to which part of the rule you're

6    talking about?  It's got about eight sections in

7    here now.

8              MR. TUCKER:  That's fine.  I'm asking

9    her.  She's the --

10              MR. FRAZIER:  I know, but you were

11    asking about specific pieces before.  I want to

12    make sure that we understand.

13              MR. TUCKER:  I want to know what

14    does -- where does it apply and how do you do it.

15              MR. FRAZIER:  Where does what apply?

16    That's my point.

17              MR. TUCKER:  Movement protection.

18        A      Mechanical department movement

19    protection applies to locomotives and equipment

20    within the confines of the perimeter blue flag area

21    or if it is being operated by a mechanical

22    department employee who has a locomotive hostler's

23    license outside a blue flag protected area.

24    BY MR. TUCKER:

25        Q      Okay.

Shirley Barnett                                    8/9/2022

Page 111

    1      A      It requires several communications to

    2   take place and that the equipment have the hand

    3   brakes set so that it is protected against movement

    4   and further communications with regard to who is

    5   going between the equipment and the operator, the

    6   mechanical department operator.

    7      Q      All right.  And how does one get

    8   movement protection under those circumstances?

    9      A      If a mechanical department employee is

   10   operating a locomotive outside of the blue signal

   11   protected area, then the employee has to verbally

   12   request it.

   13      Q      Is what that employee requesting

   14   essentially the same as what train crews do when

   15   they ask for three-step protection?

   16      A      It is a similar process.  In this case,

   17   it would be all mechanical department employees

   18   operating and requesting.

   19      Q      I understand.  But what -- three-step

   20   protection, if I remember right -- help me here --

   21   you ask the engineer, the person operating the

   22   engine, for three-step protection.  And they have

   23   to -- they have to do something with the brakes,

   24   something with the throttle, and put the reverser

   25   into -- is it neutral or -- the middle, not

Shirley Barnett                                    8/9/2022

Page 112

1    forward; is that right?

2         A       That's correct.

3         Q       And that will prevent anything from

4    moving?

5         A       That is what is required.

6         Q       Right.  And that's what it's intended

7    to do, prevent movement?

8         A       When you say "it," what are you

9    referring to?

10        Q       When movement protection -- it's

11   designed so that the equipment won't move?

12        A       That's correct.

13        Q       All right.  Okay.  And was it your

14   understanding or is it your understanding now that

15   the -- Mr. Fowler or Mr. Taylor actually performed

16   those steps which would have complied with ODB 5 if

17   it had been a mechanical department employee

18   operating it under the circumstances called for by

19   ODB 5?

20        A       The work that they were performing

21   would not have been protected.  ODB 5 doesn't

22   circumvent the blue flag requirements.

23        Q       I understand that.  But is it your

24   understanding that what they did do that night

25   followed ODB 5 even though you say ODB 5 didn't

Shirley Barnett                                      8/9/2022

Page 113

1    apply?  I got that.  But what they did followed the
2    pattern that should have been followed if ODB 5 had
3    applied?
4            MR. FRAZIER:  You're asking her if she
5    knows that?
6            MR. TUCKER:  Yes.
7        A       I do not know what they did other than
8    violate blue flag rules.
9    BY MR. TUCKER:
10       Q       You don't know -- nobody ever told
11   you -- let me ask you this.  Strike that.
12               Did you have any contact or any
13   knowledge of any discipline issued about the
14   incident in Mason Yard prior to the actual START
15   being offered to them and signed?
16       A       I was on vacation when this occurred.
17       Q       That's not what I asked you,
18   Ms. Barnett.  I asked you did you know anything
19   about it or have any contact about it.  That's what
20   I asked.  I didn't ask you if you were on vacation.
21           MR. FRAZIER:  I'm going to object to it
22   on one other ground.  She's answered that
23   question --
24           MR. TUCKER:  No, she hasn't.
25           MR. FRAZIER:  -- specifically before.

Shirley Barnett                                    8/9/2022

                                                   Page 114

1    Yes.  You asked her before.  But answer it again.

2         A      No.

3         Q      No.  Okay.  Were you aware -- well,

4    you've been to Savannah before to the mechanical

5    department; right?

6         A      Correct.

7         Q      And you've been in the carmen shack.

8    You've been in the buildings that they use, the

9    repair facility and those places?

10        A      There's one building that mechanical

11   works out of.

12        Q      Okay.  Are you aware that Mr. Fowler

13   overheard Mr. Ware after this incident in Mason

14   Yard took place and they were disciplined, that

15   Mr. Fowler overheard Mr. Ware telling a

16   transportation department supervisor that they had

17   set up Fowler and Taylor and that you had planned

18   it?

19        A      I had a conversation at some point with

20   Lewis Ware just about how ridiculous that rumor,

21   allegation, was.

22        Q      So you think Mr. Fowler was lying when

23   he said that?

24        A      That is a totally false statement.

25        Q      How do you know that?

Shirley Barnett                                      8/9/2022

Page 115

1      A      With regard to me setting or Lewis Ware

2    setting anything up with Mr. Taylor and Mr. Fowler,

3    that would be a false statement if it was made.

4      Q      Okay.  You're not denying -- you don't

5    know whether Ware actually said it or not.  You're

6    just saying it didn't happen?

7      A      I would say that my information is that

8    the allegation was made by someone.  Mr. Ware

9    denied saying it.  And I am -- I have never heard

10   Mr. Ware even talking in a way of -- in that

11   manner.

12     Q      You don't know whether he said it or

13   not.  You do know that he denies saying it?

14     A      I am aware that Mr. Ware denies saying

15   it.

16     Q      But you don't know whether he did or

17   did not.  You weren't there to hear it?

18     A      Correct.

19     Q      Okay.  If you assume that Mr. Fowler

20   and Mr. Taylor requested movement protection from

21   the train crew in order to make that repair, would

22   that have been recorded?  By radio, I mean.  Excuse

23   me.  By radio.

24           MR. FRAZIER:  Would it have been?

25           MR. TUCKER:  Yes.

Shirley Barnett                                    8/9/2022

                                                    Page 116

 1        A      Probably.

 2   BY MR. TUCKER:

 3        Q      Did you ever go back and listen to any

 4   audio or radio communication?

 5        A      I did not.

 6        Q      Do you know of anybody who did?

 7        A      I do not.

 8        Q      Does an employee have an obligation --

 9   if that employee knows either by hearing or seeing

10   that a rule violation has taken place, is taking

11   place, or is about to take place, does that

12   employee have an obligation to stop the violation

13   from taking place?

14            MR. FRAZIER:  Object to the form of the

15   question.

16        A      Can you repeat the question?

17   BY MR. TUCKER:

18        Q      If an employee, a Norfolk Southern

19   employee, knows that a rule violation -- an act is

20   going to -- somebody's going to do something that

21   is a rule violation or they see them violating the

22   rule, should they -- should they tell them to stop

23   and to prevent the rule violation from occurring or

24   going any further if it's already started?

25        A      Yeah.

Shirley Barnett                                        8/9/2022

Page 117

1              MR. FRAZIER:  Object to the form.

2     You've answered.

3     BY MR. TUCKER:

4         Q      All right.  If Mr. Fowler and

5     Mr. Taylor followed the movement protection rules

6     and asked the locomotive engineer on the train for

7     movement protection, which would be to set the gear

8     selector to neutral, apply the locomotive brake,

9     make a brake pipe reduction sufficient to hold the

10    equipment, in other words, the three-step, under

11    those circumstances as existed in Mason Yard that

12    night, should the locomotive engineer refuse to do

13    it and told them, no, you've got to establish blue

14    flag protection?

15             MR. FRAZIER:  Object to the form of the

16    question.

17        A      I am not aware of what the engineer

18    understood about what was being done on the rear of

19    the train.

20    BY MR. TUCKER:

21        Q      That's not what I asked you.  If he was

22    told that they wanted movement protection, should

23    the engineer have said, no, you've got to establish

24    blue flag?

25             MR. FRAZIER:  Same objection to the

Shirley Barnett                                    8/9/2022

Page 118

1   form of the question.

2        A      Can you repeat the question?

3   BY MR. TUCKER:

4        Q      Should the engineer have stopped -- not

5   done the movement protection when requested and

6   said, no, you've got to establish blue flag

7   protection?

8              MR. FRAZIER:  Object to the form.

9        A      I would need to know a lot more about

10  what was stated.  I don't know that the -- what the

11  engineer understood, and I don't know what the --

12  Mr. Fowler and Mr. Taylor stated to the engineer or

13  the conductor or anybody else.  I would -- I would

14  need more information.

15  BY MR. TUCKER:

16       Q      Okay.  Let's see if we can give it to

17  you.  They asked for blue -- they -- excuse me.

18  They asked for three-step protection, the three --

19  the movement protection that we -- and the engineer

20  confirms to them that it is done, and they go in

21  and repair -- so that they could do a repair on

22  that car.

23              Should the engineer have said, no,

24  you've got to do blue flag?

25              MR. FRAZIER:  Object to the form of the

Shirley Barnett                                  8/9/2022

Page 119

1    question.  Also asked and answered.

2              MR. TUCKER:  It's not asked and

3    answered.  I gave her more information.

4        A     No.  The engineer would not necessarily

5    know what was being done to the train.

6    BY MR. TUCKER:

7        Q     If he was told, we've got to go in

8    there and repair the slack adjuster that's keeping

9    you from moving?

10             MR. FRAZIER:  Objection to form.

11   BY MR. TUCKER:

12       Q     Go ahead, Ms. Barnett.

13       A     I would need more information about --

14   with regard to that.  I really don't know -- as far

15   as the engineer's training, like based on what was

16   said, I don't know what the engineer would have

17   understood.

18       Q     Okay.  So you don't have enough

19   knowledge to make a determination about that?

20       A     I do not have enough knowledge

21   regarding this situation to make a determination.

22             MR. TUCKER:  Syd, let me have a couple

23   of minutes, and I may be about through.

24             MR. FRAZIER:  Sure.

25             (Proceedings in recess, 12:03 p.m. to

Shirley Barnett                                              8/9/2022

Page 120

```
 1          12:11 p.m.)

 2    BY MR. TUCKER:

 3          Q     Do you know whether that train in Mason

 4    Yard that night was late?

 5               MR. FRAZIER:  L-A-T-E, late?

 6               MR. TUCKER:  L-A-T-E.

 7          A     I do not.

 8    BY MR. TUCKER:

 9          Q     Okay.  You don't know what its status

10    was as far as time?

11          A     I don't.

12          Q     Okay.  Do you know what -- do you know

13    whether it was a key train?

14               MR. FRAZIER:  A key train?

15               MR. TUCKER:  A key, yes.

16          A     I do not.

17    BY MR. TUCKER:

18          Q     Okay.

19          A     Well, since it had an intermodal car in

20    it, I would speculate no, but I don't know for

21    sure.

22          Q     Intermodals --

23               MR. FRAZIER:  Don't speculate.

24    BY MR. TUCKER:

25          Q     -- aren't key trains?
```

Shirley Barnett                                    8/9/2022

Page 121

1        A       Yes.  I do not know.

2        Q       What are touch points?

3        A       Touch points?

4        Q       Yeah.  I noticed in your evaluations

5   that they talked about your touch points.

6        A       Touch points were a system of

7   communicating with supervisors agreement employees

8   that focused on specific areas.  So you can perform

9   a touch point with someone about doing a good job

10  with something specific.

11       Q       Do they -- is it one of -- a management

12  fad?

13       A       It was a management tool at the time.

14               MR. TUCKER:  One man's tool is another

15  man's fad?  Is that -- don't answer that.  You

16  don't have to.

17               Syd, that's all I've got.

18               MR. FRAZIER:  We will see you later.

19               No questions.  No questions.

20               THE COURT REPORTER:  Reading and

21  signing?  Reserving signature or waiving?

22               MR. FRAZIER:  I would like for her to

23  read and sign it, please.

24               MR. TUCKER:  All I want is the

25  condensed but with the word index and exhibits.

Shirley Barnett                                    8/9/2022

Page 122

1              THE COURT REPORTER:  Okay.

2         (Deposition concluded at 12:13 p.m.)

