## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **SHANE FOWLER and** | § | |
| **KELVIN TAYLOR,** | § | |
| | § | **CASE NO.: 1:21-CV-3303-MLB** |
| **Plaintiffs,** | § | |
| | § | |
| **vs.** | § | |
| | § | |
| **NORFOLK SOUTHERN RAILWAY** | § | |
| **COMPANY, DIANNE BARNETT,** | § | |
| **LEWIS WARE, and** | § | |
| **STEPHEN WEATHERMAN,** | § | |
| | § | |
| **Defendants.** | § | |

## PLAINTIFFS' BRIEF IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This is Plaintiffs Shane Fowler's ("Fowler") and Kelvin Taylor's ("Taylor"), opposition to Defendants Norfolk Southern Railway Co.'s ("NS"), Dianne Barnett's ("Barnett"), Lewis Ware's ("Ware"), and Stephen Weatherman's ("Weatherman"), Motion for Summary Judgment (Doc. 48).

## <u>INTRODUCTION</u>

Fowler and Taylor are carmen at NS's Dillard Yard in Savannah, Georgia. Barnett is the NS Division Manager of Mechanical Operation, Atlanta, GA, with jurisdiction over the Savannah carmen and Ware. Ware was the NS Savannah Senior

General Foreman and Plaintiffs' immediate supervisor.  Weatherman was an NS Senior Ethics Compliance Investigator in Norfolk, Virginia.  This case arises from adverse actions taken by NS and the Individual Defendants against Plaintiffs, which were based, in whole or in part, on Plaintiffs' protected activities.  These actions violated the Federal Rail Safety Act, whistleblower provisions, 49 U.S.C. § 20109 ("FRSA").

Carmen such as Fowler and Taylor inspect and repair freight cars and trains and perform air brake tests on trains.  When a Federal Railroad Administration ("FRA") or NS rule defect is found on a car a tag is completed by the carman and affixed to the car and the car is reported as a "bad order".  This is an important safety function.  When inspecting and performing air brake tests on trains, the train and tracks have to have blue flag protection.

While inspecting a train on August 15, 2018, Fowler found two serious safety defects on freight cars BKTY 152743 and BKTY 153453 involving defective swing gates on the coupler draft system which could allow the couplers to pull out of the cars and cause a derailment and wreck.  He bad ordered both cars.  A confrontation between Ware, Fowler and Taylor ensued in which Fowler and Taylor argued with Ware about the defects.  Ware later pulled the bad order tags off the cars and allowed them to leave Savannah without repairs on a train.  This tagging and report was a protected activity.  Plaintiffs allege that they were harassed after that by being forced

2

to do more work than usual, demeaning and nitpicking work and other such harassment.  These were adverse actions.

Fowler and Taylor bad ordered two cars on the night of September 19, 2018, and later in the shift discovered the cars were reported repaired.  Ware told them the cars had been repaired.  Fowler and Taylor, the carmen on duty, had repaired the cars.  They later learned that Ware and a Transportation Department official had repaired these cars and that the two of them had repaired one of these cars without the track being blue flagged, which was a blue flag violation.  As a result of this harassment and the problems herein noted, Fowler and Taylor separately called the NS Ethics Hotline on about October 1, 2018, and made complaints to Senior Compliance Investigator Steve Weatherman. (Weatherman Declaration, Doc. 48-3)   These complaints were FRSA protected activity.  Fowler testified that Ware had sent defective, unrepaired, off track doors on cars on three to four occasions. (Ex. C: Fowler Depo., p. 35)  A wedge should only be used under those circumstances to enable the car to be moved a short distance to a place where it could be repaired. (Ex. C: Fowler Depo., pp. 37-39)

Plaintiff understood from their conversations with Weatherman that he would assign an independent investigator to investigate their complaints.  To Plaintiffs' shock, Barnett, Ware's immediate supervisor, and thus the company official responsible for the performance of Ware's operation in Savannah, was the

investigating officer.  Barnett issued a report on November 6, 2018. (Ex. A: Barnett

