# Exhibit C

# Fowler Deposition Excerpts

Page 1

U.S. DEPARTMENT OF LABOR
OFFICE OF ADMINISTRATIVE LAW JUDGES

```
IN THE MATTER OF:                     )
                                      )
SHANE FOWLER and                      )
KELVIN TAYLOR,                        )
                                      )
        Complainants,                 )
                                      ) CIVIL ACTION NO.
vs.                                   ) 2020-FRS-00060
                                      )
NORFOLK SOUTHERN RAILWAY              )
COMPANY, LEWIS WARE, DIANNE           )
BARNETT, and STEPHEN                  )
WEATHERMAN ,                          )
                                      )
        Respondents.                  )
                                      )
```

Deposition of SHANE ERIC FOWLER, taken by counsel for the Respondents, pursuant to notice and by agreement of counsel, under the Georgia Civil Practice Act, reported by Tamela G. Sheeler, RPR, CLR, CCR-6537-8261-3701-4272, at McKee Court Reporting, 106 Montgomery Street, Savannah, Georgia, on Wednesday, April 14, 2021, commencing at 9:05 a.m.

```
                                                          Page 35
 1   him what happened to it, he told you it got sent out?
 2        A.   Yes.  And then I would call the yardmaster
 3   because I asked, you know, do they need any help setting
 4   that car out?
 5             And he would say, no, Mr. Ware said, let it
 6   go.
 7        Q.   The last time you can recall that happening
 8   was approximately a month or two ago?
 9        A.   Yes, sir, I don't have an exact time, it's
10   somewhere in there.
11        Q.   That's all right, I want to get an idea, I
12   don't need an exact time.
13        A.   Okay.
14        Q.   How many times, just in your best
15   recollection, Mr. Fowler, how many times would you say
16   that that practice you just described, that is a car
17   door defective, off track, has not been -- not been
18   repaired, properly repaired, as you would call it, and
19   instead has been sent out on the line by Mr. Ware; how
20   many times do you think that's happened --
21        A.   Probably for me, four, four times.  Three
22   or four times, sir.
23        Q.   Three or four times in the total time
24   you've been working there with Mr. Ware?
25        A.   Yes, sir.
```

Page 37

```
1    a wooden wedge in the door to fix it?
2         A.    No, sir, I do not.
3         Q.    Did Mr. Ware instruct you to install those
4    wedges or did he or someone else do that, if you know?
5         A.    I do not know -- I know I did not.
6         Q.    Have you ever seen it done?
7         A.    No, sir.
8         Q.    How do you know what happened if you've
9    never --
10        A.    I've seen it after.
11              THE REPORTER:  I didn't get your whole
12        question.
13              THE WITNESS:  I'm sorry, my fault.
14   BY MR. FRAZIER:
15        Q.    How do you know it was done if you've never
16   seen it?
17        A.    I've seen the after -- the result of it,
18   yes, sir.
19        Q.    And what you saw was, just tell us again,
20   what did you see?
21        A.    A wedge between the doors here, and a wedge
22   goes in -- in front of the door, behind the track of
23   the -- where the camels set on.
24        Q.    Okay.  You've never seen one of those
25   installed by anyone?
```

