## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

Shane Fowler and Kelvin Taylor,

                Plaintiffs,

                          Case No. 1:21-cv-3303-MLB

v.

Norfolk Southern Railway
Company, Lewis Ware, Dianne
Barnett, and Stephen
Weatherman,

                Defendants.

_____/

## <u>ORDER</u>

This is an employment retaliation case. Defendants move for summary judgment. (Dkt. 48.) They also move to strike a sworn statement on which Plaintiffs rely in their summary judgment papers. (Dkt. 63.) The Court denies the motion to strike and grants the summary judgment motion in part.

## I.  Background

Plaintiffs are "carmen" in Defendant Norfolk Southern's Mechanical Department. (Dkts. 50 at 5, 27; 51 at 4.) They inspect and

repair trains at a railyard in Georgia. (Dkt. 58 ¶ 2.) The railyard divides employees into three shifts. (*See* Dkt. 48-4 at 9.) Plaintiffs worked the second shift during the events at issue. (Dkts. 50 at 5, 18–19; 51 at 9, 12, 15–17.)

On August 15, 2018, Plaintiffs concluded two railcars were defective because the mechanical component designed to connect each car to another car (a "coupler") had a faulty part (the "swing gate"). (*See* Dkts. 50-4 at 3–4; 58 ¶ 11; 60 ¶ 10.) Specifically, the swing gate no longer covered the "cross key"—essentially a pin that locked the couplers together—meaning the cross key could "wiggle out" and the railcars could separate. (Dkts. 50 at 4, 17–18; 60 ¶¶ 10–11.) Plaintiffs attached a written description of this defect to each railcar, a process known as "bad ordering" the cars. (Dkts. 58 ¶ 4; 60 ¶ 10.) Plaintiffs' supervisor, Defendant Ware, then instructed Plaintiffs to repair three other cars on "Shed Track #1." (Dkts. 50 at 41; 50-4 at 3–5.) He told Plaintiffs "they were being assigned the extra work because he needed to get his bad order count down due to them . . . having just bad order[ed] railcars." (Dkt. 48-4 at 44.)

The next day, Defendant Ware inspected the two railcars with the faulty swing gates and removed the bad order tags over Plaintiffs' objection. (Dkts. 56 at 49–52, 63, 70–72; 58 ¶ 11; 60 ¶ 11.)  Plaintiffs insisted the cars were defective because "the key could come out." (Dkts. 50 at 41; 60 ¶ 11.)  Defendant Ware allegedly replied the cars may be "defective"—and "could be a safety issue"—but "we're going to let them go." (Dkt. 50 at 16–18.)  He supposedly explained that, while the cross keys "may come out," they had not done so "yet."   (Dkts. 50 at 41; 51 at 10; 60 ¶ 11.)  He threatened to "write up" Plaintiff Fowler if he retagged the cars or "didn't let [them] go." (Dkt. 48-4 at 44.)

On October 1, 2018, Plaintiffs called the Norfolk Southern Ethics Hotline and made several complaints about Defendant Ware to the company's Senior Compliance Investigator, Defendant Weatherman. (Dkts. 58 ¶¶ 58–59; 60 ¶ 12.)  Plaintiffs said Defendant Ware (1) was "improperly removing bad order tags from defective railcars"; (2) had "a history of removing bad order tags" and was previously "disciplined" for doing so; (3) "retaliates against employees who bad order railcar[s] [by] threatening to bring them up on charges, assigning additional duties, or assigning menial task[s]"; (4) "instructed carmen to carry the company

3

shop phone with them while they are out in the yard inspecting railcars";
(5) "pulled the bad order tickets off of the two railcars" with the faulty
swing gates; (6) "threatened that he would write [Plaintiffs] up for failure
to follow instructions if they didn't let the railcars go"; (7) "retaliated
against [Plaintiffs] for bad ordering the railcars by instructing them to
do repair work on the first three cars on Shed Track #1"; (8) retaliated
against Plaintiffs for bad ordering other railcars by instructing Plaintiffs
on September 19, 2018 to "take 15 cases of water to the Engine Terminal"
and to "pick up . . . trash bags and water bottles"; and (9) repaired railcars
himself—or possibly with an employee from another department—in
violation of a collective bargaining agreement provision that limited the
performance of such repairs to carmen. (Dkts. 48-3 at 6–7; 58 ¶ 59.)