3         (Pursuant to Rule 30(e) of the Federal Rules

4          of Civil Procedure and/or O.C.G.A.

5          9-11-30(e), signature of the witness has been

6          reserved.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Shirley Barnett                                                        8/9/2022

Page 123

1   STATE OF GEORGIA:

2   COUNTY OF FULTON:

3

4           I hereby certify that the foregoing

5           transcript was reported, as stated in the

6           caption, and the questions and answers

7           thereto were reduced to typewriting under my

8           direction; that the foregoing pages represent

9           a true, complete and correct transcript of

10          the evidence given upon said hearing, and I

11          further certify that I am not of kin or

12          counsel to the parties in the case; am not in

13          the employ of counsel for any of said

14          parties; nor am I in any way interested in

15          the result of said case.

16

17

18

19

20

21

22                    _____

23                    Joel P. Moyer, CCR 2745

24

25

Shirley Barnett                                                    8/9/2022

Page 124

1            DISCLOSURE OF NO CONTRACT

2            I, Joel P. Moyer, Certified Court
   Reporter, do hereby disclose pursuant to
3  Article 10.B. of the Rules and Regulations of the
   Board of Court Reporting of the Judicial Council of
4  Georgia that I am a Georgia Certified Court
   Reporter; I was contacted by the party taking the
5  deposition to provide court reporting services of
   this deposition; I will not be taking this
6  deposition under any contract that is prohibited by
   O.C.G.A. 15-14-27(a) and (b) or Article 7.C. Of the
7  Rules and Regulations of the Board; and I am not
   disqualified for a relationship of interest under
8  O.C.G.A. 9-11-28(c).

9            There is no contract to provide reporting
   services between myself or any person with whom I
10 have a principal and agency relationship nor any
   attorney at law in this action, party to this
11 action, party having a financial interest in this
   action, or agent for an attorney at law in this
12 action, party to this action, or party having a
   financial interest in this action.  Any and all
13 financial arrangements beyond my usual and
   customary rates have been disclosed and offered to
14 all parties.

15           This 23rd day of August 2022.

16

17

18

19

20            --------------------------
              Joel P. Moyer, CCR 2745
21

22

23

24

25

Shirley Barnett                                                          8/9/2022

**A**

**a.m** 1:14 58:2,3
**ability** 34:3,22
**able** 19:23 30:13
  40:24 41:6
**account** 58:12
**accounted** 38:24
  39:2
**accumulated**
  37:3,3
**accuse** 26:9
**accused** 26:7
  88:24
**acronym** 89:9
  89:10
**act** 116:19
**action** 1:4
  124:10,11,11
  124:12,12,12
**actual** 113:14
**add** 49:3
**added** 32:19
**additional** 46:2
**address** 10:11
  61:1 89:15
**addressed** 81:22
**adherence** 89:19
**adjacent** 69:7
**adjuster** 90:22
  90:24 92:8
  94:8 97:14
  119:8
**aerial** 3:18
**afforded** 66:21
**agency** 124:10
**agent** 124:11
**ago** 26:2,5 35:21
  35:22 95:8
**agree** 50:23
  52:14 55:12
  71:8,13 79:3,8
  94:24
**agreed** 15:6
**agreeing** 52:6,12
**agreement**

12:22 39:10
  67:6 75:19
  121:7
**ahead** 10:9
  22:17 27:23
  29:7 31:23
  53:6 85:8
  98:16 99:17
  119:12
**Akin** 43:7
**al** 1:7
**Alabama** 2:5,11
**allegation** 45:5
  59:2 77:8
  114:21 115:8
**allegations** 3:10
  25:8,19 29:15
  54:11
**allow** 52:17,18
  54:24 78:25
**allows** 46:23
**alternative**
  89:13
**and/or** 27:13
  49:7,17 122:4
**annual** 3:13
  30:23,25 31:15
  81:23
**anonymous**
  23:17,19,20
**answer** 4:22
  10:4,14 20:22
  21:3,11,25
  22:14,17 27:23
  29:7 32:25
  34:20 48:24
  51:5,21 52:11
  53:3 55:19
  66:9 70:18
  71:22 84:1
  102:7 103:18
  109:23 114:1
  121:15
**answered** 26:18
  47:6 48:19
  52:9 70:6,9

71:22 83:23,25
  95:6 97:4
  101:23 103:18
  113:22 117:2
  119:1,3
**answering** 22:11
  70:20
**answers** 123:6
**anybody** 22:4
  34:1 116:6
  118:13
**anymore** 8:15
**apart** 63:22
**apologize** 25:17
  41:13 76:9
  84:19
**appeal** 62:13
**appear** 42:7,14
**APPEARAN...**
  2:1
**applicable** 63:6
**applied** 77:11
  82:14 104:21
  113:3
**applies** 110:19
**apply** 104:6,6,10
  105:16 108:11
  109:12 110:14
  110:15 113:1
  117:8
**appraisal** 39:25
**appreciate**
  60:16
**approve** 89:2
**approving** 20:11
**area** 49:3 98:2
  110:20,23
  111:11
**areas** 8:2 101:12
  101:15 108:18
  121:8
**arguing** 81:3
**arose** 17:15
  47:20
**arrangements**
  124:13

**Article** 124:3,6
**asked** 18:6
  20:10 23:17
  48:19 52:8
  64:7 71:21
  83:23 86:16
  98:7 102:11
  103:17 104:13
  105:14 113:17
  113:18,20
  114:1 117:6,21
  118:17,18
  119:1,2
**asking** 15:12
  21:25 22:12
  50:23 53:18
  63:18 94:23
  98:5 100:19
  110:8,11 113:4
**asks** 64:20
**assistant** 6:1
**assume** 4:21,22
  17:18 74:10
  91:13 95:15
  96:14 97:13
  102:20 115:19
**assuming** 25:22
  61:13
**astonishing** 47:2
**Atlanta** 1:2,19
  5:2 7:11,22
**attached** 3:23
  13:24 17:12
**attaching** 14:6
  14:19
**attention** 9:11
**attorney** 10:24
  124:10,11
**attorney-client**
  10:1 20:20
  21:4,22
**audio** 116:4
**August** 1:13 4:2
  6:17 124:15
**available** 33:1
  56:24 57:6,7,8

61:23
**award** 81:24
**aware** 19:5,9,15
  19:20 23:25
  27:8,10 42:25
  47:13 54:10
  57:19 64:6
  88:1 91:7,10
  104:2,4,6,8,9
  106:5,5,11,20
  106:23 107:3
  114:3,12
  115:14 117:17
**awful** 42:11

**B**

**b** 124:6
**B-O-O-M** 69:21
**B6** 8:6,7
**back** 13:5 19:23
  32:11 42:11,17
  50:11 52:25
  53:7 70:17
  94:4 96:7
  102:23 103:8
  107:16 116:3
**bad** 26:4 31:20
  32:2,3,4,7,12
  32:20,23 33:9
  33:13,18 34:3
  34:4,12,16,22
  35:5 36:12
  37:2,2,3,4,4,15
  37:16,19,22
  39:5,7,13
  41:15,22,24
  42:6,18 43:1,4
  44:10,14,16,23
  45:6 48:13
  50:10 57:20
  58:8,8,11 59:3
  65:24 66:7
  70:24 71:6
  72:16 73:1,7
  73:15,20 74:4
  75:13,14 84:15

84:15,23 85:23
86:3 87:5 92:9
96:8,8
**ballast** 101:17
101:18,22
**ballasts** 101:19
**band** 8:5,6,8
**bargaining** 67:5
75:18
**Barnett** 1:11 3:2
3:8,9,11,15 4:1
4:5,11 9:22
19:20 20:21
41:11 58:5
69:1 70:17
83:10 85:21
92:11 107:14
113:18 119:12
**base** 36:15
**based** 44:2 71:1
71:23,24 88:25
97:24 104:5
119:15
**basis** 43:23
**began** 6:17
**behalf** 2:2,8
**belief** 50:17,25
59:14 60:9
**believe** 7:11,14
15:16 31:4
52:25 53:7
82:16,20 84:12
**believed** 51:3,7
51:10 106:13
**believes** 65:18
66:1
**better** 48:19
99:19 107:13
**beyond** 124:13
**BF** 92:24
**big** 55:7 100:6
**bill** 9:2 14:21
18:5 22:5 24:8
24:21 48:14,18
67:4,4 75:11
97:1 110:4

bill@mtandj.c...
2:6
**billed** 75:9
**biller** 49:3
**billing** 48:20
49:1
**Birmingham**
2:5,11 6:18,23
**BKTY** 47:19
50:5 53:15,15
64:5 70:21
**blew** 69:15
**blind** 25:18,20
25:21
**blue** 3:19 10:22
16:12,25 17:5
25:22 38:6
42:12 76:23,25
77:3,10,17,18
77:23 78:1,7
79:5,9,17 80:4
80:13 81:8,12
82:1,10,13,25
83:21 87:10,14
87:22 88:1,5
88:24 90:20,23
91:5,12 92:24
92:24 96:1,6
96:10 97:8,9
97:16 98:5,7
98:11,14,17,25
99:4,7,22
100:4 102:8,21
102:22 103:6,8
103:16,19
105:16 106:8
106:17 107:6
107:19,20,20
107:20,25
108:17,22,23
108:25 109:6
109:12,20
110:20,23
111:10 112:22
113:8 117:13
117:24 118:6

118:17,24
**Board** 124:3,7
**bonus** 82:4 83:5
84:10
**boom** 69:18,21
**bottom** 94:18
96:7 97:8
**boxcar** 54:12
**brake** 37:20,23
91:18 117:8,9
**brakes** 46:23
111:3,23
**break** 26:23
57:23 78:25
79:16 83:13,14
**breakdown**
71:23
**breaking** 78:19
79:4
**breaks** 63:11
**bridge** 102:3,12
102:14
**bridges** 101:25
**broke** 45:14
82:25 87:22
88:1,5
**broken** 79:10
**brought** 70:15
86:24
**building** 114:10
**buildings** 114:8
**bullet** 25:8
**bulletin** 108:10
**bus** 55:12

_____
**C**
**C** 2:3
**cab** 99:10
**call** 30:5 61:5
67:12 94:17
96:8
**called** 25:22
26:22 36:24
48:1 61:11
73:16 112:18
**capable** 8:23

56:3 57:4
**capacity** 4:14
**caption** 123:6
**car** 7:5,10,12,22
17:4 32:6,11
32:16 33:7
37:19 39:5
45:15,21 46:1
46:6,9,13,20
47:1 48:14
50:9,12,13
51:18,19,25
52:2,16,18
53:11,13,19,21
54:3 55:1,14
55:15,20 56:1
56:8 59:12,14
59:16,17 60:1
60:18 63:9,10
63:24 65:22
66:2,4,10,12
70:21 71:7,24
74:3,25 75:10
75:13,14 76:4
76:18 77:20
78:2,22 79:1,5
79:11 80:3
83:12,18 84:4
90:4,25 91:1,2
92:9,12 93:3,3
93:9,11,14
94:4,19 95:24
96:5 97:14
102:23 103:5
103:20 118:22
120:19
**car's** 78:20
**car-related** 75:7
76:14 84:6
**cardinal** 107:25
**care** 40:24 97:9
**career** 6:16,17
13:14,20,21,25
14:6
**Carl** 42:11
**carman** 13:13

14:10 37:18
40:9 45:14
58:8 59:13,16
59:23,25 60:8
60:11 62:3,11
63:12,21,23
65:18,23 66:1
66:6,10 71:24
75:17
**carman's** 72:6,7
**carmen** 6:9
13:12 32:20
91:17,17,24
114:7
**Carolina** 5:6,14
**cars** 5:17 7:4 9:6
9:11 39:7
44:24,25 45:25
47:19 49:8
50:5,17,19
53:15 54:10
57:14,15 58:15
64:6 72:16
73:1,15,22
74:6,8,13
76:16 78:14,14
78:23 84:15,16
84:24 85:24
86:4 87:6 93:8
93:25 94:4,5
94:10 101:9
**case** 11:2 18:15
18:18 20:15
35:20 71:17
73:23 94:7
111:16 123:12
123:15
**cause** 38:13 41:4
47:12
**caused** 63:25
103:15
**causes** 63:11,22
63:22
**CCR** 1:22
123:23 124:20
**cell** 16:16,21