Depo. Ex. 7)       On November 19, 2018, Weatherman wrote Fowler and Taylor

telling them that there had not been a violation of company policy.  Fowler and

Taylor were sent to NS's Mason Yard Intermodal Terminal, also located in Savannah,

on November 18, 2019, eight days after Barnett's report, to repair a car on an

intermodal train which had been put together and was extending over a mile of

mainline out of this yard.  The defect was on the very last car, which was still in the

yard.  Fowler and Taylor repaired the car using movement protection provisions

contained in a bulletin ODB5 dated May 21, 2018, as they had been taught by Ware

and NS. (Ex. C: Fowler Depo. p. 144; Ex. D: Taylor Depo. pp. 57-58)  Ware and

another supervisor were secretly watching the work and accused Fowler and Taylor

of violating the blue flag regulation.  They were offered a START punishment, which

is a form of punishment that would save Plaintiff's from having to go to a

disciplinary investigation and possible being fired.  They accepted the START in

order to avoid the risk of termination.  Shortly thereafter, Fowler and Taylor were

confronted about this situation by Ware and NS official Trainmaster Jefferies.  When

Ware and Jefferies left, Fowler was in the carman's shack restroom and overheard

Ware tell Jefferies that "they", Fowler and Taylor, had tried to "get me", but instead

they got Fowler and Taylor.  He further told Jefferies that Barnett was behind it all.

The next day Fowler questioned Jefferies about the conversation and Jefferies

admitted that the substance of the conversation and that the conversation had taken place. (Fowler Depo. pp. 158-160)

## PROCEDURAL BACKGROUND

Fowler and Taylor filed their individual Federal Rail Safety Act, 49 U.S.C. §20109, (FRSA) complaints against NS, Barnett, Ware, and Weatherman on March 11, 2019.  Defendants filed their responses on May 30, 2019. Plaintiffs provided the OSHA regional investigator with additional information regarding Plaintiffs' OSHA complaints on June 28, 2019, and January 14, 2020. On April 21, 2020, OSHA dismissed Plaintiffs' charges and Plaintiffs timely appealed OSHA's findings on May 4, 2020, to the Office of Administrative Law Judges. Plaintiffs then elected to pursue their claims under 29 C.F.R. § 1982.114(a) and filed this Complaint in this U.S. District Court.

## STANDARD OF REVIEW

The evidence in this case is hotly disputed.  Credibility, or lack thereof, of witnesses, including the truthfulness of statements, is for the trier of facts to determine.  Summary judgment is warranted when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. R. Civ. P. Rule 56(c).  In determining whether such a question of fact is raised, the court must make all

credibility assessments, resolve any ambiguities, and draw all inferences, in favor of the non-moving party, and may grant the motion only if the evidence, taken in that light, reflects that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997); Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994).  The facts and inferences taken in a light most favorable to Plaintiffs establish a prima facie case.  The facts and inferences  applicable to Defendants' only defense, taken in a light most favorable to Plaintiffs, create a jury question whether NS would have taken the actions absent the Plaintiffs' protected activities.

## **ARGUMENT**

### A.   **Facts Establishing a Prima Facie Case by a Preponderance of the Evidence**

FRSA forbids a rail carrier and its employees, such as NS and the individual Defendants, from taking adverse, discriminatory and/or retaliatory action against employees, such as Plaintiffs, if such action is taken as a result, in whole or in part, of the employee engaging in protected activity. To establish a *prima facie* case, Plaintiffs' must merely show by only a preponderance of the evidence that (1) they engaged in protected activity, (2) Defendants knew they engaged in a protected activity, (3) they suffered an adverse action, and (4) their protected activity was a contributing factor, in whole or in part, in the adverse action.  Defendants admit that Plaintiffs' report to the ethics hotline was a protected activity. The report of the two

6

BKTY cars was also a good faith report of a hazardous safety condition and is a protected activity. The FRSA is to be liberally construed in favor of the railroad employees.   Araujo v. N.J. Transit Rail Operations, Inc., 708 F.3d 152, 157 (3d Cir. 2013).

In Williams v. American Airlines, Inc., ARB No. 09018, ALJ No. 2007-AIR-004 (ARB Dec. 29, 2010), the Administrative Review Board ("ARB") held that "'adverse actions' refers to unfavorable employment actions that are more than trivial, either as a single event or in combination with other deliberate employer actions alleged." Id at *7.  The Board later held that the "Williams definition of adverse personnel action also applies to FRSA Claims." Fricka v. National Railroad Passenger Corporation, ARB No. 14047, ALJ No. 2013-FRS-035.

The Court noted that what constitutes retaliation that produces an injury or harm is a matter of context in each case:

> "We phrase the standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances.  Context matters.  'The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a single recitation of the words used or the physical acts performed.'… Hence a legal standard that speaks in general terms rather than specific prohibited acts is preferable, for an 'act that would be immaterial in some situations is material in others.' Washington, supra at 661." Id at *69.