Page 38

1  A. Yes. Yes, sir, on the RIP track but not --
2  sometimes we have to move the car to get it to a point
3  to work on it.
4  Q. Yes.
5  A. Yes, I've seen it installed, yes.
6  Q. But my question is, have you seen some
7  person do what you described?
8  A. Not on the train.
9  Q. That's what I'm asking.
10 A. No, sir, not on the train.
11 Q. When you say, not on the train, I'm not
12 sure I understand the significance of that answer.
13    Are you saying --
14 A. Yes, sir.
15 Q. -- you've seen that done to steady or to
16 fix a defective door on the way to the RIP track or in
17 connection with the repair?
18 A. Once it's set out of the train, yes, sir.
19 Q. Okay. Once it's set out of the train, you
20 say a wooden wedge sometimes is used --
21 A. For --
22 Q. -- before it's actually repaired?
23 A. For a temporary fix, yes, sir. It's not a
24 proper repair.
25    MR. TUCKER: Is that just to get it to the

```
                                                      Page 39
 1         RIP track?
 2              THE WITNESS:  Yes, sir, to make it as safe
 3         as possible to move it a short distance, that's
 4         what we use it for.
 5         Q.   But you have not seen either Mr. Ware or
 6    any other person do a wedge fix, install a wedge, on one
 7    of the doors in connection with sending the car on out
 8    with the train?
 9         A.   No, sir.  As far as letting it leave,
10    right?
11              Is that what you're talking about, letting
12    it leave the yard?
13         Q.   Yes.
14         A.   No, sir.
15         Q.   Yes.
16         A.   To go to the next destination.
17         Q.   Has Mr. Ware ever told you, to you, in a
18    conversation with you, that he had done that?
19         A.   No.  No, sir.
20         Q.   Mr. Fowler, we've now talked about three
21    incidents which you have included in your answer as
22    occasions when Mr. Ware tried to prevent you from
23    properly performing your car inspection or repair
24    duties.  The first one was with the cut lever, the cut
25    lever car.
```