Defendant Weatherman assigned Defendant Barnett (Norfolk
Southern Mechanical Department Division Manager) to investigate
Plaintiffs' allegations. (Dkt. 58 ¶ 60.) Defendant Barnett was Defendant
Ware's supervisor at the time. (Dkt. 48-4 at 1.) Defendant Barnett
interviewed twelve Norfolk Southern employees as part of her
investigation. (Dkt. 48-4 at 42.) She sent Defendant Weatherman her
final report on November 6, 2018. (Dkt. 48-4 at 42–45.) She found some

merit in two of Plaintiffs' complaints: that Defendant Ware had "removed bad order tags" and repaired railcars with a non-carman. (*See* Dkt. 48-4 at 42–45.) But she found little-to-no merit in Plaintiffs' other complaints. (*See* Dkt. 48-4 at 42–45.)

On November 14, 2018, Defendant Ware and another supervisor saw Plaintiffs working on a train without placing a "blue signal" in front of the train. (Dkt. 58 ¶¶ 19, 48; *see* Dkt. 51 at 16.) Defendant Ware told Plaintiffs this violated federal and company safety regulations—known as "blue flag" rules—which require rail workers to display "[b]lue signals" when they are "on, under, or between rolling equipment" so no one moves the train. 49 C.F.R. § 218.23; (*see* Dkts. 48-4 at 22–26; 58 ¶¶ 17, 21; 60 ¶ 22). Plaintiffs insisted their conduct was permissible under another company rule called "movement protection," which requires employees to communicate with equipment operators to ensure equipment does not move during repairs and inspections. (*See* Dkts. 48-4 at 28–30; 58 ¶¶ 19–20, 48.) Defendant Ware offered to suspend Plaintiffs for 30 days on a deferred basis—pursuant to an alternative disciplinary process endorsed by the company—if Plaintiffs waived their rights to a formal investigative hearing. (Dkt. 58 ¶ 52.) On November 17, 2018, Plaintiffs

accepted the offer in consultation with their union representative.  (Dkts. 58 ¶ 53; 60 ¶ 23.)

A day or two later, Plaintiff Fowler overheard Defendant Ware tell another employee: "[T]hey tried to get me and we got them.  And we went out there and they didn't—they used the movement protection but we got them on the blue flag protection, is basically it, and Dianne [Barnett] was behind all of it."  (Dkt. 50 at 42–44.)  Around the same time, Defendant Weatherman sent Plaintiffs a letter saying the company had completed its investigation into Plaintiffs' hotline complaints and found no "violation of company policy."  (Dkts. 48-3 at 22; 60 ¶ 24.)

In 2021, Plaintiffs sued Defendants for employment retaliation under the Federal Rail Safety Act.  (Dkt. 1.)  Plaintiffs' complaint seeks damages, including punitive damages.  (Dkt. 1 at 8.)  Defendants now move for summary judgment.  (Dkt. 48.)  Defendants also move to strike a sworn statement on which Plaintiffs rely in their summary judgment papers.  (Dkt. 63.)

## II.   Motion to Strike

Defendants ask the Court to strike the statement of a Norfolk Southern carman named Steven Daniels (Dkt. 59-5) because

Mr. Daniels's statement was allegedly not under oath; falsely claims it was "taken pursuant to Notice and agreement"; was offered "in response to leading and suggestive questions"; and includes "hearsay, speculation, conjecture," and irrelevant information.  (Dkt. 63 at 1–2.)  The Court denies Defendants' motion for several reasons.  The motion includes virtually no analysis or citations to authority.  A notary/court reporter has submitted a declaration saying she took Mr. Daniels's statement "under oath."  (Dkt. 67-1.)  The notary/court reporter's declaration also says she inadvertently included the "notice and agreement" language on the cover page of Mr. Daniels's statement and that doing so was simply an "error" involving "boiler plate language."  (Dkt. 67-1.)  Much of Mr. Daniels's statement "could be reduced to admissible evidence at trial," meaning the Court "may consider" it at summary judgment. *Bowen v. Manheim Remarketing, Inc.*, 882 F.3d 1358, 1363 n.2 (11th Cir. 2018).  And several of Defendants' objections go to the weight of Mr. Daniels's statement rather than its admissibility.  (*See, e.g.*, Dkt. 63 at 63 (arguing Mr. Daniels's statement is "contrary to" other evidence and "suggests that it is acceptable to violate a federal safety rule").)