Shirley Barnett                                                    8/9/2022

certain 39:11
46:7,11
certainly 109:3
Certified 124:2
124:4
certify 123:4,11
chain 27:16 29:5
62:21
chains 8:3
chairman 61:17
61:18 62:15
105:10
change 6:8 9:12
9:12
changed 7:24
changes 6:6
charge 5:17 68:9
68:15 98:2
charged 16:15
63:24 65:23
66:6 103:16
charges 66:18
check 32:22
Circle 1:17
circumstances
15:9,11 46:8
46:12 78:2
80:3 99:5
103:12 104:7
106:9,18 107:6
111:8 112:18
117:11
circumvent
105:15 112:22
cited 46:2
City 7:9
Civil 1:4 122:4
claims 75:18
clarification
66:12
clarifies 108:15
clarify 80:7 99:6
clean 35:16
clear 18:5,11
19:1 20:5 40:1
cleared 20:2

clerk 6:18,20,21
13:3
close 9:16 28:18
closest 57:6,7,8
coaching 40:10
coastal 5:9
code 48:21,22
63:6
coded 48:7,11
collaboratively
89:14
collective 67:5
75:18
Color 3:17,18
come 19:23 50:9
50:13 72:10
94:4,5
comes 21:9,20
46:13 63:22
coming 48:18
84:14,23 90:3
100:16
command 27:16
29:5
comment 18:3
26:14 47:2,4
67:1,2
comments 34:3
49:2,3
committed 17:7
communicated
87:19
communicating
121:7
communication
116:4
communicatio...
22:13 111:1,4
company 1:7
12:18 30:22
93:20
compilation
24:11
compiling 14:14
complaint 10:17
23:17,19 24:3

25:10 27:9,11
28:9,10,13,15
43:12 44:1
45:16
complaints
23:23 24:1,11
27:17 43:16
complete 123:9
completed 31:7
32:10 77:9
compliance 61:5
61:9,12 62:14
complicate 39:9
complied 112:16
comply 60:4,11
62:6 63:7
component 46:4
computer 48:6
75:13
computers
61:25
concern 86:6
concerned 86:3
concerns 84:14
84:23 85:23
86:19 87:2,4
concluded 72:1
122:2
conclusion
10:18 74:20
84:2
condensed
121:25
condition 57:11
59:25 63:10,24
65:19 66:2,2
conducted 27:6
104:24 105:2
conductor 57:18
118:13
conferred 42:3
confines 108:17
110:20
confirm 33:5
39:11 58:13
confirmed 32:12

75:5 84:5
confirms 118:20
connections
40:3,21
consist 57:13,15
57:18 98:22
constituted
16:25 90:19
constructively
89:15
contact 113:12
113:19
contacted 124:4
contacting
69:18
contained 29:16
52:21
container 89:25
93:3
contend 14:9
content 20:18,25
continue 52:18
53:10
continued 53:8
contract 124:1,6
124:9
controlling
98:25
conversation
44:2 49:7,10
49:20 50:4,11
67:9 77:5
114:19
convoluted 29:9
Conway 68:23
copy 13:25
26:24 35:16,18
70:14
Corporation
3:21
correct 5:12 8:4
8:9,12 11:22
12:19 14:1,10
14:11,15,17
15:7,8 16:17
17:15,16 18:20

19:13,14 21:7
21:18 22:19
28:19,24 29:2
29:14 30:20,21
32:1,17 34:18
36:12,24 37:1
38:8,9 39:3
42:23 43:1,9
43:17 44:9,18
45:1 46:8
47:18,21 48:4
48:9 50:6 54:4
54:7,18 55:13
56:2,22 59:8
59:22 66:19
68:17 69:16
72:4 73:5,17
74:2 75:24
76:21 78:5,6
78:10,11,14,16
80:14 81:5,7
82:2,6,7 87:8
88:15,24 89:1
90:15 91:3
95:22 97:10,17
97:23 99:15
100:4,5 102:19
103:1 107:22
112:2,12 114:6
115:18 123:9
Cortez 28:22
59:6
Council 124:3
counsel 2:1
123:12,13
count 31:20 33:9
33:13,18 36:13
36:14 37:2,5
counts 34:5 58:9
COUNTY 123:2
couple 6:6 94:6
94:9 103:8
119:22
coupled 94:1
coupler 46:5,8
46:12,19,22,25

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Shirley Barnett                                          8/9/2022

Page 128

50:9,12 51:19 52:1,15,19 53:10,10 70:24 72:10
couplers 50:18 51:14 73:11
course 10:25 19:16 24:2
court 1:1 66:24 67:12 121:20 122:1 124:2,3 124:4,5
cover 5:5 70:23
covered 10:1
covering 71:5 72:9
craft 13:11,12
creek 102:4
crew 57:11,13 77:21 98:24 99:11,12 109:10 115:21
crews 99:3 111:14
criteria 33:13
cross 45:22 46:1 46:3,4,10 47:24 48:7,12 48:22 53:14 54:1,1 70:20 70:23 71:3,5,6 72:9,9 82:22
cross-examine 81:2
CSR 16:7 17:9 42:2,7,14
currently 5:5 56:10
customary 124:13
cut 73:7,9,10,23 75:4 76:20 79:25 82:17

D
damaged 73:10

dangerous 46:12,16,19,21 46:25 50:18 54:23
Daniels 14:3,4,9 15:7 16:11,24
Daniels' 13:25 14:19 15:10,11 17:9
date 29:22 77:1 109:4
dated 30:17
day 61:7 124:15
days 16:13
dealing 24:3
decision 20:5 41:7
declaration 3:9 11:2,3,4,10,19 14:1,7,21 15:1 15:4 16:10 18:19 24:21,22 25:2,4 41:12 41:25 42:17
defect 33:5 38:3 38:5 48:12,16 56:16 59:24 60:10 62:4 65:19 66:2,6
defective 32:5 44:24 45:1,8 45:11,13,15,20 45:22,23,25 46:7,10 48:5 53:9 57:14 59:12,14 65:22 66:11,13 71:18 72:1 73:9
defects 39:11 58:13
Defendant 2:8
Defendants 1:8
deferred 15:5,10 16:6,13
deficiencies 89:15

Define 55:5
definitely 34:2
definitively 72:11
delay 38:13 63:22 82:19 83:17
delayed 19:22
delays 38:24 39:1
demand 9:11
denied 59:7 115:9
denies 115:13,14
denying 115:4
depart 90:1
department 20:5,8,11 29:3 33:11 37:12 53:13,19,20 73:22 77:9,20 78:4,8 82:16 85:16 108:12 108:21 110:18 110:22 111:6,9 111:17 112:17 114:5,16
departments 82:23
departure 38:14
depending 38:3 38:13 56:15
deposed 4:20
deposition 1:10 3:8 4:1 9:23 10:7 18:8,9 21:9,20 22:22 23:5 35:11,20 35:23 70:15,19 92:22 94:16 122:2 124:5,5 124:6
depositions 20:15 23:3,8
deputy 8:18
derail 100:13,22

derailment 63:11
derailments 47:12
describe 93:4 108:2
described 100:15
description 97:24
designed 73:19 112:11
details 44:6 70:3
determination 119:19,21
determine 30:13 86:9,17
determined 65:22 66:11 81:10,11 86:11
Dianne 1:11 3:2 3:8,9,11,15 4:1 4:5,11 9:1 15:1 15:16 85:21
difference 77:16
different 8:2,2 18:10 28:7 48:20 54:5 88:22
dimensions 100:9,9 101:9
direct 6:3 12:15 28:19 31:6
directing 21:24 64:8
direction 123:8
directive 65:21
directly 5:25
director 4:15 6:1 7:25
disagree 37:8 67:13,14 71:8
disagreed 11:7
discipline 12:10 13:21 15:5 41:14,22 44:19

derailment 87:5 89:17 113:13
disciplined 41:23 42:5,13 42:23 63:13 66:13 81:8,13 82:4 85:23 86:4 114:14
disclose 124:2
disclosed 124:13
DISCLOSURE 124:1
discourage 39:6
discuss 60:13
discussed 20:18 20:25 33:19 34:14 35:11 75:8 78:9 104:11,15,19
discussing 86:12
discussion 33:21 33:23 105:9,10
discussions 25:13
dispute 23:13 47:20
disqualified 124:7
distance 96:4
DISTRICT 1:1 1:1
division 1:2 3:21 5:8,9 7:20,23 8:24 34:15 35:15 36:3,8 36:13,23,25 37:12 69:8 108:9
divisions 36:1
DMMO 3:14 4:18 7:20
doctors 20:1
document 16:8 29:16
documented 104:20

Shirley Barnett                                              8/9/2022

**doing** 16:25 17:3
62:19,25 80:19
82:21,22 121:9
**door** 54:22,24
55:15,21 56:20
**door's** 55:25
**doors** 54:11,12
54:14,18,21
55:7,16,17
**double** 48:25
95:20
**doubled** 93:17
93:21
**draft** 46:5 90:25
**drew** 92:23
**drive** 102:16
**drove** 92:23
102:21
**due** 40:4
**dues** 13:10
**duly** 4:6
**Dunbar** 2:9
**duties** 40:24
64:18
**duty** 9:12
**dwell** 37:2,3

————————
**E**
————————
**earlier** 72:3
**Earth** 11:13
**easier** 59:1
103:4,12
**easily** 102:16
**education** 74:23
**effect** 37:17 38:2
38:2,18
**effective** 108:20
**effects** 37:15
**efficiently** 58:15
**eight** 110:6
**either** 18:17
24:25 32:8
38:11 49:19
59:20 66:17
67:9 71:16
116:9

**ejecting** 70:23
**eliminate** 75:17
**email** 3:11 25:1
25:21 29:17
30:17,17
**emailed** 88:18
**emergency**
47:11
**emphasis** 9:13
**employ** 123:13
**employed** 4:12
**employee** 16:11
39:10 48:13,16
60:4,17,20
62:6 63:17
64:20 65:12
66:13,21 68:9
68:13,19,20
78:4 109:15,21
110:22 111:9
111:11,13
112:17 116:8,9
116:12,18,19
**employee's**
68:12
**employees** 19:19
24:4 34:21
40:8,12 41:2,3
85:16,19,19,22
86:2,13,18
87:1,3 89:14
90:22 101:4,19
102:8 104:16
104:20 108:16
109:9 111:17
121:7
**empty** 37:5
**encourage** 39:10
**ends** 102:9
**engine** 94:3
102:22 111:22
**engineer** 57:18
111:21 117:6
117:12,17,23
118:4,11,12,19
118:23 119:4

119:16
**engineer's**
119:15
**engines** 78:23
**ensued** 25:14
**entering** 75:13
**entire** 11:9
86:12
**equipment**
78:20 108:17
110:19 111:2,5
112:11 117:10
**equipped** 91:5
**erect** 103:19
**erected** 98:6
**erecting** 96:6
**escalating** 62:20
**Esquire** 2:3,3,9
**essentially** 8:1
89:12 101:23
111:14
**establish** 98:11
117:13,23
118:6
**established**
40:11
**et** 1:7
**ethics** 61:5,8,11
62:14
**evaluated** 34:7
34:11,18,22
**evaluation** 31:7
33:10,14,20,24
33:25 39:25
**evaluations**
30:23,25 121:4
**evaluator** 31:3,5
**evening** 90:19
**events** 19:16
26:5 87:25
**everybody**
36:10 67:4
**evidence** 68:15
123:10
**exact** 68:5 100:9
**EXAMINATI...**