Defendants argue that there must be a showing of animus by the Defendants in order to prove a violation of the FRSA statute.  While Plaintiffs disagree that this is a requirement, even if such an animus were required such animus is established here. A railroad "may not discharge demote suspend, reprimand, *or in any other way discriminate against an employee* if such discrimination *is due, in whole or in part,* to the employee's lawful, good faith act done, or perceived by the employer to have been done or about to be done – to [one of the protected activities listed, including the good faith reporting of a work-related injury or a safety hazard.]" 49 USC 20109 [emphasis added herein].  In the instant case, Plaintiffs reported the safety hazards on the ethics hotline call to NS and made NS aware of the violations. As stated, bad ordering the two cars and reporting the facts to management of the blue flag violation in question were good faith reports of hazardous safety conditions.

"[A] contributing factor is 'any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision.'" Kuduk v. BNSF Ry. Co., 768 F.3d 786, 791 (8th Cir. 2014)(quoting Procedures for the Handling of Retaliation Compls. Under the Fed. R.R. Safety Act, 75 Fed. Reg. at 53,524).  "In considering [the contributing factor] element, [courts] must take into account the evidence of the employer's nonretaliatory reasons." Gunderson v. BNSF Ry. Co, 850 F.3d 962, 969 (8th Cir. 2017).  A plaintiff can show his protected activity was a contributing factor using any of the factors set out by the 2nd Circuit Court of Appeals

in <u>Sirois</u>, such as temporal proximity, evidence of pretext, shifting explanation, and the falsity of the explanation, among others.  <u>Sirois v. Long Island R.R. Co,</u> 2018 WL 8963528 (E.D. N.Y. 2018), 799 Fed. Appx. 56, 59-60 (2020).  Reasonable triers of facts could easily find any, or all, of these exist in the case at bar. This is so even if one assumed retaliation animus was required.

The intent in FRSA cases is to remove barriers, such as retaliatory discipline, that railroad workers face in engaging in the statute's enumerated protected activities. <u>See Araujo.</u>  The 9th circuit recently and soundly rejected the argument that a FRSA Plaintiff is required to separately prove that an Employer acted with a discriminatory intent.  (<u>Frost v. BNSF Ry. Co.,</u> 914 F.3d 1189 (2019)).  The 9th Circuit considered what is an appropriate standard of unlawful discrimination, given that a FRSA plaintiff must show by a preponderance of the evidence that the protected conduct "was a contributing factor in the unfavorable personnel action alleged in the complaint." <u>Id</u> at *1195 (citing <u>Rookaird v. BNSF Railway Co.,</u> 908 F.3d 451, 460 (9th Cir. 2018).  The 9th circuit defined a "contributing factor" as "any factor, which alone or in connection with other factors, tends to affect in any way the outcome of the decision. <u>Id.</u> (citing <u>Rookaird</u> at *461).  Therefore the "only burden the statute places on FRSA plaintiffs is to ultimately prove…that their protected conduct was a contributing factor to the adverse employment action – i.e., that it 'tended to affect' the decision in some way." <u>Id</u>. Here, the Plaintiffs have proven evidence that a

reasonable trier of facts could determine, by a preponderance of the evidence presented, were contributing factors in Defendants' decision to discipline Plaintiffs.

In Frost, BNSF argued that FRSA is a "discrimination statute" requiring plaintiffs to affirmatively prove animus as part of their FRSA claim. Id. The 9th Circuit disagreed, saying that a "[s]howing that an employer acted *in retaliation for* protected activity *is* the required showing of intentional discrimination; there is no requirement that FRSA plaintiffs separately prove discriminatory intent." Id. Further, "the presence of an employer's subjective retaliatory animus is irrelevant" and "[a]ll a plaintiff must show is that his 'protected activity was a contributing factor in the adverse [employment] action.'" Id (citing Tamosaitis v. URS Inc., 781 F.3d 468, 482 (9th Cir. 2015)).