Page 60

```
 1   can't take down both of us; okay?  Let me get my
 2   question out.
 3              The question was, it's your testimony that
 4   Mr. Ware looked at those cross keys and agreed with you
 5   that they were defective and sent them on anyway?
 6        A.   Yes, sir.
 7        Q.   Your testimony is that he told you that
 8   they were defective?
 9        A.   He told me the swing gate -- can I answer?
10             MR. TUCKER:  Go ahead.
11   BY MR. FRAZIER:
12        Q.   Yes.
13        A.   The swing gate was not covering the cross
14   key and the cross key could come out, but he didn't
15   think the cross key was defective.  And that's not why I
16   bad ordered it for the -- I bad ordered it for the swing
17   gate covering the cross key.  But we always put the
18   cross key on it.  The swing gate is the issue, sir.
19        Q.   Okay.  And so --
20        A.   It's a unit, it goes together.
21        Q.   Have you finished your answer?
22        A.   Yes, sir.
23        Q.   Is it correct then that Mr. Ware did
24   disagree with you that those cross keys were defective?
25        A.   Not -- we just discussed that the cross key
```

```
                                                      Page 105
 1   Mr. Smith; did you not?
 2        A.   Yes.
 3        Q.   Okay.  And tell me about that discussion,
 4   what did he say to you about your -- about your
 5   explanation for why you and Mr. Taylor had not obtained
 6   blue flag protection, what did he say to you about that
 7   subject?
 8        A.   I showed him all of the documents, me and
 9   Kelvin did.  And he said it wouldn't -- we would lose.
10             Because he said, they are bent on the blue
11   flag protection.  And he said, you can go and get worse
12   time than you're getting now.  My advice to you is to
13   take this punishment and not fight it.
14        Q.   That's what Mr. Smith told you?
15        A.   Yes, sir.
16        Q.   And you accepted that explanation and
17   that's what you did?
18        A.   Yes, sir.
19        Q.   Okay.  Now, did anybody at Norfolk Southern
20   threaten you with dismissal or with anything else if you
21   didn't agree to that --
22        A.   Just the worry of the investigation.
23   After -- if we were proven found, we could lose our job,
24   yes.  If we took it to an investigation.
25        Q.   But you've been offered 30 days deferred
```

```
                                                       Page 106
 1    and Mr. Smith discussed it with you; correct?
 2         A.    Yes.
 3         Q.    Nobody told you you were going to be
 4    dismissed if you went to a hearing --
 5         A.    Could possibly be, yes, they did.
 6         Q.    No, that wasn't my question.
 7               My question is, did anybody tell you if you
 8    go to this hearing on this charge, you're going to be
 9    dismissed?
10         A.    No, sir.
11         Q.    Mr. Ware did not tell you that; correct?
12         A.    No, he didn't tell me that, no, sir.
13         Q.    Thank you.
14               MR. TUCKER:  Hallelujah.
15               THE REPORTER:  Hallelujah.
16               THE WITNESS:  Wow, man.
17               MR. TUCKER:  They finally turned that motor
18         off, my God it was --
19               THE WITNESS:  It was making my heart beat.
20               MR. FRAZIER:  Do you need to take a break,
21         Bill?
22               MR. TUCKER:  No, no, it was just that motor
23         going out there, it was rattling the windows.
24         There is a bunch of construction out in front of
25         the building, and we are on the first floor right
```

```
                                                      Page 144
 1         A.    Movement protection.
 2         Q.    And it would be by carmen, and it would be
 3    recorded; correct?
 4         A.    It would be recorded.
 5         Q.    And Ware would know it?
 6         A.    Ware would know it.  But Kelvin was in
 7    incidents with him using it and Ware was at the --
 8    Mr. Ware was at the office, and he got in the -- on the
 9    radio and interacted with Mr. Taylor while he was using
10    the movement protection and never said anything about
11    it, so he knew about it.
12         Q.    But that was prior to your report to the
13    ethics and compliance hotline?
14         A.    Yes.
15         Q.    And did that indicate --
16         A.    Absolutely.
17         Q.    -- to you another reason he was mad
18    about --
19         A.    Yeah.
20         Q.    -- what you all did?
21         A.    Yes.
22               MR. FRAZIER:  Object to the form -- object
23         to the form of the question.
24               MR. TUCKER:  All right.
25    BY MR. TUCKER:
```

```
                                                      Page 154
 1   parts, it doesn't have a specific thing on it.  That's
 2   all one thing.  So the slide gate that goes with that,
 3   you have to have the slide gate to have the cross key
 4   in.
 5          Q.   All right.  Did Ware tell you -- tell me
 6   what Ware told you about the cross key, about the whole
 7   situation with the cross key.
 8          A.   Well, the discussion was, he wasn't going
 9   to let it go out.  And we had a discussion on it and --
10   which -- his idea of it.
11               And he -- I instructed him that it was bad
12   because the key could come out, the slide gate wasn't
13   closing over the cross key.
14               And he told me, yeah, it may come out, but
15   it's not going to come out here, or something to that
16   effect.  It's all on the tape, so...
17          Q.   Is it on the tape?
18          A.   Yeah, I think so.  All of it is.
19          Q.   Was that the same night that Ware and the
20   Transportation Department Supervisor Waylon Kimble
21   repaired the GATX cut lever?
22          A.   I believe it is, I'm not for certain.
23               The 19th, I think it was, when they
24   repaired that.
25          Q.   Were you aware that the Federal Railroad
```

Page 156

```
 1          A.    I do not know that.
 2          Q.    Is it your impression -- do you contend
 3    that Mr. Weatherman's letter back to you was a whitewash
 4    of the entire situation?
 5                MR. FRAZIER:  Object to the form of the
 6          question.
 7          A.    I don't know that, I would suspect, but --
 8          Q.    Is that what you think it resulted in?
 9                MR. FRAZIER:  Object to form, he's already
10          answered it.
11    BY MR. TUCKER:
12          Q.    Do you think the BKTY cars did not go to
13    the shop?
14          A.    Yes.
15          Q.    Nick, the carman we mentioned.
16          A.    Wzebrowski.
17          Q.    Okay.  If the car had gone to the track --
18    well, let me -- let me go back.
19                Were the two cars taken out of the train
20    and set aside in Dillard Yard?
21          A.    Yes.
22          Q.    If you were to take the couplers apart, or
23    a coupler apart, to pull that cross key out and then put
24    it back together again, how long would that take?
25          A.    Depends on what you're dealing with.  An
```