To be sure, Mr. Daniels's statement does include some assertions—including legal conclusions and speculative allegations—that are entitled to no weight even at the summary judgment stage.  (*See, e.g.*, Dkt. 59-5 at 8 (characterizing conduct as "a form of retaliation"), 10 (describing "what Fowler and Taylor thought" without any foundation or elaboration).)  Such assertions cannot create a genuine issue of material fact.  *See, e.g., Crawford v. Chao*, 158 F. App'x 216, 217 (11th Cir. 2005) ("Conclusory allegations or evidence setting forth legal conclusions are insufficient to show that a genuine issue of material fact exists.").[1]  But Defendants have not shown the Court should *strike* Mr. Daniels's statement, much less that it should strike the document *in full*.  That is the relief Defendants seek.  (*See* Dkt. 68 at 5 ("[T]he Court should strike all of the Daniels Statement excerpts.").)  So the Court denies Defendants' motion.

---

[1]The Court recognizes *Crawford* and other cases cited herein are unpublished and not binding.  The Court cites them nevertheless as instructive.  *See Searcy v. R.J. Reynolds Tobacco Co.*, 902 F.3d 1342, 1355 n.5 (11th Cir. 2018) ("Unpublished cases do not constitute binding authority and may be relied on only to the extent they are persuasive.").

### III.   Motion for Summary Judgment

#### A.      Standard of Review

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must "resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences in his or her favor." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Salinero v. Johnson & Johnson*, 995 F.3d 959, 964 (11th Cir. 2021).

#### B.     Legal Framework

The Federal Rail Safety Act ("FRSA") says a railroad carrier may not "discharge, demote, suspend, reprimand, or in any other way discriminate against an employee" for engaging in protected activity. 49 U.S.C. § 20109(a)–(b). The statute lists several protected activities, including reporting hazardous safety conditions, refusing to violate railroad safety rules, and reporting other violations of such rules. *See id.* The statute is designed to "promote safety in every area of railroad

operations and reduce railroad-related accidents and incidents." *Id.* § 20101.

To establish a FRSA retaliation claim, an employee must show "1) he [or she] engaged in protected activity, 2) the employer knew he [or she] engaged in said activity, 3) the employee suffered an adverse employment action, and 4) the protected activity was a contributing factor in the adverse action." *Grantham v. CSX Transportation, Inc.*, 2022 WL 677575, at *3 (S.D. Ga. Mar. 7, 2022); *see Hitt v. CSX Transportation, Inc.*, 2023 WL 3398538, at *6 (N.D. Ala. May 11, 2023) (same); *Singleton v. Norfolk S. Ry. Co.*, 2023 WL 1768115, at *4 (N.D. Ga. Feb. 3, 2023) (same). "Once the employee makes this prima facie showing, the burden shifts to the employer to demonstrate by clear and convincing evidence that it would have taken the same unfavorable personnel action absent the protected activity." *Singleton*, 2023 WL 1768115, at *4. "The employee cannot obtain relief if the employer succeeds in establishing th[is] same-action defense." *Yowell v. Admin. Rev. Bd., United States Dep't of Lab.*, 993 F.3d 418, 422 (5th Cir. 2021).

Defendants' motion focuses on the fourth element of Plaintiffs' prima facie case (the "contributing factor" requirement) and Defendants'

same-action defense.  The latter is straightforward.  The former is trickier.  It requires an employee to show his or her protected activity was "a contributing factor" in the adverse action about which he or she complains.  Defendants say this requires proof of retaliatory *animus*, meaning "plaintiff must prove that the employer's adverse action was motivated [at least in part] by a desire to retaliate against the plaintiff for engaging in protected activity."  *Branum v. Norfolk S. Ry. Co.*, 2022 WL 20272913, at *12 (N.D. Ga. Sept. 30, 2022); (*see* Dkt. 48-1 at 25–29). Plaintiffs disagree, claiming they need only show "the protected activity was one factor . . . that caused the adverse action."  *Branum*, 2022 WL 20272913, at *11; (*see* Dkt. 59 at 9–11).