3:3 4:8
**EXAMINATI...**
3:1
**examined** 4:6
**Excepted** 12:21
**exceptions**
58:16
**exclude** 18:23
**excuse** 8:25
37:21 51:13
56:18 58:6
59:24 60:18
75:22 81:10
84:15 104:9
115:22 118:17
**execute** 40:25
**exhibit** 3:8,9,10
3:11,13,14,15
3:17,18,19,21
4:3 11:15 14:1
14:7 15:16,18
15:24 16:3,3
24:21,23,23
27:1 29:16
30:1,10,11
31:11 35:6
39:24 58:21
81:18 90:8
92:19,22 107:9
108:4
**exhibits** 3:6,7,23
11:21 121:25
**existed** 117:11
**existing** 40:7
**expedite** 38:11
**expression**
39:15
**extended** 92:14
94:17

————————
**F**
————————
**f** 2:9 109:8
**facility** 56:21
114:9
**fact** 35:9,22 75:8
79:19 82:15,18

106:7
**fad** 121:12,15
**fairly** 19:11
**faith** 66:1
**fall** 55:1
**false** 114:24
115:3
**falsifying** 65:23
66:7,14,14
**familiar** 8:11
47:16,22 93:4
**far** 89:19 98:19
99:4 119:14
120:10
**feared** 84:13,22
85:3,9,14
**February** 6:23
**federal** 63:6
77:25 81:9
87:11,15,17,19
88:6,13 107:25
108:1 122:3
**feel** 85:1,3,9
86:2,5,25 87:3
**feet** 16:16,21
98:21
**felt** 52:19 85:22
86:8,14,18
**figured** 67:15
**FILE** 1:4
**finally** 71:11
**financial** 124:11
124:12,13
**find** 25:12 42:1
44:15 45:21
48:17 70:14
85:15,18 95:24
**findings** 30:18
**finds** 37:19
**fine** 9:19 105:7
110:8
**first** 4:6 43:18
56:24
**five** 93:8
**five-movement**
104:3

Shirley Barnett                                                8/9/2022

**fives** 93:8
**fix** 38:7 59:20
**fixed** 55:24
  97:15 102:23
**flag** 10:22 16:12
  17:1 42:13
  76:25 77:10,17
  77:18,23 78:1
  78:7 79:5,9
  81:8,12 82:1
  82:10,13,25
  83:21 87:10,15
  87:22 88:1,5
  88:24 90:20,23
  96:6,10 97:9
  97:10,16 98:6
  98:11,14,17,25
  99:4,7,14,22
  100:4 102:9,22
  102:22 103:6
  103:16,19
  105:16 106:8
  106:17 107:6
  107:19,20,25
  110:20,23
  112:22 113:8
  117:14,24
  118:6,24
**flagged** 79:17
  80:4,13
**flags** 38:7 76:23
  77:3 91:5,12
  92:24,24 96:1
  98:8 103:8
**Florida** 5:6,11
**focus** 9:4,6
**focused** 8:22 9:2
  121:8
**focuses** 9:5
**follow** 60:21
  65:20
**follow-on** 18:7
**followed** 112:25
  113:1,2 117:5
**follows** 4:7 25:7
**footprint** 79:1

**foregoing** 123:4
  123:8
**foreman** 5:25
  7:3,10,12 88:4
  104:18 105:4
**forgot** 75:10
**form** 9:24 17:11
  17:12 18:2
  20:19 21:10,16
  21:23 27:22
  29:6 31:22
  32:24 33:16
  34:19 36:5,19
  37:25 38:16
  40:16 42:19
  45:3 46:14
  48:23 50:14,20
  51:1,4,20 57:1
  63:14 64:1,25
  65:4,14 66:8
  66:20,25 80:5
  80:15,21 81:4
  83:2,22 85:7
  88:7 95:20
  99:16 102:6
  103:9 105:25
  109:22 116:14
  117:1,15 118:1
  118:8,25
  119:10
**formal** 66:22
**formerly** 13:13
**forth** 50:11
  52:25 53:8
**forward** 84:14
  84:23 112:1
**foul** 75:2 78:14
  78:15,17,21
  79:11,23 82:8
**fouled** 80:11
**fouling** 79:5
**found** 16:12,20
  32:19,20 45:20
  45:24,25 55:25
  68:8,13 71:11
  74:12 75:17

**four** 6:10,11
  16:16,21 26:1
  26:5
**Fowler** 1:3 3:18
  11:25,25 12:10
  15:6 16:19
  21:8,19 22:21
  23:2,13 27:8
  27:13 49:7,16
  49:19,21 50:1
  50:8,16 53:1,2
  61:11 64:6,23
  69:18,22 70:18
  72:15 73:1,14
  75:12 79:10,12
  84:12,21 88:20
  90:18 92:2,7
  92:23 95:23
  96:15 103:15
  106:6,12
  112:15 114:12
  114:15,17,22
  115:2,19 117:4
  118:12
**Fowler's** 20:14
  70:14
**FRA** 45:16
  71:25 77:7
  87:17
**Frazier** 2:9 9:1
  9:19,24 10:8
  10:14 14:20,23
  14:25 15:12,15
  15:18,21,24
  16:2,6 17:18
  17:22 18:2,5
  18:15,22,25
  19:3 20:19
  21:1,2,10,21
  22:2,10,16,23
  24:7,13,17,19
  25:1,6 26:1,9
  26:13,16,18,21
  27:22 29:6
  30:10 31:10,22
  32:24 33:16

  34:8,19 36:5
  36:19 37:25
  38:16 40:16
  41:17 42:19
  43:7 45:3
  46:14 47:3,6
  48:23 49:5,23
  49:24 50:20
  51:1,4,20 52:8
  53:3 57:1,24
  58:1,21 63:14
  64:1,25 65:4
  65:14 66:8,20
  66:25 67:4,17
  67:20 69:20,22
  69:24 70:6,9
  71:21 80:5,15
  80:20,24 81:3
  81:16 83:2,19
  83:22 84:1
  85:7 88:7
  94:23 95:5
  96:11,16,22,25
  97:4,18,21
  99:16 102:6
  103:9,17
  105:25 107:17
  109:22 110:4
  110:10,15
  113:4,21,25
  115:24 116:14
  117:1,15,25
  118:8,25
  119:10,24
  120:5,14,23
  121:18,22
**Frazier's** 70:20
**freight** 77:20
  90:2
**frequently**
  43:12,16
**front** 95:3 98:19
  99:23
**full** 4:10
**FULTON** 123:2
**furlough** 19:17

**furloughed** 19:6
  19:10
**furloughs** 19:12
**further** 54:25
  63:21 82:19
  83:17 102:17
  111:4 116:24
  123:11

---

### G

**G** 47:16
**gang** 40:9
**gate** 47:23 48:10
  53:14,24,25
  70:22 71:4,16
  71:18 72:8
**gather** 33:6
**GATX** 73:6
**gear** 117:7
**gears** 72:14
**general** 3:19
  5:24 7:3,10,12
  18:18 41:4
  61:18 88:4
  104:18 105:4
**genuinely** 85:1
**Georgia** 1:1,19
  5:6,14 29:4
  35:14 36:3,8
  36:22,25 37:11
  123:1 124:4,4
**getting** 73:4
  83:16 94:3
**give** 6:15 35:25
  118:16
**given** 15:7 20:15
  34:2 123:10
**giving** 62:8,22
**go** 10:8 13:5
  15:19 22:17
  25:12 27:22
  29:7 30:8 31:9
  31:23 32:22
  35:12 38:11
  39:11 42:16
  51:18,25 52:15

Shirley Barnett                                     8/9/2022

53:6 58:24
70:17 72:16
73:2 78:9,13
85:8 90:5 92:5
98:13 99:17
103:1 116:3
118:20 119:7
119:12
**goes** 47:11
**going** 4:21,22
6:6 11:18
12:11 22:16
26:11 27:7
38:12 52:25
53:9 57:22
62:16,19 65:8
70:18 74:1
92:17 94:3
95:17 96:5,8
97:2 107:15
111:5 113:21
116:20,20,24
**good** 30:5 61:14
63:23 66:1
83:1,12,14
108:1 121:9
**good-faith** 50:17
50:24 59:14
60:9
**Google** 11:13
**gotten** 36:16
49:18 62:2
**government**
81:9 87:11,15
87:18,19 88:6
88:13
**grab** 78:22
**graded** 34:4,7
34:11,17 38:20
**grievance** 61:2
**ground** 8:10
22:14 113:22
**grounds** 21:22
**group** 61:9
**guess** 54:6
**guilty** 68:9

**gully** 102:5

---

**H**

**half** 26:2
**hand** 111:2
**handle** 58:16
**handled** 88:2
**handling** 57:14
89:13
**handwriting**
3:18
**hang** 25:2
**happen** 115:6
**happened** 44:11
74:13 76:17
**happens** 63:23
**happier** 85:20
**Harrisburg** 7:19
36:14 68:21,22
68:23 69:3,5
69:12
**head** 39:21
68:14 96:5
98:12,13
100:15 109:15
**hear** 25:16 50:8
51:12,13 95:10
115:17
**heard** 39:15,18
39:22 44:4
47:15 115:9
**hearing** 66:22
67:19 68:2
116:9 123:10
**heavy** 55:3,5
**help** 25:23 65:12
111:20
**hint** 58:6,7
**hired** 40:25
**history** 41:14,22
42:18,25 43:22
**hit** 55:8
**hold** 36:13 117:9
**holds** 46:4 47:24
53:25 54:1
**honestly** 84:13

**hope** 38:8
**hostler** 109:16
109:17
**hostler's** 110:22
**hotline** 25:9
61:5,10,12
62:15
**HR** 42:3
**hundred** 36:15
**hypothetical**
55:25 62:22
96:19 100:14
**hypothetically**
97:25

---

**I**

**idea** 100:25
**identification**
4:4 11:16 27:2
30:2 31:12
35:7 81:19
90:9 92:20
107:10 108:5
**illegal** 60:7,23
62:9,12 77:25
**immoral** 60:7,24
62:10
**improper** 55:22
58:5,7 59:10
59:11 77:19
78:3 80:20
106:25 107:2
**improperly** 59:3
59:7 86:15
**improving**
89:18
**inbound** 73:3
**incentive** 81:23
84:10
**incident** 15:10
56:12 64:5
77:24 82:3,6
86:23 105:24
106:13 113:14
114:13
**incidents** 17:15

32:21
**included** 19:12
**including** 57:14
**increase** 84:9
**independent**
27:16,18
**index** 3:1,6
121:25
**indicates** 86:20
**information**
27:12,24 28:4
33:7 45:13
46:2 88:25
90:21 94:16
115:7 118:14
119:3,13
**Inman** 7:16,17
**input** 20:5,10
**inside** 79:11
108:25
**inspect** 45:18
**inspected** 66:5
**inspection** 71:1
73:3,4
**inspections** 17:4
91:18
**inspector** 32:7
**inspector's**
71:25
**installed** 53:15
**instruct** 21:3
22:14,16
**instructed** 75:16
106:14
**instructing** 60:6
60:22
**instruction**
22:24 53:13,20
60:21
**instructions**
53:22 60:5
62:7,8 63:6,8
65:10 66:12
75:4 79:25
82:9 108:15
**instructs** 63:16

**insubordination**
66:15
**intended** 71:19
110:2 112:6
**interest** 124:7
124:11,12
**interested**
123:14
**interject** 67:6,8
**intermodal** 37:4
37:5 88:23
89:25 120:19
**Intermodals**
120:22
**interrupted**
61:14
**interviewed**
14:12 24:4
**interviews** 27:6
30:14
**invades** 20:20
21:4,22 22:11
**investigate**
23:18 45:17
**investigated**
86:23
**investigating**
27:17
**investigation**
23:21 24:1,2,3
25:7 27:12
28:18 31:20
36:18 44:17
49:14 71:25
74:12,18 75:20
86:7
**investigator**
28:9
**involved** 7:22
12:9 23:13
82:20 109:6
**irons** 78:22
**issue** 19:21
48:20 69:18,20
70:21
**issued** 113:13

Shirley Barnett                                                    8/9/2022

**issues** 8:23 9:10
   12:10 41:4
   46:1

_____
                    **J**
_____

**J** 2:3 24:23
**Jacksonville**
   5:11
**Jacobs** 2:4
**job** 7:13 40:3
   53:12 121:9
**jobs** 13:8
**Joel** 1:22 123:23
   124:2,20
**Jr** 2:3,9 3:13
**Judicial** 124:3
**June** 108:20
**jurisdiction**
   32:21