Most recently, the United States Supreme Court considered the causation standard of a "discrimination statute" in the context of Title VII discrimination claims. In Bostock v. Clayton County, 2020 U.S. Lexis 3252 (June 15, 2020), the Court considered the causation standard where an Employer is accused of violating Title VII where it is "unlawful …for an employer to fail or refuse to hire or to discharge any individual, *or otherwise discriminate against any individual* with respect to his … employment, *because of* such individual's [statutorily protected characteristic, such as sex]". (emphasis added). Under FRSA Section 201019, an employer railroad "may not discharge, demote, suspend, reprimand, *or in any other*

*way discriminate against an employee* if such discrimination *is due, in whole or in part,* to the employee's lawful, good faith act done – to [one of the protected activities listed, including the good faith reporting a work-related injury or <u>safety hazard</u>]" (emphasis added).  The language of both statutes is almost identical, with the causation standards of "because of" and "due, in whole or part, to" being the primary distinction.

The Merriam Webster Dictionary defines "due to" thusly "as a result of, because of."  The Supreme Court interprets this language as a simple "but for" causation standard.  The Court explained that it has previously found "the ordinary meaning of 'because of' is 'be reason of' or 'on account of.'"  <u>Bostock</u>, pg. 5.  "[A] but-for test directs us to change one thing at a time and see if the outcome changes.  If it does, we have found a but-for cause."  <u>Id</u>.  The Court noted that Congress "could have added "solely" to indicate that actions taken "because of" the confluence of multiple factors do not violate the law."  <u>Id</u> at *6 (citing 11 U.S.C. § 525; 16 U.S.C. § 511.  The Court further rejected the defendants' arguments that they didn't *intentionally* discriminate by subjecting the plaintiffs to disparate treatment.  <u>Id</u> at *17.  The Court's inquiry was to whether the employers intended the discriminatory conduct, regardless of the underlying motivations of the conduct.  <u>Id</u>

Plaintiffs provided evidence of Ware's intentional animus toward Plaintiffs as it relates to the Ethics Hotline complaint filed by Plaintiffs.  After Plaintiffs accepted

the blue flag START to avoid possible termination, Fowler overheard Ware and Jefferies discussing the blue flag charges that Barnett was behind of the charges o relating it to Plaintiff's complaints to NS about Ware.  Jeffries shortly confirmed the conversation and the content of that conversation to Fowler. (Ex. C: Fowler Depo., p. 156)

Ware denies the conversation, but Jefferies' confirmation is undisputed.  In addition, Daniels felt that Ware had something against Fowler and Taylor and that they were treated differently by Ware. (Ex. E: Daniels's Sworn Statement pp. 39-40) At best, Defendants have demonstrated that there are disputed issues of fact making summary judgment inappropriate.

It is important to note that Ware has admitted under oath that he had been untruthful earlier in his deposition when discussing whether he had a bad order counsel.  The evidence in this case is replete with testimony from Fowler, Taylor and Daniels that Ware pulled bad order tags and was concerned about adverse evaluations of his performance because his bad order count was too high and there were train delays caused by having to remove bad ordered cars from trains.  Defendants do not acknowledge any of this evidence  in their brief and made no reference to testimony from the Defendants.  When asked in his deposition if his earlier testimony about bad orders was not the truth, Ware answered, "Yes." (Ex. B: Ware Depo., pp. 46-47) Ware's dishonesty and his obvious unease about admitting the bad order count are

evidence that could leave a reasonable jury to find that everything that Ware and NS is claiming in this case is not trust worthy or reliable.  Barnett's evasion for almost four pages of her deposition testimony about whether she was evaluated based on bad order counts is another example of the same phenomenon and could have the same effect.

Defendants contend that Plaintiffs' complaints to Weatherman were fabrications However, Barnett's November 6, 2018, email correspondence to Weatherman found Ware's NS supervisory performance to be less than exemplary and, in fact, Barnett provided verbal warnings and reprimands to Ware due to his poor performance. In particular, Barnett admits that,

> "Mr. Ware has no history of being properly disciplined for improperly removing bad order tags and did not admit to regularly removing tags. However, I suspect that it has occurred in the past more frequently than reported in this complaint."

Barnett goes further to state:

> "I feel that Mr. Ware's management style is different than that of the supervisors preceding him and that has resulted in misunderstanding between him and his direct reports. I advised Mr. Ware have another carman with him to confirm that a car is not defective and have that carman remove the bad order tags, noting why they were removed on the tags to insure transparency in the inspection and repair process."