"[T]he Eleventh Circuit has not weighed in on this debate" (or on FRSA claims more generally).  *Branum*, 2022 WL 20272913, at *10, *12.  The authority from other courts is also mixed.  At least three circuits have adopted Defendants' position.  *See Tompkins v. Metro-N. Commuter R.R. Co.*, 983 F.3d 74, 82 (2d Cir. 2020); *Armstrong v. BNSF Ry. Co.*, 880 F.3d 377, 381–82 (7th Cir. 2018); *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 791 (8th Cir. 2014).  District courts in our circuit have sided with Defendants as well.  *See, e.g.*, *Boatright v. CSX Transportation, Inc.*,

2023 WL 4548280, at *7 (S.D. Ga. July 14, 2023) ("[A]n employee must prove retaliatory animus to satisfy the 'contributing factor' aspect of FRSA's anti-retaliation statute."); *Singleton*, 2023 WL 1768115, at *4 ("[P]roof of retaliatory animus is needed to succeed on an FRSA claim."). But two circuits have taken the contrary view. *See Frost v. BNSF Ry. Co.*, 914 F.3d 1189, 1195–96 (9th Cir. 2019); *Araujo v. New Jersey Transit Rail Operations, Inc.*, 708 F.3d 152, 158–59 (3d Cir. 2013).

The Court declines to take a position on this issue today because doing so would not affect the outcome of Defendants' motion. That is, whether or not retaliatory animus is required, the Court would still reach the same conclusions expressed in this Order. The Court is also reluctant to stake out a position on the current record because the parties' briefing only scratches the surface of the issues involved. The question is a thorny one—based on the Court's preliminary review, anyway—and the parties should be prepared to address it in depth if it comes up again, for example, in crafting necessary jury instructions.

### C.   Plaintiffs' Claims

The Court next considers Plaintiffs' claims. They are hard to pin down. The complaint alleges several protected activities, including that

(1) Plaintiffs bad ordered two railcars on August 15, 2018; (2) Plaintiffs "refus[ed] to not violate federal safety statutes and rules relating to car inspections and bad ordering"; (3) Plaintiffs complained about Defendant Ware to Defendant Weatherman on October 1, 2018; (4) Plaintiffs repeated their complaints to Defendant Barnett during her investigation; and (5) Plaintiffs made "multiple reports of safety hazards, statutory violations, and improper retaliation." (Dkt. 1 ¶¶ 9, 14, 16, 27.)  The complaint also alleges several adverse employment actions, including that (1) "[o]n November 14, 2018, Ware accused Plaintiffs of a blue flag violation and removed Plaintiffs from service"; (2) "[o]n November 15, 2018, Plaintiffs received [a] letter notifying them of [an upcoming disciplinary] conference" to discuss Plaintiffs' alleged blue flag violation; (3) Defendant Ware ultimately "subject[ed]" Plaintiffs to the conference; (4) Defendant Ware "discipline[d]" Plaintiffs for the blue flag incident; and (5) on November 19, 2018, Defendant Weatherman told Plaintiffs "the NS ethics investigation was complete" and "Ware had not committed any offenses." (Dkt. 1 ¶¶ 18–19, 22, 24.)  Many of these activities and actions appear to overlap.  And the complaint never says which action was retaliation for which activity.  (*See, e.g.*, Dkt. 1 ¶ 35.)