_____
                    **K**
_____

**kangaroo** 66:24
   67:12
**Kansas** 7:9
**keep** 55:15 97:2
**keeping** 40:13
   119:8
**Kelvin** 1:3 11:25
   19:5
**kept** 34:25
**key** 45:22 46:3,4
   46:10 47:24
   48:1,4,7,10,12
   48:22 53:14,14
   54:1,1 70:21
   70:23,25 71:3
   71:5,6 72:9,9
   120:13,14,15
   120:25
**keys** 46:1
**Kimble** 74:24,24
   75:5 76:3,9,13
   84:3 87:8
**kin** 123:11
**knew** 51:14
   52:22

**know** 4:20,21
   5:13,20 10:12
   11:24 13:9,23
   14:3 16:24
   17:20,21 20:17
   21:8,18,25
   22:7,19 23:2,4
   23:23 25:25
   26:17,20 28:15
   33:24 51:6,7
   51:10 57:19
   65:6 68:5 71:2
   71:3,20 72:21
   74:7 76:19
   87:21 89:5
   90:2,17 91:4
   91:20 95:6
   98:3,3,9 99:13
   99:20 100:9
   101:3,6,21,24
   101:25 102:12
   102:14 103:11
   103:23,24,25
   104:8,9,14,17
   104:23 105:1,1
   105:8 106:2
   110:10,13
   113:7,10,18
   114:25 115:5
   115:12,13,16
   116:6 118:9,10
   118:11 119:5
   119:14,16
   120:3,9,12,12
   120:20 121:1
**knowledge**
   45:24 113:13
   119:19,20
**knowledgeable**
   63:5 99:3
**knows** 67:5
   99:12 113:5
   116:9,19
**Knoxville** 6:25

_____
                    **L**
_____

**L-A-T-E** 120:5
   120:6
**L.M** 3:13
**labeled** 36:4,7
**labor** 12:25
**lane** 101:17
**large** 109:5
**late** 120:4,5
**law** 16:12 17:1
   42:13 78:1
   81:9 82:1,10
   82:25 83:13,21
   87:23 88:1,5
   88:24 90:20
   106:17 107:25
   124:10,11
**laws** 108:1
**lawyer** 20:21
   21:1 22:6,13
   22:20 26:7
**lawyers** 21:9,20
   22:5
**lead** 81:1 98:22
**leader** 40:9
**learn** 75:6 76:14
   76:24 77:3
   82:17,21 84:5
**leave** 60:3,12,18
   60:18,20 62:5
   63:2 97:15
**led** 39:24
**left** 13:8
**legitimate** 59:24
   60:1 62:4
**let's** 6:13 22:2
   24:20,23 26:10
   26:24 30:4
   45:2 55:24,24
   91:13 97:1
   118:16
**letter** 3:15 81:22
   81:25 84:9
**lever** 73:7,9,24
   75:5 76:20
   80:1 82:17
**levers** 73:10

**Lewis** 3:16 5:20
   5:22,24 11:1,5
   12:14 23:14,24
   31:16 39:25
   40:1,11 64:24
   105:11,12,14
   105:22 106:7
   106:14 114:20
   115:1
**Lewis's** 40:4
**license** 110:23
**lieu** 105:16
**limits** 78:21
**line** 63:12 94:19
   100:15,16,21
   100:23 101:19
   101:22
**list** 24:10 48:16
   53:20 57:13,18
   64:18
**listed** 48:7 57:20
**listen** 49:6,11
   116:3
**listened** 64:10
**little** 29:9
**LLC** 2:4
**LLP** 2:9
**load** 37:4
**loads** 37:4
**local** 61:17
   62:15 105:10
**location** 32:15
   56:6 57:3
   92:24 95:7
**locations** 29:12
**locomotive** 6:22
   7:1,5,10,13
   8:23 98:17
   99:1,8,14
   109:5,9,14,19
   109:21 110:22
   111:10 117:6,8
   117:12
**locomotives**
   5:18 7:4 9:3,5
   9:7,10 98:17

**98:20 108:22**
   110:19
**long** 6:13 38:13
   64:22 65:3,6
   69:2 101:1,3,7
   101:9 102:24
**look** 11:12 24:20
   35:24 48:25
   58:18 71:1
   93:8
**looked** 10:12,15
   30:14 47:18
**looking** 24:13,16
   54:14,20 72:12
**loose** 54:22
   55:25
**loss** 82:4
**lost** 84:10
**lot** 18:1 40:7
   54:6 82:22
   97:1 118:9
**low** 85:17,19
**LSE** 108:23
**lying** 51:9 85:5
   114:22

_____
                    **M**
_____

**ma'am** 4:10
   21:14 29:19
   35:19 40:22
   48:9 62:24
   77:23 79:8,19
   80:11 84:19
   89:22 93:23
   97:13 99:7
   106:11
**Macon** 28:22
   43:6,8 56:15
   88:22
**main** 4:21
   100:15,16,20
   100:23 101:17
   101:19,22
**maintain** 40:1
**making** 41:6,7
   57:4 103:20

man 55:8
man's 121:14,15
manage 58:11
management
  9:11 121:11,13
manager 7:21
  7:23
mangled 73:7
manner 115:11
manual 49:1
Maples 2:4
mark 93:12
marked 4:3
  11:15 27:1
  30:1 31:11
  35:6,17 36:2
  81:18 90:8
  92:19 107:9
  108:4
Mason 3:17
  28:22 44:3,9
  44:12 59:6
  88:21,22,22
  89:20,21 90:12
  91:5,11,16
  92:8 100:17
  101:1,4 106:13
  106:18 107:7
  113:14 114:13
  117:11 120:3
material 58:14
materials 33:6
matter 26:16
  79:4,9,12,14
  79:15 80:2,3
mattering 80:8
  80:9
matters 12:3,7
  12:11
mean 9:5 18:18
  38:8 54:5
  58:11 59:15
  60:18 63:20
  87:5 96:10
  99:14 115:22
means 58:13

78:18 99:14,20
meant 35:17
measures 86:13
mechanical 4:15
  6:22 7:14,21
  7:24,25 8:11
  28:21,25 29:3
  33:10,14 37:12
  43:5 44:3
  74:23 77:9,20
  78:3,7 85:16
  93:20 108:12
  108:21 110:18
  110:21 111:6,9
  111:17 112:17
  114:4,10
mechanism
  53:25
medical 20:5,7
  20:11
meet 12:2
meeting 18:7
member 12:24
  13:2,3 109:10
memo 24:14
memory 26:4
met 12:1,6 14:4
  17:17,22 18:9
  18:14
method 61:1
middle 111:25
mile 94:20 101:1
mind 47:17
mindful 40:1,13
minor 38:7,10
minute 36:13
minutes 95:7
  119:23
mismatch 73:11
misunderstood
  95:14
mix 90:2
moment 25:12
months 35:21,21
morale 85:15,18
morning 17:23

17:24
move 54:25
  56:11 64:8
  112:11
moved 6:25 32:9
  32:14 56:5,15
movement
  54:12,12,16
  56:5 105:15
  106:15 107:5
  108:21 109:18
  110:17,18
  111:3,8 112:7
  112:10 115:20
  117:5,7,22
  118:5,19
moving 46:13,20
  47:1 112:4
  119:9
Moyer 1:22
  123:23 124:2
  124:20
multiple 94:1
multiunit 93:3

─────────── N ───────────
name 4:10,17
  68:12 72:6,7
names 23:23
necessarily
  119:4
necessary 75:14
need 25:23 33:8
  39:13 60:4,20
  62:6,13 63:7
  86:14 98:13,16
  98:21,24 118:9
  118:14 119:13
needs 40:1,23
  91:23
negatively 39:21
neither 45:7
neutral 41:7
  111:25 117:8
never 28:5 39:18
  39:20 41:21,23

42:22 47:15,16
  47:18 75:12
  92:16 95:11
  115:9
new 4:17 5:7
  44:8 106:8
nice 17:25
night 42:10
  77:24 106:18
  107:7 109:3
  112:24 117:12
  120:4
nine 35:21
Norfolk 1:6 3:21
  23:14 33:14
  40:5 88:4
  89:23 91:17,24
  116:18
normally 63:1
north 2:4 5:6,14
  103:7
NORTHERN
  1:1
noted 57:17
notes 10:17
Notice 3:8
noticed 121:4
notification
  10:15 23:16
notified 77:6
  81:9,14 87:17
notify 57:11
  61:4
noun 37:17
November
  29:23 30:19
  88:15,20 109:4
NS 3:20 4:12
  30:22 37:12
  77:7 87:18
  107:23
NSRC_0021
  3:13
number 11:18
  11:19 26:12
  30:4 31:8,14

35:12 41:16
  68:5 71:15
  81:15,21 90:7
  92:18 107:14
  107:19 108:7,8
  108:9,10
numerous 53:22
  104:11

─────────── O ───────────
O.C.G.A 122:4
  124:6,8
object 9:24 18:2
  20:19 21:10
  22:13 27:22
  29:6 31:22
  32:24 33:16
  34:19 36:5,19
  37:25 38:16
  40:16 42:19
  45:3 46:14
  47:3,3 48:23
  50:20 51:1,4
  51:20 57:1
  63:14 64:1,25
  65:4,14 66:8
  66:20,25 80:5
  80:15 83:2,19
  83:22,23 85:7
  88:7 99:16
  102:6 103:9
  105:25 109:22
  113:21 116:14
  117:1,15 118:8
  118:25
objection 10:8
  10:11 21:2,16
  21:21 22:10,23
  47:8 52:8
  71:21 95:5
  103:17 117:25
  119:10
objections 10:4
obligated 71:6
  96:22
obligation 116:8

Shirley Barnett                                      8/9/2022

Page 134

116:12
**occasion** 43:2
  44:6
**occasions** 18:10
**occur** 46:22
**occurred** 43:11
  113:16
**occurring** 12:11
  33:15 116:23
**occurs** 55:16
**October** 29:24
  30:14
**ODB** 3:21 104:3
  112:16,19,21
  112:25,25
  113:2
**off-the-record**
  25:13
**offered** 15:5
  16:13 113:15
  124:13
**officer** 37:12
  67:19 68:2
  82:12 93:20
**officers** 12:18
**officials** 30:23
  33:11,14
**oh** 6:21 16:1
  24:22 42:22
  70:13 76:6
**Ohio** 7:3
**okay** 4:24,25 5:7
  5:10,17,20 6:2
  6:5,9,21,24 7:6
  7:8,18 8:7,10
  8:17,21,25
  9:16 10:3,21
  10:23 11:1,6
  11:12,18,21,24
  12:2,9,14,24
  13:5,8,11,14
  13:24 14:5,18
  14:24 15:4,17
  16:9,24 17:10
  17:14,17,23,25
  18:12,21 19:11

19:20,25 20:14
20:25 21:5
22:25 23:12
24:5,22 25:25
26:7 27:20
29:2,15 30:7
32:18 33:4,9
34:4,17,25
35:9,24 36:10
37:2 38:5,10
38:20 39:8,23
41:8 42:1,5,9
42:16 43:20,22
44:15,25 46:3
47:15,22 48:4
48:18 49:6,20
50:3,7 51:12
51:17 52:6,20
54:3,15,22
55:10,14,19
56:7,23 57:17
57:21 59:5,13
60:8,15,25
61:14 63:9
64:5,11 65:18
66:17 67:15
68:16,18,22,25
69:14,17 70:13
72:13,17,20
73:6 74:5
76:12 77:15
78:5,17 80:2
81:1,7,15 82:8
83:16 84:8
85:5,12,15
86:1,20 87:7
87:10,20 88:3
88:11,14,20
89:2,7,11,20
90:6,14,24
91:4,9,14,15
92:2,6,17 93:1
93:15 94:2,12
94:15,21,22
95:13,19 96:17
97:21 98:1,10