(Barnett Declaration, Doc. 48-4, pp. 1-11; Barnett Report, Doc. 48-4, pp. 42-45)

As indicated by Barnett's email to Weatherman, Barnett felt it necessary to warn and reprimand Ware when she stated in the above referenced email, "Also discussed our anti-retaliation policy found in Corporate Policy 328 'prohibition against workplace harassment' with Mr. Ware. He will receive a follow-up letter to confirm our conversation regarding the policy." Defendants emphasize that Ware has no history of "discipline" for pulling bad order tags. The careful use of the modifying term "discipline" is demonstrated by Barnett's own November 6, 2018, report. She said that Ware did not "admit to regularly removing tags. However, I suspect that it has occurred in the past more frequently than reported in this complaint" (Plaintiffs' Ethics complaints). (Ex. A: Barnett Depo., Ex. 4)

Next, Defendants contend that Barnett's decision that Ware's August 16, 2018, decision to override Plaintiffs' bad ordering of the two rail cars in question was fully justified does not take into account the evidence of Ware's tacit admission that the swing gates and the danger they presented, were real. When challenged by Fowler the defects he and Taylor found could allow the couplers to pull out Ware said that he knew, but they weren't going to "come out here". (Ex. C: Fowler Depo., p. 154)

During that same conversation Ware told Fowler that if he didn't remove the bad order tags he could discipline Fowler for failure to follow instructions. (Ex. C: Fowler Depo., p. 60) Plaintiff's charge that Ware retaliated against Plaintiffs for bad ordering cars is supported by carman Steven Daniels. Daniels has stated that Ware

14

told the carmen if "you bad order it, you fix it." (Ex. E: Daniels' Sworn Statement, p. 25)  Daniels found this to be retaliation against the carman for bad ordering cars. (Id.)  Barnett knew that Ware used threats and intimidation and would remove bad order tags to further NS bad order goals.  (Ex. E: Daniels Sworn Statement, pp. 11-12 and 17-19)  Despite Daniels reporting this information to Barnett, Lewis' supervisor, during her investigation of the hotline complaints from Fowler and Taylor, Barnett ignored Daniels' complaint that corroborated Fowler's and Taylor's complaints.

Barnett clearly knew on November 6, 2018, that Ware and Kimbel had violated the blue flag regulations by repairing a cut lever on a car in a train with no blue flag protection.  Barnett did not discipline Ware then.  She did not do so until a year later on September 25, 2019.   The irony of this situation is stunning and clearly demonstrates the motives behind the charges against Fowler and Taylor.

NS's START discipline policy allows for a charged employee to accept certain punishment without the need for an investigation prosecuted and with punishment dictated by NS management. Plaintiffs contend that the work they performed on the subject car using amended Rule 22 movement protection was proper under the rules as taught by NS and Ware and was consistent with NS's and Ware's accepted practices.  However, Plaintiffs felt that had they declined the START and subjected themselves to a formal investigation they were certain to be found guilty and possibly terminated. (Ex. C: Fowler Depo., pp. 105-106; Ex. D: Taylor Depo., p. 93)

Daniels also recounts that the training materials for movement protection were simply left in the breakroom for the carman to read and interpret with no guidance. (Daniels Sworn Statement, p. 35)  Daniels' understanding of how to utilize the Rule 22 movement protection was the same as Fowler's and Taylor's understanding. (Id.) Furthermore, Taylor testified to specific instances when Ware ratified utilization of Rule 22 in lieu of blue flag protection:

> A.    Well, here's the thing—Mr. Ware was standing right there behind me in the office. I had just got there, got on my PPE. When they called and said this, that's when I said, I picked up the radio, because we were told, Mr. Ware said, go out there and check that out. I got on the radio and I called that train, that engineer, right there with Mr. Ware standing behind me. And I said, okay, I'm going to go ahead and I'm going to roll in from the east end. I heard a couple of leaks in it while I was coming in. Go ahead and give me movement protection. I went out there—he gave it to me. I went out there, I fixed one of the leaks. Then I moved to the other one and fixed the other one. And he told me, okay, the flow meter is coming down. This is what the engineer told me over the radio, the flow meter is coming sown. So I told him, I said, there is one more. I said, what is your flow meter reading right now? He said 50. At that point is when Mr. Ware got on the radio and said, never mind, Mr. Taylor, he said they can pull at 50. So he knew it, he was standing right there and he was monitoring the whole thing over the radio the whole time. So he knew that we were using it. This wasn't something that we tried to hide. And not only was we using it, other carmen was also using it.
>
> Q.    But my question involved, you were using it without blue flag protection.
>
> A.    Correct. In situations where we could not blue flag the track. If we could blue flag the track, then

> we did not use it. But in a situation, this train had moved
> out of the track, part of it was in there.