Plaintiffs' summary judgment brief is not a model of clarity either but, having reviewed it carefully and repeatedly, it does appear to narrow Plaintiffs' theories.  It frames Plaintiffs' alleged protected activities as (1) bad ordering the two railcars on August 15, 2018; and (2) complaining about Defendant Ware to Defendant Weatherman on October 1, 2018. (*See* Dkt. 59 at 2–3, 6–8.) It claims that, in retaliation for the first protected activity (the August 15 bad orders), Defendant Ware "harassed" Plaintiffs by giving them "demeaning and nitpicking work," assigning them "more work than usual," and subjecting them to "other such harassment."   (Dkt. 59 at 2–3.)   Piecing things together, this harassment specifically involved (1) threatening to "write up" Plaintiff Fowler on August 16, 2018 "for failure to follow instructions" if he bad ordered the two cars he had bad ordered a day earlier; and (2) directing Plaintiffs to repair the three Track #1 cars on August 15, 2018.  (Dkts. 48-4 at 44; 59 at 2–3, 14.)  Plaintiffs' brief also claims that, in retaliation for the second protected activity (the October 1 hotline complaint), Defendant Ware disciplined Plaintiffs for allegedly violating the company's blue flag rules.  (*See* Dkt. 59 at 9–17.)

This Order focuses on the claims in Plaintiffs' brief (as the Court reads them).  To the extent Plaintiffs purport to assert other claims, those claims fail either because Plaintiffs have abandoned them by not sufficiently raising/pressing them or because no reasonable jury could conclude they have merit.  *See Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[T]he onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."); *Whitten v. Soc. Sec. Admin., Comm'r*, 778 F. App'x 791, 793 (11th Cir. 2019) ("For an issue to be adequately raised in [a] brief, it must be plainly and prominently raised and must be supported by arguments and citations to the record and to relevant authority.").

## D.    Plaintiffs' First Claim: Write-Up Threat[2]

Plaintiff Fowler first claims Defendant Ware threatened to write him up on August 16, 2018 (adverse action) because he had bad ordered

---

[2] The parties' summary judgment papers are unclear and imprecise. They rarely spell out with specificity how the parties' assertions tie into Plaintiffs' theories or into the legal elements of a FRSA claim.  They also talk past one another at several points (which is probably because neither side really knows what the other is trying to say).  The Court has done its best to sort through the mess.  To the extent the Court has failed to

two railcars a day earlier (protected activity). (*See* Dkts. 59 at 2–3, 6–8, 14; 48-4 at 44.) Defendant says this claim fails as a matter of law because Plaintiff's bad orders were not a "contributing factor" in Defendant's threat. (*See* Dkt. 48-1 at 3, 25–31.) The Court disagrees (even assuming the contributing-factor element requires animus) as there is evidence from which a jury could reach this conclusion.

First, Defendant's threat came just one day after Plaintiff bad ordered the cars. This means there was "close temporal proximity" between the protected activity (the August 15 bad orders) and the adverse action (the August 16 threat). *Branum*, 2022 WL 20272913, at *13; *see Head v. Norfolk S. Ry. Co.*, 2017 WL 4030580, at *17 (N.D. Ala. Sept. 13, 2017) (one-day gap between protected activity and adverse action suggests the former contributed to the latter).

Second, Defendant Ware had a weekly "bad order goal or expectation"; train delays and bad orders affected his performance evaluations; and his supervisor praised him for "lowering the bad order count" and "pushing to meet the safety, bad order, and productivity

---

divine the parties' intended arguments or claims in any respect, the responsibility for that failure lies with the parties alone.

goals." (Dkts. 56 at 42–47; 60 ¶¶ 1–9.) This gave Defendant a motive to retaliate against employees for bad ordering railcars. *See Branum*, 2022 WL 20272913, at *13 (supervisors had a "motive[] to retaliate" against employees who adversely impacted the "metrics on which [the supervisors] are evaluated").

Third, according to Plaintiff, Defendant Ware told employees "there's not going to be any more bad ordering done because we reached the bad order quota." (Dkt. 50 at 24.) Mr. Daniels testified Defendant Ware "made it seem like [bad ordering] was a definite problem," which "intimidat[ed]" employees and deterred them from bad ordering cars. (Dkt. 59-5 at 5.) There is also substantial evidence that Defendant removed bad order tags from "several" railcars in violation of company policy. (*See* Dkt. 48-4 at 42–43; 55 at 39; 56 at 72; 59-5 at 6.) All of this suggests Defendant harbored "antagonism or hostility toward [Plaintiff's] protected activity" (bad ordering), which underscores his motive to punish that activity. *Branum*, 2022 WL 20272913, at *13.