98:23 99:2,22
100:3,10,12,22
100:24 101:25
102:18,20
103:4,14,22
104:2 105:22
106:5,24 107:3
107:12 108:7
108:24 109:3
109:11 110:25
112:13 114:3
114:12 115:4
115:19 118:16
119:18 120:9
120:12,18
122:1
**on-time** 37:18
  38:23 39:1
**once** 20:1
**ones** 25:9 27:9
**onset** 86:7
**operable** 48:5
**operated** 73:18
  108:23 109:21
  110:21
**operating** 3:20
  107:24,24
  111:10,18,21
  112:18
**operations** 3:21
  4:16 7:21,24
  7:25 8:11 75:7
  76:14 82:21
  84:6 108:9
**operator** 111:5
  111:6
**opinion** 50:15
  50:15 86:1
**opportunity**
  66:22
**options** 61:15
**order** 31:20 32:4
  32:7,12,23
  33:9,13,18
  34:4 36:12
  37:2,2,3,4,4,16

37:16,19 39:5
39:7,13 41:15
41:24 42:6,11
42:18 43:1,4
44:10,14,16,24
45:6 57:20
58:8,11 59:3
65:24 66:7
70:24 71:7
73:7 75:15
84:23 96:9
115:21
**ordered** 50:10
  60:1 64:23
  66:3 72:16
  73:1,15 74:4
  75:13 84:15
  86:4
**ordering** 48:13
  84:15 85:23
  87:6
**orders** 32:2,20
  34:3,12,16,23
  35:5 41:22
  58:8 73:20
**organizational**
  6:8
**original** 3:23,24
**originally** 44:10
**outbound** 37:19
  37:23 73:4
  91:18
**outside** 20:21
  77:9 78:21
  108:23,25
  109:6,12,12,20
  110:23 111:10
**overhead** 3:17
  90:11
**overheads** 11:13
**overheard**
  114:13,15
**overseeing**
  82:11

_____
          **P**

**P** 1:22 123:23
  124:2,20
**p.m** 119:25
  120:1 122:2
**page** 3:3,7 35:18
  41:16 43:18
  58:19 70:19
  72:19
**pages** 16:3 29:21
  123:8
**paid** 13:9
**paragraph**
  14:20
**paragraphs**
  41:12
**Park** 2:4,10
**Parkway** 1:17
**part** 14:13 20:10
  25:1 33:9,24
  33:25 59:5
  78:23 89:17
  90:24 110:5
**parties** 123:12
  123:14 124:14
**parts** 101:20
**party** 80:22,23
  80:24 124:4,10
  124:11,12,12
**pattern** 113:2
**pay** 8:5,6,7 82:4
  84:9
**Pennsylvania**
  7:20
**people** 8:24 18:1
  35:1 58:15
  91:24
**percent** 37:5
  38:24 39:2
**perform** 79:16
  105:5 121:8
**performance**
  29:3,5,11
  37:18 38:23
  39:1 75:1,24
  76:5,11 84:4
  89:18

Shirley Barnett                                                    8/9/2022

Page 135

performed
  80:12 112:15
performing
  71:18 74:22
  108:16,16
  112:20
perimeter
  108:22 110:20
period 19:7 40:6
permissible 39:4
  51:17,24 52:4
  52:7
persists 60:16
person 18:17
  78:8 111:21
  124:9
personal 40:2,21
  41:1,3 47:2
  67:7,9
personnel 91:19
pertains 109:8
pertinent 33:7
Phelps 2:9
phone 16:16,21
phones 61:23
physical 19:21
pick 103:1
picture 72:12
pictures 11:12
piece 94:7
pieces 110:11
pipe 117:9
Pittsburgh 69:6
place 2:4,10
  8:24 35:3 38:6
  46:5 47:25
  54:1,2 56:24
  63:4 98:14,17
  98:25 100:12
  100:22 102:8
  106:16 107:5
  111:2 114:14
  116:10,11,11
  116:13
placed 96:1 99:8
  99:8,9,10,24

99:25 100:1
places 5:13
  114:9
Plaintiff's 3:7
  4:3 11:15 27:1
  30:1 31:11
  35:6 81:18
  90:8 92:19
  107:9 108:4
Plaintiffs 1:4 2:2
plane 78:20,25
  79:5,10,16
planned 114:17
play 71:15
please 4:10
  35:25 67:6,8
  121:23
plug 54:18,22
  55:15,16,17,21
  56:19
plug-door 56:1
  56:8
plugs 56:17
point 5:10 8:22
  13:18 14:8
  25:8 33:19
  34:15 47:14
  49:12 62:13
  77:6 91:7
  110:16 114:19
  121:9
points 121:2,3,5
  121:6
portable 100:4
  100:13
portion 78:25
portions 11:4
Portsmouth 7:2
position 7:14,23
  18:23 54:2,25
positions 12:21
  12:22,23
possibility 55:2
possible 53:16
potential 54:24
pounds 55:6

100:11
Powers 6:1 8:17
  9:2
precaution 71:5
preparation
  18:8
prepare 9:23
  10:1,6 75:11
present 33:2
presented
  106:18
pretty 8:1
prevent 70:23
  112:3,7 116:23
previous 15:16
  15:18 16:2
primarily 7:22
  8:23 9:2
primary 9:4,6
principal 124:10
prior 12:10
  103:20 113:14
privilege 10:2
  20:20 21:4,22
  22:9,12
privy 103:12
probably 7:1
  59:1 96:21
  116:1
problem 22:9
  48:7,10 63:25
  94:8 95:25
  96:9
procedure 19:22
  53:12 122:4
Proceedings
  58:2 119:25
process 14:13
  34:3,22 58:17
  67:6 73:18
  111:16
processing
  34:16 35:5
professional
  5:23 40:2,21
prohibited

124:6
promoted 6:22
proper 55:20,23
  59:20 84:24
properly 84:16
protect 75:1,24
  76:4,10 84:4
protected
  108:18 110:23
  111:3,11
  112:21
protection 17:5
  77:10 82:13
  90:23 98:6,11
  99:4 102:9
  103:19 104:3,5
  105:15,16
  106:15 107:5
  107:20 108:21
  108:22,23
  109:1,6,13,19
  109:20 110:17
  110:19 111:8
  111:15,20,22
  112:10 115:20
  117:5,7,14,22
  118:5,7,18,19
provide 44:5
  124:5,9
provided 75:3
  79:24 82:9
pull 46:8 47:1
  50:18 51:14,15
  51:19 52:2,15
  52:19,22 60:19
  62:3,4 66:4
  71:2 74:5 94:4
  94:5 103:6,7
pulled 45:6
  53:11 63:10
  74:2,7
pullouts 46:22
pulls 46:19
punishable
  66:18
purpose 14:5,19

78:8
purposes 91:13
  95:16 96:18
pursuant 122:3
  124:2
put 6:13 32:7
  42:10,11 45:2
  54:7 60:15
  64:7,20 65:9
  71:4 90:1
  99:23 102:21
  102:22 111:24

────────────
          Q
────────────

Qtr 3:14
question 4:23
  9:25 18:6,7,11
  20:20 21:3,11
  21:12,21,23
  22:3,11,17
  24:7 26:19
  29:7 31:23
  33:12,17 36:6
  37:22 38:1,17
  38:25 40:17
  41:17 43:14
  45:4 46:15
  47:7 48:8,24
  50:21 51:5,22
  53:4 55:20
  57:2 62:2,18
  63:15 64:2
  65:1,5,15,25
  66:9 67:3,21
  69:25 77:22
  79:7,18 80:6,8
  80:16,18,21
  81:4 83:3,23
  84:18 85:8
  88:8 96:19
  97:4,6,8,12
  99:6,17 102:7
  103:10 106:1
  106:10 109:23
  109:24 113:23
  116:15,16

Shirley Barnett                                          8/9/2022

Page 136

117:16 118:1,2
119:1
**questions** 67:7
70:20 91:13
95:16 121:19
121:19 123:6
**quote** 28:17,18

<hr>

**R**

**R3** 72:16,22
**radio** 115:22,23
116:4
**rail** 89:23
**railcar** 32:5
**railcars** 45:6,7,7
45:18
**railroad** 6:16
108:1
**RAILWAY** 1:6
**rarely** 47:13
**rates** 124:13
**re-ask** 37:21
**re-track** 56:8
**read** 10:13 11:1
11:3,4,9,10
20:14 23:6,8
23:10,11 71:9
71:9 74:21
79:19 89:1
121:23
**reading** 43:17
72:18 108:19
121:20
**ready** 37:23
73:2
**really** 68:24
69:13 82:15
84:22 119:14
**rear** 117:18
**reason** 44:23
60:13 105:8
**reasons** 55:18
**recall** 12:13 14:8
19:18 25:24
27:19 30:16
31:24 35:2

42:15 50:2,11
51:16 54:13,19
64:9 65:8
68:14,23,24
69:13 70:2
74:3,16 76:1
76:17 77:6
87:16,25
**recalled** 19:17
19:19 74:22
87:16
**receive** 84:9
**received** 10:16
23:15 39:12
45:16 49:13
83:4 90:21
**receiving** 66:11
**recess** 58:2
119:25
**recite** 25:9
**recollect** 70:11
**recollection**
17:4 23:15
27:10 28:24
49:15 52:24
**record** 13:15,21
13:25 14:6
16:7,7 18:6
19:1 66:15
67:25
**recorded** 49:6
50:1,4 115:22
**recording** 49:16
49:22,23,25
50:7 52:21
**recordings**
49:18 64:9
**records** 104:22
**reduced** 123:7
**reduction** 81:23
83:4 117:9
**refer** 82:5
**referred** 43:23
**referring** 29:17
54:20 112:9
**reflect** 24:20

107:24
**refuse** 117:12
**regard** 10:16
53:23 80:8
87:4,5,5 89:15
108:15 111:4
115:1 119:14
**regarding** 81:23
119:21
**regulations** 63:7
124:3,7
**relations** 65:13
**relationship**
5:23 124:7,10
**relationships**
40:8,12 41:1,3
**release** 75:14
**released** 32:11
45:19
**releasing** 20:1
**reliability** 38:21
**remain** 41:6
**remember** 17:2
24:19 25:5
26:21 27:21
28:8 31:2
41:13 49:21
50:8 52:20
53:18 54:14,20
68:12,18 69:1
69:17 72:5,7
105:19 111:20
**reminder** 40:10
**remove** 39:5,13
44:10,13 59:11
60:2,2 63:17
63:20 64:8,23
65:21 74:10
75:4 79:25
**removed** 39:14
43:3,15 44:16
45:1 60:14
**removes** 63:21
**removing** 39:6
41:15,22,24
42:6,18 43:1

44:23 59:2,3,7
**rendered** 14:14
**repair** 32:9,10
38:12 44:13
53:13 56:1,2,7
56:20,24 66:14
74:25 75:6,9
75:10 76:4,10
76:15,20 77:8
79:17 80:12
82:17 83:12
84:3 91:23
103:7,20 114:9
115:21 118:21
118:21 119:8
**repaired** 32:8,13
33:8 38:6
56:13,21,23
58:16 59:17
73:24 84:17
**repairing** 56:3
83:18
**repairs** 32:15
53:21,23 56:15
57:4,9 75:17
81:11 84:24
**repeat** 21:12
33:12 38:25
43:14 48:8
51:22 65:25
77:22 79:7,18
84:18 97:12
106:10 109:24
116:16 118:2
**repeats** 25:4
**replace** 75:4
79:25
**replaced** 106:8
**report** 6:3 14:14
24:24 25:3
27:7 30:5,5,18
39:12 43:18
58:18 59:6
65:24 66:7
72:19 73:14
84:2 87:10,14

88:3,5,12,14
89:13
**reported** 28:23
43:2,12,16,25
44:12 50:16
74:22 75:10,12
86:19 123:5
**Reporter** 121:20
122:1 124:2,4
**reporting** 8:3
28:21 124:3,5
124:9
**reports** 5:25
87:2
**represent** 123:8
**representing**
96:18
**request** 45:16
111:12
**requested**
115:20 118:5
**requesting**
111:13,18
**require** 110:1,3
**required** 32:13
64:15 65:9
87:14 88:12
96:4 102:8
112:5
**requirement**
103:3
**requirements**
3:19 112:22
**requires** 111:1
**reserved** 122:6
**Reserving**
121:21
**resolved** 63:3
**resources** 58:14
**respond** 51:13
**responsible** 9:6
29:4,11 63:5
64:19
**rest** 36:4
**restricted** 57:12
57:16