(Ex. D: Taylor Depo., pp. 59-60)

Contrary to Defendants' contention that the Plaintiffs' "rolled out two new assertions…" NS has been aware of the facts of the assertion for a very long time.

Fowler and Taylor both explained to Ware at the START conference what they had done at Mason Yard regarding movement protection, and why. This included that they were acting as Ware had instructed. (Ex. C: Fowler Depo. p. 144; Taylor Depo., p. 57-58)  Defendants deny this but, a factual dispute is raised.

### B.  Defendants Have Not Proven Their Only Available Affirmative Defense by Clear and Convincing Evidence.

Once Plaintiffs have established disputed issues of material facts on the elements of a prima facie case, Defendants can avoid liability only if they demonstrate by clear and convincing evidence that the Defendants would have taken the same unfavorable actions in the absence of the protected activity.  While Defendants have denied all of Plaintiffs' charges, it is apparent there are disputed facts from which a reasonable jury could determine that the Plaintiffs have established a prima facie case.  Defendants' bare denials do not suffice in the face of the detailed facts and evidence as show above.

Defendants offer evidence that another carman, Steven Daniels, received similar punishment for a blue flag violation.  They offer no evidence, however, of the

circumstances in Daniel's situation which could be used to compare it to Plaintiffs' situation.  In fact, Daniels' incident did not involve movement protection procedures and he admits he actually violated the regulation. (Ex. E: Daniels' Sworn Statement, p. 26)  In the matter at bar there is credible evidence from which the jury could find that Plaintiffs had been targeted, set up and punished for doing the work exactly as they had been taught.  Thus, the Daniels' case may not be used as a comparator. Lewis v. City of Union City, Georgia, 918 F.3d 1213, 1227 (11th Cir. 2019)

Further the situation giving rise to the charge occurred only eight days after Barnett's report on the investigation of Plaintiffs' Ethics Hotline charges against Ware.  Then, there is the admission by Ware, which Fowler overheard, to Jefferies that Fowler and Taylor had tried to "get" him, but that "they" got them (Fowler and Taylor).  None of the Defendants have disputed Jefferies' account.  Ware, however, disputes that he made those statements and that there was any type of set up.  Ware's credibility is certainly in question in this case.

Given the facts and Ware's admission in deposition that he had been untruthful under oath about a material fact in this case, that is, the existence of the bad order counts, it is obvious that Defendants have not established at this stage that they would have taken the same actions that they would have.

**C.**     **Defendants Are Not Entitled To A Summary Decision As To Punitive Damages.**

Without restating the evidence above, Ware's comments that were overheard by Fowler in addition to the threats that were recorded during the discussion between Ware and Fowler related to the bad ordering incidents, coupled with the fact that Barnett downplayed Ware's history of releasing bad order cars and ignored the FRA blue flag violation committed by Ware, which had been previously reported to NS, shows an obvious reckless disregard for Plaintiffs' rights and the trier of facts could determine the Defendants committed intentional violation of Federal Law.

## CONCLUSION

Based upon the voluminous number of undisputed facts and the voluminous amount of disputed facts, it is clear that a reasonable jury could determine all of these facts in favor of the Plaintiffs. Defendants have presented no undisputed material facts that would entitle it to a summary judgment on any issue. Therefore, Plaintiffs request the court to deny Defendants' Summary Judgment Motion.

_/s/ W. C. Tucker, Jr._
William C. Tucker, Jr. (bill@mtandj.com)
J. Thomas Walker (tom@mtandj.com)
MAPLES, TUCKER & JACOBS, LLC
2001 Park Place North, Suite 1325
Birmingham, AL 35203
205-322-2333

## **<u>Certificate of Service</u>**

The undersigned hereby certifies that the foregoing was electronically filed with the Clerk of Court using the CM/ECF system which will send notification to the following:

>Sydney F. Frazier, Jr. (Sydney.Frazier@phelps.com)
>Crawford S. McGivaren, Jr.  (Crawford.McGivaren@phelps.com)
>Desharne Carroll (Desharne.Carroll@phelps.com)
>PHELPS DUNBAR LLP
>2001 Park Place North, Suite 700
>Birmingham, AL 35203

Date:  December 5, 2022

>_/s/ W. C. Tucker, Jr._
>Of Counsel