Finally, Defendant Ware told Plaintiff not to bad order the cars on August 16—and that he would write Plaintiff up if Plaintiff did so— because the cars "were not defective." (Dkt. 48-4 at 44; *see also* Dkt. 48-

5 ¶¶ 5–6 (taking the same position in this litigation).)  But, according to Plaintiffs, Defendant Ware also suggested the cars *were* "defective," presented "a safety issue," and "could" malfunction.  Thus, a jury could find Defendant's "explanation" for threatening Plaintiff was "fals[e]" and "pretext[ual]."  *Branum*, 2022 WL 20272913, at *13 (jury may infer retaliatory intent from "the falsity of an employer's explanation for the adverse action," "indications of pretext," and "an employer's shifting explanations for its actions").

Given the totality of this evidence and the record more broadly, Plaintiff Fowler has adequately shown his August 15 bad orders were "a contributing factor" in Defendant Ware's decision to threaten him with a write-up on August 16.  Plaintiff's write-up claim can thus proceed.

### E.   Plaintiffs' Second Claim:  Track #1 Train Repairs

Plaintiffs next claim Defendant Ware assigned them to repair three cars on Shed Track #1 (adverse action) in retaliation for Plaintiffs' August 15 bad orders (protected activity).  (Dkts. 48-4 at 44; 59 at 2–3.) Defendant never specifically addresses this claim in the argument section of his brief.  (*See* Dkt. 48-1 at 25–37; *see also* Dkt. 61.)  So he has not shown he is entitled to summary judgment on the claim.

18

Even if Defendant had addressed the claim and argued it fails under the "contributing factor" element—as he did with Plaintiffs' other claims—the Court would reject that argument at this stage of the litigation. Defendant Ware instructed Plaintiffs to repair the Track #1 cars just hours—maybe even minutes—after Plaintiffs bad ordered the two cars with the faulty swing gates. (Dkts. 50 at 41; 50-4 at 3–5.) This means there was near-immediate temporal proximity between the protected activity (the bad orders) and the adverse action (the Track #1 instruction). Defendant had a strong motive to punish Plaintiffs for bad ordering the cars (for the reasons explained above). First shift employees were "typically responsible for repairing railcars in Shed Track #1," were "originally . . . supposed to take care of the[] cars," had "two or three times [more] manpower" than Plaintiffs' second shift team (who were "doing other things" at the time), had "the time to do th[e] work," did not understand why Defendant Ware reassigned the work to Plaintiffs, and viewed the reassignment as a "joke." (Dkts. 48-4 at 44; 50 at 18–19.) Defendant Ware also *explicitly* linked his Track #1 instruction to Plaintiffs' bad orders. He said Plaintiffs "were being assigned the extra

19

work because he needed to get his bad order count down *due to them . . . having just bad order[ed] railcars.*"  (Dkt. 48-4 at 44 (emphasis added).)

A jury could easily find this evidence satisfies the less demanding version of the "contributing factor" test (the one requiring mere causation).  The evidence might even satisfy the heightened test (the one requiring animus).  That is a closer call, of course.  But, given Defendant's failure to explain *why* the heightened test applies at all (he just describes the test and says it applies), the Court would not grant him summary judgment based on an argument whose success depends on that test.

One final thing to flag here.  A defendant can always avoid FRSA liability by showing he "would have taken the same unfavorable personnel action absent the protected activity."  *Singleton*, 2023 WL 1768115, at *4.  This is known as the same-action defense.  Defendant does not specifically raise that defense in connection with Plaintiffs' Track #1 claim.  But, if he had, the Court may well have upheld it. Plaintiff Fowler testified that, *before* he bad ordered the cars during the second shift of the day on August 15, Defendant Ware instructed first shift employees not to repair the three Track #1 cars because "he was going to make [Plaintiffs] do it."  (Dkt. 50 at 18.)  Plaintiff also

testified a first shift employee told him about this development before Plaintiff received the assignment from Defendant Ware. (Dkt. 50 at 18.) That, at least, is how the Court reads Plaintiff's testimony. If the Court's reading is right, Defendant committed to take the adverse action at issue before Plaintiffs' protected activity even occurred—in which case Defendant "would have taken the action regardless of [the] protectivity activity" and the same-action defense applies. *Blackorby v. BNSF Ry. Co.*, 936 F.3d 733, 736 (8th Cir. 2019).