Shirley Barnett                                                    8/9/2022

result 44:16
83:8 123:15
retainer 48:2,5
48:10,21 53:14
72:8
retaliation
84:13,22 85:4
85:10,14
return 20:1,11
reveal 75:21
revealed 74:19
reverser 111:24
review 3:13
31:16
reviewed 10:22
13:14 33:19
42:2
reviewing 42:10
Rex 6:1
ridiculous
114:20
right 5:10 6:3,10
6:11 8:14 9:9
11:24 13:24
14:12,16 15:4
15:9,21 16:9
16:19 17:6
18:19,21 19:5
19:15 27:4
30:4 32:6
35:13 36:11,22
37:8,13,15
38:8 39:4
41:11,11 42:9
42:16,18 44:15
44:19 45:21
46:3 50:14
53:12 54:17
55:12 57:10,21
58:1,22 59:9
59:13,23 61:21
62:11 68:25
69:9,14,17
70:16 71:9
72:5,13,13,21
73:11,13,18

75:20 76:20,22
78:12,21,22
79:2,15 80:4
87:7,7 88:14
89:9,20 90:17
91:12 92:3,6
92:11,13,25
93:2,16 94:15
94:20 95:15,21
95:23 96:7
98:1,10 99:12
99:22 100:24
103:4,14 105:8
107:17,19,23
108:8,11 109:1
109:12,18
111:7,20 112:1
112:6,13 114:5
117:4
rip 38:12
river 102:5
road 63:12,21
92:14 94:19
95:4
roll 39:16
rolled 39:16
routed 57:3,8
routine 12:7
rule 75:19 89:16
99:2 104:3
105:15 106:8
106:17 110:1,5
116:10,19,21
116:22,23
122:3
rules 3:20 4:21
10:22 60:7,23
62:9 63:6
83:15 89:19
106:15 107:6
107:24,24
113:8 117:5
122:3 124:3,7
rumor 44:4
114:20
run 37:24 55:14

55:20 60:10
63:9,10
running 63:13
63:24

_____

**S**

safe 9:14 70:24
safety 71:4
108:1
Savannah 5:25
8:12,16,18
12:7 14:10
16:11 19:13
27:6 29:4,13
31:21 32:2
44:16 45:19
55:24 56:8,13
61:20,23 72:23
85:16 105:6
107:4 114:4
saw 30:14
saying 22:8
23:22 27:20
28:3,4 51:13
52:22 87:21
97:18 115:6,9
115:13,14
says 11:20 60:10
62:3 107:4
108:20
scheduled 72:16
school 55:12
score 34:25
38:24 39:2
scorecard 35:2,4
35:22 36:17,23
37:6 81:16,17
scorecards 3:14
36:1
second 17:7
74:14 76:18
sections 110:6
secure 56:10
71:16,17,17
secured 56:4
see 11:13 22:2

24:5,20,23,24
35:14,18,23
59:2,7 100:25
116:21 118:16
121:18
seeing 60:9
116:9
seen 55:8 90:11
105:5
selector 117:8
senior 5:24 7:3,9
7:12 37:11
74:23 88:4
104:18 105:4
sense 91:25
94:13
sent 10:18 30:18
30:19 32:9,14
84:16,24
separate 40:14
40:15,18 58:19
58:24
separation 40:2
September 19:7
64:24 72:15
74:13 77:24
82:5
sequence 87:25
service 13:15,21
13:25 14:6
19:17 32:11
109:9,14,21
services 124:5,9
session 74:23
82:12 83:12
set 46:23 73:25
111:3 114:17
117:7
setting 115:1,2
severity 56:16
shack 114:7
Shakes 39:21
Shane 1:3 11:24
11:25
share 27:11 70:3
shared 28:1

shift 72:14 74:15
74:15,16
Shirley 1:11 3:2
4:1,5,11
shop 32:10,16
56:11 57:8
58:16
short 40:6
shortly 45:19
show 30:17
showed 35:4
showing 29:22
shows 31:15
35:14 37:7
side 102:13,16
sign 121:23
signal 3:19 6:19
17:5 107:20,20
108:17,22,23
109:1,6,12,20
111:10
signature
121:21 122:5
signed 113:15
significant
80:13
signing 121:21
sill 46:5
similar 111:16
sincere 85:22
86:5,10,17,18
86:21 87:1,4
sit 52:21 63:2
86:25
situation 39:9
62:23 74:22
86:12 95:20
100:14,18
119:21
six 6:12
sketch 6:15
slack 90:22,24
92:8 94:8
97:14 119:8
slide 71:6
slope 101:17

Shirley Barnett                                      8/9/2022

Page 138

**Smith** 105:11,12
105:14,22
**sole** 65:7
**somebody** 74:9
75:23 91:19
**somebody's**
116:20
**sorry** 42:22
61:15 69:20
76:6 77:13
79:13 83:9
95:13
**sort** 8:3 9:9
**sounds** 6:11
**source** 22:1,8
**South** 5:6,14
**Southern** 1:6
3:21 23:14
33:14 40:5
88:4 91:17,24
116:18
**Southern's**
89:24
**speak** 17:24
**special** 57:14
97:11
**specific** 44:6
78:12 104:25
110:5,11 121:8
121:10
**specifically** 17:2
49:2 105:18
113:25
**specify** 24:2
49:4
**speculate**
120:20,23
**speed** 57:12,16
**spoke** 42:3 84:5
**spoken** 10:24
**stabilizations**
9:18
**stack** 90:1
**staged** 93:25
**start** 10:13
17:11,12 89:2

89:7,8 113:14
**started** 116:24
**state** 53:8 123:1
**stated** 16:10
28:5,5 38:14
42:24 43:21
44:7 45:15
53:8 75:2 76:9
76:13 79:23
84:2 85:14
86:3 104:4,19
118:10,12
123:5
**statement** 11:9
27:25 43:24
80:7 114:24
115:3
**states** 1:1 5:5
**stating** 27:19
51:16
**status** 75:15
120:9
**statutory** 77:25
**steno** 6:18
**stenographer**
6:20,21
**Stephen** 10:16
10:18 23:16
28:1 88:18
**steps** 112:16
**Steve** 3:11 24:24
**Steven** 13:25
14:3,4,9 15:7
16:11
**stop** 46:24 64:19
116:12,22
**stopped** 118:4
**Strike** 113:11
**stuff** 42:10
**stupid** 4:23
**submitted** 11:2
11:5
**subpart** 109:8
**subsequent** 77:5
105:10
**subsequently**

7:2,13
**sufficient** 117:9
**Suite** 1:18 2:5
2:10
**summary** 23:6
23:10,11
**superintendent**
7:14 28:21,25
44:3
**supervisor** 6:23
7:2 12:15,18
28:19 31:6
32:22 33:1
34:14 39:5,12
40:6,23 41:4
43:3,6 44:8
51:18,25 52:1
52:17 58:7
60:2,5,6,10,13
60:16,17,21,22
61:4,16,21,22
62:2,7,8,14
63:16 65:7
66:3 74:24
82:16 83:11
114:16
**supervisor's**
63:8 65:20
**supervisors**
12:17 34:21
39:6 41:9,10
42:4 63:4
89:14 121:7
**supervisory**
12:23
**support** 68:15
**supposed** 100:1
**sure** 9:20 13:18
18:10 19:1,3
40:13 41:6
53:17 58:14
82:13 95:18
96:20 97:3
110:12 119:24
120:21
**surgical** 19:22

**suspect** 43:11
**suspected** 43:15
**suspension** 15:5
15:10
**swap** 72:14,14
**swing** 47:22
48:10 53:14,24
53:25 70:22
71:4,16,18
72:8
**switch** 38:14
73:22 94:3
99:24
**swore** 70:15
**sworn** 4:6
**Syd** 9:17 29:21
30:9 31:9
57:22 119:22
121:17
**SYDNEY** 2:9
**sydney.frazier...**
2:12
**system** 19:12
48:12 75:9
89:8,17,24
90:25 121:6

---

**T**

**T&E** 109:10
**tag** 39:5 42:6
43:4 44:14
45:1 58:8
59:11,15 60:2
60:11,14,19,21
62:3,4 63:10
63:17,20,21
64:8,23 65:21
66:4 74:7
**tag's** 32:7
**tagged** 32:6
59:16,19 60:1
65:19
**tags** 37:16,19
39:7,13 41:15
41:24 42:18
43:1,15 44:10

44:16,24 45:6
59:3,7 66:3,10
74:5,11
**take** 26:23 35:24
40:24 55:24
56:17 57:23
60:10 64:22
65:3 86:14
101:1,4,7
106:16 107:5
111:2 116:11
**taken** 23:17
38:11 47:9
65:7 66:4
116:10
**takes** 38:13 97:9
102:24
**talk** 12:11 18:1
27:7 61:16,17
87:8 98:24
**talked** 22:4,20
121:5
**talking** 12:18
35:18 41:8
54:9,18 61:7
74:14 77:21
106:16 107:21
110:6 115:10
**target** 36:15
**taught** 106:22
106:24 107:1
**Taylor** 1:3 11:25
12:10 15:6
16:20 19:6,9
19:16 21:8,19
27:8,13 49:8
49:17,19,21
50:1,8,16
51:12 61:11
64:7 72:15
73:1,15 84:13
84:22 88:21
90:18 92:2,7
95:24 103:15
106:6,12
112:15 114:17

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Shirley Barnett                                    8/9/2022

115:2,20 117:5
118:12
**Taylor's** 20:15
22:21 23:3,13
**teach** 83:11
**teaching** 83:12
**Teamwork** 89:8
**tell** 4:10 9:22
10:4 23:2,12
27:13 32:3
35:20,25 36:2
37:15,17 58:6
58:7 73:19
74:12,18 78:17
86:22 90:17
93:19 96:21,22
103:14 105:12
116:22
**telling** 25:16
94:24 96:14
105:3 114:15
**tells** 93:19
**ten** 100:11
**tenure** 40:4
**Terminal** 74:23
**termination**
66:18
**terms** 23:20
24:1 40:7
48:13,14
**territory** 5:4
**test** 37:20,23
**testified** 4:7
25:10 96:15
106:6,12
**testify** 12:4
**testifying** 96:11
96:17
**testimony** 27:5
87:20 94:17
**tests** 91:18
**Thank** 14:24
19:2 58:25
67:7,10
**Thanks** 31:10
**thereto** 123:7

**they'd** 57:19
**thing** 8:2,3 38:7
41:24 46:12
70:16 71:12
99:14 103:1
107:21
**things** 9:25 55:3
71:15 78:5
97:1 101:5
**think** 15:19
18:22 19:8
22:11 27:18
29:9 32:18
35:10 41:1
50:24 51:9
52:11,12 53:2
54:17 58:19
62:1 65:12
69:11 80:20
83:16,25 84:21
85:1 96:15
101:22 108:19
114:22
**thinks** 59:23,25
60:17 62:3,11
**third** 16:8 74:15
**THOMAS** 2:3
**thought** 43:24
51:19 52:1,15
83:9 87:20
**three** 93:8 94:10
118:18
**three-step**
111:15,19,22
117:10 118:18
**Threes** 93:7
**throttle** 99:9
111:24
**thumbnail** 6:15
**till** 63:3
**time** 6:4 8:20
12:14 17:3
19:7 28:17,20
28:20 30:22
31:19,19 32:21
33:15 35:3