Defendant raises none of these issues. And the Court will not do it for him. On the current record, Plaintiffs' Track #1 claim may proceed.[3]

---

[3] In their summary judgment brief, Plaintiffs claim Defendant Ware gave them "demeaning and nitpicking work" in retaliation for the August 15 bad orders. (Dkt. 59 at 3.) Plaintiffs cite no specific work assignment in support of this claim. Nor is any such assignment apparent from the record. In their October 1 hotline complaint, Plaintiffs did say Defendant Ware instructed them on September 19 to "take 15 cases of water to the Engine Terminal" and to "pick up the trash bags and water bottles [other] employees had thrown on the ground around the Engine Terminal." (Dkt. 48-3 at 7.) But Plaintiffs did not link this assignment to their August 15 bad orders. (*See* Dkt. 48-3 at 6–7 (linking the assignment to another incident).) And the record does not suggest the assignment was retaliatory. (*See, e.g.*, Dkts. 48-4 at 45 (Engine Terminal had "no water" at the time); 50-4 at 10 (Defendant Ware instructed another employee to pick up trash and water bottles around the same time); 58 ¶ 34 ("employees on every shift . . . participate in transporting water [and] cleaning up trash," and other employees complained about the same work).)

### F.     Plaintiffs' Third Claim:  Blue Flag Discipline

Plaintiffs' final claim is that Defendant Ware disciplined them for allegedly violating the company's blue flag rules on November 14, 2018 (adverse action), in retaliation for Plaintiffs' hotline complaint to Defendant Weatherman on October 1, 2018 (protected activity). Defendant Ware says this claim fails because Plaintiffs' hotline complaint did not factor into his disciplinary decision (contributing-factor element) and, even if it did, he would have disciplined Plaintiffs regardless of their complaint (same-action defense).  A reasonable jury could reject these arguments and find for Plaintiffs on both issues (even assuming the contributing-factor element requires animus).

Plaintiffs testified (1) Defendant Ware told carmen they could repair a train without displaying blue signals if blue signals were unavailable and carmen called the train operator to establish "movement protection"; (2) Plaintiffs and other carmen followed this instruction for several months; (3) Defendant Ware knew carmen were following this instruction and oversaw—without objection—at least one incident in which Plaintiff Taylor used movement protection in lieu of blue signals; (4) Defendant  Ware  never  disciplined  anyone  for  following  his

instruction; (5) Plaintiffs followed Defendant Ware's instruction on November 14, 2018 because blue signals were unavailable and Plaintiffs called the train operator to arrange for "movement protection"; and (6) Defendant Ware punished Plaintiffs for essentially following his instruction on November 14, 2018.  (Dkts. 50 at 26–28, 37–38; 51 at 16–18; *see also* Dkt. 59-5 at 10–11 (Mr. Daniels testifying "other carmen had done the exact same thing" and never got "in trouble").)  Plaintiff Fowler also testified that, "a day or two" after Plaintiffs' punishment, Defendant Ware boasted to another employee: "[T]hey tried to get me and we got them. . . .  [T]hey used the movement protection but we got them on the blue flag protection . . . and [Defendant Barnett] was behind all of it."  (Dkt. 50 at 42–44.)

This evidence contains "indications of pretext," involves an "inconsistent application of [Defendant's] policies," and suggests "a change in [Defendant's] attitude toward [Plaintiffs] after [they] engage[d] in protected activity," all of which supports an inference of retaliation.  *Branum*, 2022 WL 20272913, at *13.  Defendant Ware's inflammatory comment—that "they tried to get me and we got them"—also suggests subjective retaliatory animus.  A jury could accept this

evidence, reject Defendants' conflicting evidence, and conclude Defendant Ware disciplined Plaintiffs not because they failed to display blue signals but because they lodged a litany of formal complaints against Defendant just six weeks earlier.  A jury could also conclude from the same evidence that Defendant Ware would not have disciplined Plaintiffs if they hadn't complained about him. *See id.* at *14 ("a jury could use the same evidence noted in this Court's 'contributing factor' analysis" to find the same-action defense did not apply).  Plaintiffs' blue-flag claim can thus proceed.