36:17,24 38:14
40:5,6,8 42:2
43:3 44:10
45:14 56:12
65:8 69:2
74:17 75:18
82:22 84:8
86:2 87:3
106:13 120:10
121:13
**times** 18:14 68:4
86:21
**title** 7:24
**today** 50:15 54:6
86:25
**told** 8:17 27:15
44:4,7,9,13
45:10,12 59:6
72:3 73:8
75:23,24 76:1
77:12,14 85:6
85:12 92:4,5
92:16 95:7,11
104:24 105:5,7
106:7,21 107:4
113:10 117:13
117:22 119:7
**tom@mtandj.....**
2:7
**tomorrow**
107:16
**tool** 121:13,14
**tools** 75:3 79:24
82:9
**top** 59:2 68:14
**topic** 33:21,23
**totally** 114:24
**touch** 70:16
121:2,3,5,6,9
**touched** 71:12
**track** 16:16,21
32:9,14 37:23
38:11,12 54:23
56:1 72:16,22
75:3 79:24
80:4,12,13

82:9,14 91:12
94:3,5 97:17
98:14,18 99:25
100:2 101:11
102:23
**track's** 97:9
**tracks** 72:23
91:6 94:1,10
95:21 98:8
101:13,16,20
102:9
**train** 32:14
37:20 38:13,15
38:20 40:9
46:20,23,24
47:1,11 52:1
57:11,12,15
59:18 62:16,20
62:25,25 66:5
72:17 73:2,24
75:1,24 76:4
76:10 77:21
82:15,18,24
83:17 84:4
88:23 92:9,14
92:16 93:13,17
93:21,24,25
94:11,17 95:3
95:12,21 96:2
97:14,15 98:12
98:12,14 99:3
99:23 101:2,9
103:5 109:5,10
111:14 115:21
117:6,19 119:5
120:3,13,14
**training** 82:11
82:22 83:1
99:13 104:21
104:21,23
105:2,6,23
106:3,25
119:15
**trainmaster**
82:20 83:18
**trains** 37:18

90:1 120:25
**transcript** 3:24
123:5,9
**transportation**
73:20,21 82:12
82:16 114:16
**treated** 86:15
**triple** 95:20
**tripled** 93:18,22
**true** 123:9
**try** 53:19
**trying** 18:23
22:5 83:11
86:22 93:4
**Tucker** 2:3,4 3:4
4:9 9:8,17,20
9:21 10:3,5,10
10:20 11:17
14:22,24 15:3
15:14,23 16:1
16:5,9,14 18:4
18:12,13,16,24
19:2,4 20:24
21:5,6,13,15
21:17,24 22:7
22:15,18,25
23:1 24:9,15
24:18,25 25:5
25:11,15 26:3
26:11,15,17,20
26:23 27:3
28:2 29:8,21
30:3,8,11,12
31:8,13,25
33:3,22 34:9
34:24 35:8
36:9,21 38:4
38:19 40:19
41:18,19 42:21
43:8,10 45:9
46:18 47:5,8
47:10 50:22
51:2,8,23
52:10 53:5
57:5,21,25
58:4,23 63:19

64:4 65:2,11
65:17 66:16,23
67:2,8,11,18
67:22,24 68:1
69:21,23 70:4
70:7,10 72:2
80:10,17,22,25
81:1,6,15,17
81:20 83:6,20
83:24 84:7
85:11 88:10
90:6,10 92:17
92:21 95:1,9
96:13,20,24
97:3,7,20,22
99:18 102:10
103:13,21
106:4 107:11
107:15,18
108:6 109:25
110:8,13,17,24
113:6,9,24
115:25 116:2
116:17 117:3
117:20 118:3
118:15 119:2,6
119:11,22
120:2,6,8,15
120:17,24
121:14,24
**Turn** 14:25
**turns** 66:5
**twice** 4:20
**two** 16:3 29:21
45:6,7,7 47:19
49:8 50:3,5,16
53:15 72:16
73:1,20 74:13
95:7
**types** 90:4
**typewriting**
123:7
**typically** 46:22

_____
**U**
_____
**unbiased** 41:7

**uncouple** 103:5
**underneath**
91:1
**understand** 9:1
20:9 27:5 32:3
35:19 47:9
59:19 61:24
62:1,18 69:9
69:24 83:7,10
91:22 96:16,24
101:6,21
103:22 107:15
109:11 110:12
111:19 112:23
**understanding**
72:25 73:14
91:11,16 92:7
92:10,12,15
93:2 94:25
95:2,3 112:14
112:14,24
**understood** 4:23
86:13 117:18
118:11 119:17
**undesirable**
46:17
**undesired** 56:4
**unfairly** 86:15
**union** 12:25
13:3,9
**unit** 98:22
**UNITED** 1:1
**unsubstantiated**
44:5
**unusual** 95:19
**upgraded** 7:13
**upset** 27:14
**upstairs** 107:16
**use** 37:16 97:11
106:9 114:8
**usual** 9:18 53:20
124:13
**usually** 78:22
93:7

_____
**V**
_____

**vacation** 103:25
113:16,20
**valid** 32:13,19
33:6
**variety** 55:17
90:4
**verb** 37:17
**verbal** 75:3
79:24
**verbally** 111:11
**verbatim** 74:21
**VIDEOCONF...**
1:10
**view** 3:17,18
90:11
**views** 67:5,7,9
**violate** 82:10,24
83:14 113:8
**violated** 16:12
**violating** 75:18
81:8 88:24
116:21
**violation** 16:25
17:7 42:12
77:25 81:14,25
82:5 83:21
87:11,15 90:19
103:16 116:10
116:12,19,21
116:23
**violations** 89:16
**virtually** 18:17
**visible** 99:11
**volunteered**
74:25 76:3,10
84:3
**vs** 1:5

_____
**W**
_____
**wait** 36:13
**waiver** 22:9
**waiving** 121:21
**walk** 98:16
101:1,19
102:17,18
**walked** 102:21

**WALKER** 2:3
**walking** 96:4
101:12,15
**walkway** 102:4
102:13
**walkways**
101:11
**want** 10:12
17:20,21 18:10
18:25 21:25
22:7 33:23
42:16 57:22
58:20 70:17
71:9 72:13,14
100:8 101:6,21
102:11 103:22
103:24 105:1
110:11,13
121:24
**wanted** 13:6
35:17 75:6
76:13 84:5
117:22
**Ware** 3:13,16
5:20,22,24 8:7
13:11 23:14,24
28:20 31:16
34:1 39:25
41:14 43:2
44:7 45:5,12
49:7 50:4
51:13,16 52:22
52:24 53:8
59:2,6 61:20
64:7,11,18,24
65:7 74:5,21
75:2,8,16,21
75:21 76:9,9
78:13 79:4,13
79:20,23 81:8
81:13,22 82:8
82:11 83:4
84:8,13,22
87:11 104:18
104:24 105:2,4
105:7,9 106:7

106:14 114:13
114:15,20
115:1,5,8,10
115:14
**Ware's** 11:1
12:15 28:18
31:3 42:2,12
65:9 71:23
**wasn't** 24:10
61:11
**way** 6:14 9:17
22:15 30:5
41:2 45:2 48:6
50:10 73:12
74:14 77:17
89:12,13,18
94:6 100:17
105:14 108:2
115:10 123:14
**Waylon** 74:24
**ways** 54:5,7
**we're** 12:3,11,18
27:7 52:12
107:15,21
**we've** 57:22 61:6
62:1 94:16
106:15 119:7
**Weatherman**
3:12 10:16,19
14:15 23:16,22
23:25 24:14,24
25:4,19 27:15
28:1,14,16
29:19 43:13,17
43:24 49:17
61:6,8 86:24
88:19
**Weatherman's**
24:11
**wedge** 56:19
**wedged** 54:11
54:12,14,16,21
55:15,16,17,21
**weeks** 104:12
**weigh** 100:10
**went** 7:2,9,19

27:5 53:7
**weren't** 80:4
104:8 115:17
**whatever's**
78:24
**widest** 78:23,24
**wiggle** 70:25
**WILLIAM** 2:3
**wish** 57:24,24
**withdraw** 26:13
**witness** 3:2 9:4
15:17,20 21:3
70:1 122:5
**woman** 55:11
**word** 121:25
**words** 117:10
**work** 19:6,23
20:1,7,12 61:8
77:19 78:1
91:1 108:16
109:19 112:20
**working** 6:10
16:15,20 17:3
45:14 74:17
88:21 90:22
**works** 114:11
**worn** 71:3
**worried** 27:14
**worry** 47:17
**wouldn't** 64:11
79:4,9 92:3
**wreck** 63:11,22
**write** 39:24 48:6
85:21,25
**writing** 64:7,20
65:10
**written** 48:11
**wrong** 36:13
60:17 64:17
84:20 96:21,25
97:1
**wrote** 27:7
58:18 74:20
93:13

**X**

**Y**

**yard** 3:17 7:16
7:17 17:3
48:25 51:18,25
55:15,21 56:20
72:24 88:22
89:20,21,23,25
90:12 91:5,11
91:17 92:8,13
94:18,19 95:4
100:17 101:1,4
103:6,7 106:13
106:19 107:7
113:14 114:14
117:11 120:4
**yardmaster**
73:16,19
**yards** 90:4
**yeah** 15:15,24
23:21 24:15,18
25:6 26:15
39:1 40:20
41:18 48:1
54:16 55:1,8
57:25 69:10
76:7,8 87:16
92:5 99:12
105:1 110:1
116:25 121:4
**year** 19:8 35:9
35:21 87:22
**years** 6:7 26:2,5
40:7,12 87:24
**yellow** 71:10
**yesterday** 17:22

**Z**

**Zoom** 2:3

**0**

**02** 7:6

**1**

**1** 3:8,23 4:3 59:2
68:16 108:20
**1-1-2015** 3:20

**1:21-cv-3303-...**
1:5
**10** 3:19 38:24
39:2 107:9,14
107:19
**10.B** 124:3
**10:25** 58:2
**10:33** 58:3
**107** 3:19
**108** 3:21
**11** 3:9,21,23
108:4,7,8,9
**11-6-2018** 3:12
**12:03** 119:25
**12:11** 120:1
**12:13** 122:2
**120** 36:16
**13** 41:16
**1325** 2:5
**14th** 88:20 109:4
**15** 37:5
**15-14-27(a)**
124:6
**150** 98:21
**152743** 47:19
**153453** 47:19
**170** 36:14
**19** 74:14 82:5
**1998** 6:17
**1999** 6:23
**19th** 72:15

**2**

**2** 3:9 11:15,18
11:19 14:7
58:19
**20** 68:6
**2000** 7:1
**2001** 2:4,10
**2002** 7:3,7
**2005** 7:10
**2008** 7:11
**2009** 7:15
**2012** 7:20
**2016** 7:23 36:15
**2017** 3:14 15:13

35:10 36:16
**2018** 3:13 12:12
19:7 29:23,24
30:20 31:15,19
32:22 33:15
36:17 49:13
64:24 72:15
74:14 82:6
88:17 108:20
109:4
**2019** 17:7 42:13
81:23
**2022** 1:13 4:2
124:15
**205** 2:6,11
**22(f)** 108:19
**23** 3:13 47:16
**23rd** 124:15
**27** 3:10 14:20,22
14:25
**2745** 1:22
123:23 124:20
**2nd** 3:14

**3**

**3** 3:10 26:12
27:1 29:16
72:19
**30** 3:11 16:13
68:6
**30(e)** 122:3
**31** 3:13
**32106** 73:6
**322-2333** 2:6
**35** 3:14
**35203** 2:5,11
**37** 75:19
**377** 72:17 73:2
**3rd** 30:15

**4**

**4** 3:4,8,11 8:8
30:1,4,10,11
41:16 58:21
**40** 68:6

**5**

**5** 3:13,21 31:8
31:11,14 39:24
108:10 112:16
112:19,21,25
112:25 113:2
**5-21-2018** 3:22
**50** 68:7,8,16
**500** 1:18
**59** 70:19

**6**

**6** 3:14 35:6,12
81:15
**6th** 30:19 88:15

**7**

**7** 3:15 81:18,21
**7.C** 124:6
**700** 2:10
**716-5200** 2:11
**75** 1:17

**8**

**8** 3:17 90:7,8
**800** 55:6
**81** 3:15

**9**

**9** 1:13 3:18 4:2
92:18,19
**9-11-28(c)** 124:8
**9-11-30(e)** 122:5
**9-25-2019** 3:16
**9:01** 1:14
**90** 3:17
**900** 1:17
**92** 3:18