### G.   Punitive Damages

Defendants' summary judgment motion includes a generalized, one-sentence request for summary judgment on Plaintiffs' claim for punitive damages.  (*See* Dkt. 48-1 at 37 ("[S]ince there is no evidence of reckless or callous disregard for the Plaintiffs' rights, or intentional violations of federal law, summary judgment should be entered on the claim for punitive damages.").)   The Court denies this request as conclusory.  The request also fails on the merits because a jury could find "Defendant disciplined [Plaintiffs] to punish [them] for reporting" safety

24

concerns and FRSA violations.  *Boatright*, 2023 WL 4548280, at *19. That is sufficient to trigger punitive damages.  *Id.*

## IV.  Conclusion

Defendants' Motion to Strike Statement Excerpts of Steven Daniels (Dkt. 63) is **DENIED**.  Defendants' Motion for Summary Judgment (Dkt. 48) is **GRANTED IN PART** and **DENIED IN PART**.  It is denied to the extent it seeks summary judgment on Plaintiffs' claims that (1) Defendant Ware threatened to write up Plaintiff Fowler on August 16, 2018 in retaliation for Plaintiff's bad orders a day earlier; (2) Defendant Ware instructed Plaintiffs on August 15, 2018 to repair three railcars on Shed Track #1 in retaliation for Plaintiffs' bad orders earlier that day; and (3) Defendant Ware disciplined Plaintiffs in mid-November 2018 in retaliation for Plaintiffs' October 2018 hotline complaint to Defendant Weatherman.  These claims may proceed against Defendants Ware and Norfolk Southern.  Plaintiffs' request for punitive damages may also proceed.  Defendants' motion for summary judgment is otherwise granted.  This means, among other things, that Plaintiffs'

claims against Defendants Barnett and Weatherman are no longer a part of this case.[4]

The Court **ORDERS** this case to mediation. The parties may retain a private mediator at their own expense. Or they may ask the Court to appoint a magistrate judge to conduct the mediation. The parties are not required to pay for mediation by a magistrate judge.

The parties shall advise the Court of their mediation preference within the next 30 days. If the parties elect to retain their own mediator,

---

[4] At this stage, Defendants have not shown Plaintiffs' claims against Defendant Norfolk Southern should be treated differently than Plaintiffs' claims against Defendant Ware. So, to the extent the claims against Defendant Ware can proceed, they can also proceed against Norfolk Southern. Plaintiffs do not contend—and certainly have not shown—Defendants Barnett and Weatherman are liable for Defendant Ware's retaliatory "harassment" for the August 15 bad orders. Nor do they dispute that Defendant Weatherman "had no role in the decision to discipline [Plaintiffs] for the November 14, 2018 Blue Flag violation." (Dkt. 58 ¶ 68.) To the extent Plaintiffs claim Defendant Barnett is liable for Plaintiffs' blue flag discipline or any other retaliatory act, they have not shown a jury could find in their favor. They have not raised a cat's paw theory and Defendant Ware's alleged comment that Defendant Barnett was "behind all of it"—without more—is too vague and conclusory to create a triable issue. That is so given the dearth of other evidence against Defendant Barnett and Defendant Ware's testimony that (1) he "did not speak with Dianne Barnett about the November 14, 2018 Blue Flag violation," (2) "Barnett was on vacation that week," and (3) "for that reason [Defendant Ware] discussed the case with [another supervisor] who was the designated contact for such matters in Barnett's absence." (Dkt. 48-5 at 6; *see* Dkt. 58 ¶ 54.)

they shall identify the mediator no later than 45 days after the entry date of this Order.  Mediation must occur within 90 days after the entry date of this Order.  The parties must have present at the mediation a person with authority to settle this litigation.  The parties shall file a report on the outcome of their mediation no later than 7 days after the mediation concludes.

The Court **STAYS** this case pending mediation.  The Court **DIRECTS** the Clerk to **ADMINISTRATIVELY CLOSE** this case during the period of the stay.

**SO ORDERED** this 22nd day of September, 2023.


_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE